FILED

UNITED STATES DISTRICT COURT 2022 MAR -2 PM 1:40
MIDDLE DISTRICT OF FLORIDA CLERK, US DISTRICT COURT
JACKSONVILLE DIVISION    MIDDLE DISTRICT OF FL
                         JACKSONVILLE FLORIDA

UNITED STATES OF AMERICA

v.                                  Case No.   3:22-cr-23-MMH-btt
                                    BJD - PDB
                                    Ct. 1: 18 U.S.C. § 371
AARON ZAHN and                      Ct. 2: 18 U.S.C. § 1343
RYAN WANNEMACHER

## INDICTMENT

The Grand Jury charges:

## COUNT ONE
### (Conspiracy)

### A. Introduction

At times material to this Indictment:

Defendants and Individuals

1.     Defendant AARON ZAHN was a resident of Jacksonville

Beach, Florida. ZAHN was the Chief Executive Officer (CEO) of the

Jacksonville Electric Authority (JEA), the public utility owned by the City of

Jacksonville (COJ), from on or about November 27, 2018 to on or about

January 28, 2020, and the interim CEO from on or about April 17, 2018 to on

or about November 27, 2018. Before being hired as CEO of JEA, ZAHN had

no experience in a major public utility. As the CEO of a publicly owned

utility, ZAHN owed a fiduciary duty to JEA, the JEA Board, and the City of

Jacksonville. ZAHN was an agent of JEA, within the meaning of 18 U.S.C. § 666(d)(1).

2.      Defendant RYAN WANNEMACHER was a resident of Jacksonville, Florida. WANNEMACHER was the Director of Financial Planning and Analysis for JEA from in or around April 2015 to in or around April 2018, and the Chief Financial Officer (CFO) from in or around April 2018 to on or about December 27, 2019. WANNEMACHER reported to ZAHN during ZAHN's tenure as interim CEO and permanent CEO. As the CFO of a publicly owned utility, WANNEMACHER owed a fiduciary duty to JEA, the JEA Board, and the City of Jacksonville. WANNEMACHER was an agent of JEA, within the meaning of 18 U.S.C. § 666(d)(1).

3.      Person A was a resident of Jacksonville Beach, Florida. Person A was the President and Chief Operating Officer (COO) of JEA from in or around April 2018 to in or around December 2019, and the interim CEO of JEA from in or around December 2019 to in or around April 2020. Person A reported to ZAHN during ZAHN's tenure as interim CEO and permanent CEO. As the COO and interim CEO of a publicly owned utility, Person A owed a fiduciary duty to JEA, the JEA Board, and the City of Jacksonville. Person A was an agent of JEA, within the meaning of 18 U.S.C. § 666(d)(1).

4.     Person B was a resident of Jacksonville, Florida and worked for

JEA as the Chief Administrative Officer from in or around April 2019 to on or

about July 14, 2020. Person B reported to ZAHN during ZAHN's tenure as

permanent CEO. As the Chief Administrative Officer, Person B owed a

fiduciary duty to JEA, the JEA Board, and the City of Jacksonville. Person B

was an agent of JEA, within the meaning of 18 U.S.C. § 666(d)(1).

Jacksonville Electric Authority (JEA)

5.     JEA was the municipal utility serving electric, water, and sewer

customers in the Jacksonville, Florida area. JEA was a not-for-profit,

community-owned utility and independent agency of the City of Jacksonville

(COJ). JEA was governed by a seven-member board appointed by the Mayor

and confirmed by the City Council. The JEA Board had the authority to hire

and remove the permanent CEO. JEA made an annual contribution to the

COJ General Fund, which generally exceeded $100 million.

Office of General Counsel

6.     Led by a General Counsel, the Office of General Counsel was

the law firm for the COJ. The Office of General Counsel provided

comprehensive legal services to all entities of the consolidated COJ

government, including JEA. At times, this included authorizing independent

authorities, such as JEA, to hire outside law firms to advise and consult on certain legal issues.

### The Council Auditor's Office

7.      The Council Auditor was an agency of the COJ comprised of independent Certified Public Accountants that reported to the Jacksonville City Council. The Council Auditor's Office provided independent analysis and oversight of COJ finances and budgets, and financial matters that impact the COJ.

### Related Entities, Companies, and Law Firms

8.      Company A was a consulting and strategic planning firm in Washington, D.C., which ZAHN caused to be hired in or around 2018 to assist JEA with its strategic planning.

9.      Company B was a compensation consulting firm in Atlanta, Georgia, which ZAHN began consulting with in or around late 2018, and later caused to be hired to assess JEA's base compensation for employees, a short-term incentive compensation plan, and a long-term incentive (LTI) compensation plan.

10.      Law Firm A was an international law firm with an office in New York City, New York, which served as JEA's bond counsel and advised JEA executives as to a version of what became known as the Long-Term Incentive

(LTI) Performance Unit Plan (PUP). In May 2019 and again in early July 2019, Law Firm A refused to prepare LTI PUP documents. After early July 2019, Law Firm A performed no additional work on the LTI PUP plan.

11.     The Office of General Counsel hired Law Firm B (with offices in Jacksonville, Florida) and Law Firm C (with offices in New York City, New York) to advise on various aspects of the anticipated Invitation to Negotiate (ITN).

### The Invitation to Negotiate (ITN)

12.     The ITN was a statutorily required procurement process under Florida law that applied to public utilities such as JEA. The ITN required a written solicitation for competitive sealed replies to select one or more vendors or bidders with which to commence negotiations for the procurement of commodities or contractual services. An ITN was for complex, sophisticated procurements or transactions involving public or municipal assets wherein the desired result is to receive the best value based on objective factors that include price and quality. During the ITN process, the government entity would rank responsive replies against the evaluation criteria set forth in the ITN. The government entity would then select one or more respondents to negotiate with.

13.     The JEA Board formally authorized an ITN via Resolution 2019-09 during the July 23, 2019 JEA Board Meeting. After the Board's authorization, JEA Executives were formally authorized to invite bidders, including investor-owned utilities (IOU), private equity firms, other private entities interested in entering the utility business, and public-private partnerships, to bid on JEA's assets and liabilities.

14.     A successful ITN bidder was subject to the following before consummating a transaction to purchase, privatize, or otherwise acquire JEA assets and liabilities: (1) the JEA Board approving the transaction; (2) the City Council voting in favor of the transaction; and (3) a referendum vote in which voters in Jacksonville, Florida voted in favor of the transaction.

The Long-Term Incentive (LTI) Performance Unit Plan (PUP)

15.     The PUP was a purported LTI compensation plan for JEA employees that ZAHN and WANNEMACHER created and designed, which would have paid hundreds of millions of dollars in bonuses, primarily to the top JEA executives including themselves, upon a sale of JEA's assets and liabilities.

16.     A PUP unit purportedly would have been available for purchase by every JEA employee for the price of $10. The PUP called for 100,000 PUP units, with the potential of limiting the initial PUP units to 30,000. The

6

overwhelming amount of the PUP units would have been available to JEA executives, including ZAHN and WANNEMACHER.

17.     The PUP was to be funded in two ways: (1) based on a calculation of JEA's performance as a municipal utility over a three-year period; or (2) when a recapitalization event (including a sale of JEA) occurred, meaning payouts would have been funded by net proceeds to the COJ from the sale of JEA.

## B. **The Conspiracy**

18.     Between at least in or around March 2019 through in or around November 2019, in the Middle District of Florida, and elsewhere, the defendants,

AARON ZAHN and
RYAN WANNEMACHER,

did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.     to embezzle, steal, obtain by fraud, and otherwise without authority knowingly convert to their own use and the use of others, and intentionally misapply property with a value of at least $5,000, owned by and under the care, custody, and control of the City of Jacksonville and its agency

7

JEA, a city government and municipal utility that both received benefits in

excess of $10,000 under a Federal program in a relevant one-year period, in

violation of 18 U.S.C. § 666(a)(1)(A); and

    b.     wire fraud, in violation of 18 U.S.C. § 1343.

### C. Manner and Means of the Conspiracy

    19.    The manner and means by which the conspirators sought to

accomplish the objects and purposes of the conspiracy included, among other

things:

    a.     It was part of the conspiracy that ZAHN would and did begin

planning for an ITN and to effectuate a sale of JEA in or around 2018 before

he was named the permanent CEO of JEA.

    b.     It was further part of the conspiracy that ZAHN and

WANNEMACHER would and did breach their fiduciary duty owed to JEA,

the JEA Board, and the COJ by failing to disclose material information and

making, and causing to be made, false and fraudulent representations to the

JEA Board and others about material facts concerning the development of a

purported Long-Term Incentive (LTI) Performance Unit Plan (PUP) and

formula for the PUP that would be linked to the ITN, knowing that if JEA

was sold, the PUP would pay ZAHN, WANNEMACHER, and others

exorbitant sums of money from funds that would have otherwise gone to the

COJ General Fund once JEA was sold.

      c.     It was further part of the conspiracy that from at least in or around January 2019 through in or around June 2019, ZAHN would and did make presentations about a purported LTI plan to the JEA Board Compensation Committee (a Committee of three JEA Board Members), and met individually with JEA Board Members regarding the LTI PUP, without ever disclosing the substantial impact and effect on PUP payouts if JEA was privatized or sold.

      d.     It was further part of the conspiracy that ZAHN and WANNEMACHER would and did press Law Firm A to render a legal opinion that an iteration of the LTI PUP involving an issuance of JEA bonds was legal under Florida law; disengage from Law Firm A when Law Firm A rendered a contrary written legal opinion in May 2019 and another verbal opinion in early July 2019 that the LTI PUP was not legal under Florida law; and then withholding Law Firm A's legal opinion from Law Firm B and Law Firm C.

      e.     It was further part of the conspiracy that WANNEMACHER would and did prepare and save electronic worksheets, accessible to ZAHN – titled "Performance Unit Scratch Sheet.xlsx" and "Notes.xlsx" – which calculated that an increase of $4 billion to JEA's Book Value would

substantially raise the value of a PUP unit from $0 to $11,500, and result in a total PUP payout of $345 million to those holding PUP units.

      f.    It was further part of the conspiracy that ZAHN and WANNEMACHER would not and did not disclose or reveal the substance of either worksheet – "Performance Unit Scratch Sheet.xlsx" or "Notes.xlsx" – to any JEA Board member, City Council member, the Council Auditor's Office, or lawyer involved in the ITN.

      g.    It was further part of the conspiracy that ZAHN would and did cause Company A to be hired and would not and did not disclose to Company A the true intent of the LTI PUP or any of its effects in enriching JEA executives, including ZAHN and WANNEMACHER, if JEA was sold or privatized.

      h.    It was further part of the conspiracy that ZAHN, WANNEMACHER, Person A, and Person B would and did lead JEA Senior Leadership Team (SLT) Members, along with Company A, in crafting a bleak baseline scenario for JEA's future performance as a municipal utility. Company A worked with JEA executives to create Scenario One (known as the Status Quo) as a prediction of JEA's performance in the electric and water business to calendar year 2030 if JEA did nothing to react to market forces or otherwise adjust its business model during that timeframe. Company A and

JEA executives did not design Scenario One as a realistic option for the JEA Board to select. Scenario One was delivered during the May 28, 2019 JEA Board Meeting.

   i.   It was further part of the conspiracy that ZAHN and WANNEMACHER would and did craft Scenario Two (known as the Traditional Utility Response) to falsely and fraudulently project that JEA was in a "death spiral" and that the only available adjustments in JEA's business included terminating up to 29% of the JEA workforce, significantly raising customer rates, reducing capital expenditures, and significantly reducing the annual contribution to the COJ General Fund, to year 2030. ZAHN, WANNEMACHER, and certain others would and did deliver Scenario Two during the June 25, 2019 Board Meeting to falsely and fraudulently convince the JEA Board that a third scenario, Scenario Three (the ITN and Non-Traditional Utility Response), was necessary to avoid JEA's certain demise.

   j.   It was further part of the conspiracy that, even before a scheduled July 2019 JEA Board Meeting, ZAHN would and did begin meeting with and informing at least one potential purchaser of JEA that JEA would be exploring a sale or privatization.

   k.   It was further part of the conspiracy that ZAHN,

11

WANNEMACHER, Person A, and Person B would and did present Scenario Three during the July 23, 2019 Board Meeting as the only feasible option for the JEA Board to select, which resulted in the JEA Board approving Resolution 2019-09 which authorized the ITN and Non-Traditional Utility Response. WANNEMACHER labeled Scenario Three as "a once in a generation opportunity" and further stated that "no one will be left behind."

l.      It was further part of the conspiracy that, during the July 2019 JEA Board Meeting, ZAHN and WANNEMACHER would and did falsely and fraudulently present to the JEA Board and others altered slides from a draft PowerPoint of Company B that bore Company B's logo to fraudulently represent that Company B had created and approved of the LTI PUP, when such was not the case.

m.      It was further part of the conspiracy that, during the July 2019 Board Meeting, ZAHN would and did persuade and coerce the JEA Board to approve Resolution 2019-06, which authorized JEA to terminate 574 JEA employees (approximately 29% of its workforce) over a seven-month period unless Scenario Three was adopted.

n.      It was further part of the conspiracy that, during the July 2019 JEA Board Meeting, ZAHN and WANNEMACHER would not and did not present any financial calculations or illustrative examples that would reveal

the substantial payouts required under the proposed LTI PUP to ZAHN, WANNEMACHER, and certain others and the corresponding detriment to the COJ General Fund if JEA was sold.

o.      It was further part of the conspiracy that ZAHN and WANNEMACHER would and did purposely craft the language of Resolution 2019-10 so that the LTI PUP would be prospectively approved by the JEA Board and require no further consideration by the JEA Board.

p.      It was further part of the conspiracy that ZAHN and WANNEMACHER would and did craft the language of the LTI PUP formula such that if JEA was sold for $3 billion or more in net profits, the PUP units would result in exorbitant payouts of tens of millions of dollars to ZAHN, WANNEMACHER, and certain others to the detriment of the COJ General Fund.

q.      It was further part of the conspiracy that ZAHN and WANNEMACHER would and did request that Law Firm C prepare PUP documents to facilitate JEA employees' enrollment in the PUP, using an LTI PUP share formula provided by ZAHN and WANNEMACHER.

r.      It was further part of the conspiracy that ZAHN and WANNEMACHER would and did falsely and fraudulently represent, and cause to be represented, to the JEA Board and others that any potential

payouts under the LTI PUP would be modest, while having previously calculated and recognizing that a sale of JEA, as contemplated by Scenario Three (the ITN), would substantially raise the PUP payouts to ZAHN, WANNEMACHER, and certain others by tens of millions of dollars to the detriment of the COJ General Fund.

s.      It was further part of the conspiracy that ZAHN would and did design and establish minimum requirements for a successful ITN bid that would result in a net financial gain to the COJ and thereby ensure that the LTI PUP made substantial payouts to ZAHN, WANNEMACHER, and certain others holding many PUP units if JEA was sold.

t.      It was further part of the conspiracy that ZAHN would and did design and establish other minimum requirements for a successful ITN bid that would likely press and/or motivate Members of the City Council and voters in the COJ to approve ZAHN's plan to sell JEA, including a net financial gain that could: (i) fund the then unfunded JEA pension liability (which the City Council passed in Ordinance 2019-566-E); (ii) provide funding for discretionary capital expenditures to City Council Members to be used in their Districts and at large; and (iii) pay a rebate up to approximately $1,400 to each JEA customer, depending upon the number of JEA services received (electric, water, wastewater, and irrigation).

u.      It was further part of the conspiracy that ZAHN and WANNEMACHER would and did conceal from the JEA Board and others that the proposed LTI PUP would overwhelmingly allocate the potential 100,000 LTI PUP units to ZAHN, WANNEMACHER, and certain others.

v.      It was further part of the conspiracy that ZAHN would and did exclude other Members of the SLT from the process of crafting or creating the LTI PUP and conceal from other SLT members the substantial financial impact on the LTI PUP units upon a sale of JEA.

w.      It was further part of the conspiracy that ZAHN and WANNEMACHER would and did intentionally conceal information and make material misrepresentations and omissions to the General Counsel's Office, the Council Auditor's Office, outside consultants, and law firms, among others, as to the nature, effect, and calculations of the LTI PUP upon a sale of JEA.

x.      It was further part of the conspiracy that the conspirators would and did conceal, misrepresent, and hide the purpose of acts performed in furtherance of the conspiracy.

### b.  Overt Acts

20.     In furtherance of the conspiracy and to effect its unlawful objects,
the conspirators committed and caused to be committed the following overt
acts in the Middle District of Florida and elsewhere:

a.     On or about March 18, 2019, WANNEMACHER prepared an
Excel spreadsheet titled "Performance Unit Scratch Sheet.xlsx" using JEA
financial statements from 2016 through 2018 to perform an example LTI
calculation in which WANNEMACHER added $4 billion to JEA's Book
Value for 2018.

b.     On or about June 18, 2019, ZAHN presented the LTI PUP to the
JEA Board Compensation Committee Members and told them that the plan
was a self-funded plan that would provide payouts over a three-year cycle in
the range of approximately $3.4 million total for all participating JEA
employees, while omitting any discussion of how privatization of JEA would
substantially increase LTI PUP payouts.

c.     On or about June 18, 2019, ZAHN presented the LTI PUP to the
JEA Board Compensation Committee Members via a PowerPoint
presentation containing the insignia of Company B, when Company B had not
authorized ZAHN to do so, nor had Company B designed, created, or
approved the LTI PUP presentation.

16

d.      On or about June 18, 2019, ZAHN and WANNEMACHER falsely and fraudulently told the JEA Board Compensation Committee and showed a PowerPoint slide stating that the core function of the LTI PUP was to bring JEA employees to the 50th percentile in the market for pay of all utilities (whether municipal or IOUs).

e.      On or about June 18, 2019, ZAHN falsely and fraudulently described the LTI PUP to the JEA Board Compensation Committee as a three-year plan and that payouts under the LTI PUP would be modest, when in fact LTI PUP payouts to select executives would have been exorbitant if JEA was sold.

f.      During the June 25, 2019 Board Meeting, WANNEMACHER reviewed Scenario One (the baseline or Status Quo that Company A assisted in developing), and ZAHN began the presentation of Scenario Two, which ZAHN created, by stating that in a Traditional Utility Response, there were only three adjustment tools: (i) cut costs and workforce; (ii) increase customer rates; and (iii) reduce capital expenditures. ZAHN then caused Person A to deliver the details of Scenario Two, which included the termination of 574 JEA employees (29% of the JEA workforce), significant rate increases until year 2030, and the likelihood of a significantly reduced or zero contribution to the COJ General Fund beyond 2023.

g.      During the June 25, 2019 Board Meeting, after hearing individual JEA Board Members express displeasure with Scenario Two with comments such as Scenario Two being a "doom and gloom" outlook, ZAHN told the JEA Board, "As I have told the employees, I am not here to implement the traditional utility response. I believe there is a lot of exciting opportunities if we just gain some alignment with our community."

h.      On or about July 1, 2019, WANNEMACHER sent an email to two lawyers at Law Firm A containing an attachment which was an iteration of the LTI PUP involving a bond issuance that provided for accelerated payments based on an "Extraordinary Mandatory Redemption," which was defined as: "In the event of repayment of substantially all of the debt outstanding under either subordinate bond resolution, the Benefit Bonds associated with such resolution will be subject to Extraordinary Mandatory Redemption. In an Extraordinary Mandatory Redemption, the Current Year Value will be calculated based upon the expected Net position immediately after the Extraordinary Redemption." The only event that could pay off all outstanding debt is a sale of JEA. WANNEMACHER took this action after Law Firm A provided a written memorandum on May 20, 2019 that such an LTI PUP plan was not in accordance with Florida Law, and then orally advised the same after receiving WANNEMACHER'S July 1, 2019 email.

18

i.      On or about July 10, 2019, a conspirator prepared a spreadsheet titled "FY2020 LTI Estimate," which contained calculations relating to the LTI PUP through Fiscal year 2022, and included an allocation of performance units by job level.

j.      On or about July 11, 2019, WANNEMACHER finalized the formula for the LTI PUP in connection with privatization of JEA and crafted the formula in connection with the minimum requirements for a successful ITN bid, such that substantial payouts to JEA executives under the LTI PUP, primarily himself and ZAHN, were a certainty if JEA was sold.

k.      On or about July 17, 2019, ZAHN caused a JEA employee to send an email wire communication to JEA Board Members advising them how they would receive the Board Meeting materials for the July 23, 2019 JEA Board Meeting.

l.      On or about July 18, 2019, WANNEMACHER prepared an Excel spreadsheet titled "Notes.xlsx," which calculated how 30,000 LTI PUP units each with a beginning value of $0 would increase in value to $11,500 for a total payout of $345 million. This spreadsheet was never provided to the JEA Board, the Jacksonville City Council, the General Counsel's Office, the Council Auditor's Office, or the outside consultants and law firms.

m.    On or about July 19, 2019, ZAHN authorized delivery of hard copies of the materials for the July 23, 2019 Board Meeting via courier to the JEA Board Members.

n.    On or about July 19, 2019, ZAHN met with the CEO of a potential buyer in West Palm Beach, Florida and told the CEO and others attending that JEA would be exploring privatization.

o.    On or about July 22, 2019, ZAHN falsely and fraudulently told JEA Board Member with initials A.A. that the LTI PUP payouts would be modest and in the range of $3.4 million per year for all participating JEA employees, while omitting any reference to how a sale of JEA would substantially increase LTI PUP payouts.

p.    On or about July 23, 2019, ZAHN withheld authorization to post the complete July 23, 2019 Board package on the JEA internet website (including the portion dealing with the LTI PUP) until after the conclusion of the July 23, 2019 Board Meeting, when the full Board package was ready days earlier and the normal course was to post the full Board packages on the JEA website before the monthly JEA Board meeting.

q.    On or about July 23, 2019, during the JEA Board meeting, which was live streamed on Facebook and IBM's USTREAM service, WANNEMACHER informed the JEA Board Members the minimum

20

requirements for a successful ITN bid, and stated, "It becomes clear that any capitalization opportunity that hits these table stakes will truly be a once in a generation opportunity. No one will be left behind."

r.     On or about July 23, 2019, during the JEA Board meeting, ZAHN asked the JEA Board to approve Resolution 2019-06, which authorized the termination of 574 JEA employees pursuant to Scenario Two (Traditional Utility Response) if the JEA Board did not authorize the ITN via Resolution 2019-09.

s.     On or about July 23, 2019, during the JEA Board meeting, WANNEMACHER presented the LTI PUP and falsely and fraudulently omitted any explanation of the LTI PUP formula in connection with a sale of JEA, knowing that the Board Members did not have sufficient information in the Board package to make that determination.

t.     On or about July 23, 2019, during the JEA Board Meeting, ZAHN asked the JEA Board to prospectively approve the LTI PUP in Resolution 2019-10 with no further JEA Board oversight and without disclosing the substantial amount of LTI PUP payouts that would result if JEA was sold.

u.     On or about July 23, 2019, during the JEA Board meeting, ZAHN and WANNEMACHER falsely and fraudulently advised the JEA

Board that the LTI PUP was an LTI that would cost JEA approximately $3.4 million per year on the low end or approximately $10 million per year on the high end over a three-year period, without disclosing the substantial increase in LTI PUP payouts that would result if JEA was sold.

v.      On or about July 23, 2019, during the JEA Board meeting, WANNEMACHER falsely and fraudulently advised that the payouts under the PUP would not exceed 6% of JEA's entire payroll to employees having previously calculated and being fully aware that, in the event of a JEA sale, the LTI PUP payouts would substantially exceed that 6% amount.

w.      On or about July 23, 2019 at approximately 2:15 pm, ZAHN caused a JEA employee to upload the entire Board Meeting materials for the July 23, 2019 Board Meeting on the JEA internet website.

x.      On August 14, 2019, in response to an email on August 9, 2019 from an auditor at the Council Auditor's Office that contained a list of twenty-two questions about the LTI PUP, WANNEMACHER responded via email and attached draft LTI PUP plan documents and stated in the email: "Attached are the latest drafts of the plan documents and award agreement that was approved by the board. This will answer many of these questions. As we are still working on a number of other pressing items, can we circle up in a few weeks on any additional questions you may have after reviewing these

documents." WANNEMACHER forwarded this response via email to ZAHN, Person A, Person B, and a lawyer with the General Counsel's Office.

y.      On or about October 31, 2019, during a meeting with auditors in the Council Auditor's Office, WANNEMACHER continued to represent that any payments under the LTI PUP would be reasonable and modest, and failed to disclose to the Council Auditors that there would be a substantial increase in LTI PUP payouts if JEA was sold.

z.      On or about November 5, 2019, ZAHN and Person B met with the General Counsel for the COJ seeking to obtain approval for the LTI PUP. ZAHN told the General Counsel that any LTI PUP payouts would be modest, and intentionally concealed the substantial increase in LTI PUP payouts if JEA was sold, knowing that a sale would net the COJ a profit between $3 billion and $6 billion.

aa.     On or about November 12, 2019, ZAHN wrote a letter to the General Counsel because the General Counsel declined to approve the LTI PUP, which stated, in part, that the PUP was "indefinitely suspended" and that if an ITN option was selected as a result of strategic planning "the plan would be moot from a long-term incentive basis," knowing that the purpose of the LTI PUP was to pay JEA executives, namely ZAHN and

WANNEMACHER who created the LTI PUP, substantial payouts if JEA was sold – a fact that ZAHN intentionally hid from the General Counsel.

bb.    On November 13, 2019, after receiving fifteen additional questions and a list of eight "concerns" from the Council Auditor's Office via email on October 31, 2019 (sent after the October 31, 2019 meeting) and a second email on November 7, 2019 from another auditor in the Council Auditor's Office seeking conformation of how to perform the LTI PUP calculation, WANNEMACHER responded with an email stating: "All, We have decided to not move forward with the implementation of the performance units at this time." WANNEMACHER attached ZAHN's letter to the General Counsel dated November 12, 2019. In that email, WANNEMACHER did not answer any of the Council Auditor's additional questions or address the concerns set forth in the October 31, 2019 email and did not address the sample calculation set forth in the November 7, 2019 email from the Council Auditor's Office.

cc.    On or about November 13, 2019, after receiving another email from a Council Auditor asking WANNEMACHER to confirm the LTI PUP formula, WANNEMACHER emailed Council Auditor's Office employees a spreadsheet with a sample calculation of the LTI PUP over a three-year period showing modest gains for a performance unit, as if that was the only potential

payout scenario under the LTI PUP. This hid and concealed the substantial payouts to ZAHN, WANNEMACHER, and others under the LTI PUP if JEA was sold or privatized.

dd.    On or about November 14, 2019, WANNEMACHER, after receiving additional questions about the LTI PUP calculation if JEA was sold and the COJ received $4 or $5 billion in net revenue, sent an email to Council Auditor's Office employees stating, in sum and substance: "As noted in my previous email, you have been notified that this was a DRAFT plan that is not being finalized or implemented. In addition, as Aaron's letter noted, as a long-term incentive plan it would be moot in any recapitalization scenario. No other questions or answers are necessary at this time." WANNEMACHER knew the LTI PUP was not a draft plan and that the LTI PUP was designed to pay substantial payouts to ZAHN, WANNEMACHER, and certain others if JEA was sold.

All in violation of 18 U.S.C. § 371.

## COUNT TWO
### (Wire Fraud)

### A. Introduction

1.     The Grand Jury realleges Section A of Count One of this Indictment and incorporates it as though fully set forth herein.

### B. The Scheme and Artifice

2.     Between at least in or around March 2019 through in or around November 2019, in the Middle District of Florida, and elsewhere, the defendants,

AARON ZAHN, and
RYAN WANNEMACHER,

did knowingly and intentionally devise a scheme and artifice to defraud, and for the purpose of obtaining money by means of materially false and fraudulent pretenses, representations, promises, and omissions.

### C.  Manner and Means of the Scheme and Artifice

3.     The substance of the manner and means of the scheme and artifice is described in Section C of Count One of this Indictment and is hereby realleged and incorporated by reference as though fully set forth herein.

### D.  Execution of the Scheme and Artifice

4.     On the date set forth below, in the Middle District of Florida and elsewhere, the defendants,

AARON ZAHN, and
RYAN WANNEMACHER,

knowingly and intentionally executed the aforesaid scheme and artifice, by

transmitting and causing to be transmitted by means of wire and radio

communication in interstate and foreign commerce, any writings, signs,

signals, pictures, and sounds, as detailed below:

| COUNT | DATE | WIRE COMMUNICATION |
|-------|------|--------------------|
| TWO | July 23, 2019 | The live stream of the July 23, 2019 JEA Board Meeting on media platform IBM USTREAM, which caused wire transmissions outside the State of Florida |

All in violation of 18 U.S.C. § 1343.


## FORFEITURE

1.     The allegations contained in Counts One and Two are

incorporated by reference for the purpose of alleging forfeiture pursuant to 18

U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2.     Upon conviction of a conspiracy in violation of 18 U.S.C. §

666(a)(1)(A) and 18 U.S.C. § 1343, in violation of 18 U.S.C. § 371, or upon

conviction of the violation of 18 U.S.C. § 1343, the defendants, AARON

ZAHN and RYAN WANNEMACHER shall forfeit to the United States,

pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property,

real or personal, which constitutes or is derived from proceeds traceable to the offense.

3.      If any of the property described above, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant

to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

A TRUE BILL,

Foreperson

ROGER B. HANDBERG
United States Attorney

By: _____
Tysen Duva
Assistant United States Attorney

By: _____
Frank Talbot
Assistant United States Attorney
Chief, Jacksonville Division

29

FORM OBD-34
2/16/22 Revised

No.

## UNITED STATES DISTRICT COURT
### Middle District of Florida
### Jacksonville Division

## THE UNITED STATES OF AMERICA

vs.

### AARON ZAHN
### RYAN WANNEMACHER

INDICTMENT

Violations:   Ct. 1: 18 U.S.C. § 371
Ct. 2: 18 U.S.C. § 1343

A true bill,



Foreperson

Filed in open court this _2nd_ day

of March, 2022.

_Tracie S. Perotti_

Clerk

Bail   $_____

GPO 863 325