# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                         **Case No. 3:22-cr-00023-BJD-MCR**

**AARON ZAHN and**
**RYAN WANNEMACHER,**

      **Defendants.**

_____/

## DEFENDANT AARON ZAHN'S
## MOTION FOR *INTRADISTRICT* TRANSFER

Defendant Aaron Zahn moves the Court for a transfer of this case from the Jacksonville division to the Tampa division of the Middle District of Florida pursuant to Federal Rule of Criminal Procedure 18.

As explained below, Mr. Zahn cannot obtain a fair trial in the Jacksonville division.  He is accused of orchestrating a scheme to defraud Jacksonville taxpayers, and he is described as "the principal architect and ringleader of perhaps the greatest fraud in Jacksonville history."[1]  First, pretrial publicity about the allegations in the Indictment against him has been pervasive and overwhelmingly negative. Captivated by scandal, the Jacksonville community has been saturated with inflammatory media coverage regarding Mr. Zahn and the JEA scandal.  Investigative reports and the City Council's Special Investigation Committee (SIC) have judged Mr. Zahn to be guilty

---

[1] David Bauerlein, *JEA sues ousted CEO Zahn,* THE FLORIDA TIMES-UNION (June 5, 2020), https://www.jacksonville.com/story/news/politics/county/2020/06/05/jea-suit-zahn-was-fraud-lsquoringleaderrsquo-and-has-no-claim-to-get-nearly-1-million/41746107/.

of fraud, and their conclusions have been broadly publicized.  Second, among the investigative reporting, the most prejudicial coverage includes wide dissemination of Mr. Zahn's inadmissible *Garrity*-protected testimony.  Third, the residents of Duval, Clay, Nassau, and St. Johns counties who are customers of JEA have a personal interest in the outcome of this case because the harm Mr. Zahn allegedly caused to *their* utility affected (or was perceived as affecting) the pecuniary interests of all JEA ratepayers.

In light of the scathing and widespread pretrial publicity, multiple local investigations prejudging Mr. Zahn's guilt, the prejudicial reporting of Mr. Zahn's immunized testimony, and the fact that Jacksonville division jurors – as JEA ratepayers – are personally interested in the outcome of the case, Mr. Zahn respectfully asks this Court to exercise its discretion under Rule 18 to move the trial in this matter to the Tampa division—a venue statistically proven to eliminate the substantial likelihood of juror bias that is present in the Jacksonville division.  As the Supreme Court has recognized, when an individual's fundamental liberty is at stake "it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion . . ." *Irvin v. Dodd*, 366 U.S. 717, 728 (1961).

## I.  <u>The Court Has Wide Discretion to Transfer a Trial Within the District.</u>

Unlike the constitutionally based Rule 21 change of *district* venue, Rule 18 provides the Court with discretion to transfer a trial to any *division* within a district that justice counsels.  *See United States v. Merrill,* 513 F.3d 1293, 1304 (11th Cir. 2008) ("A district court has discretion to fix the place of trial in any division within the district");

*United States v. Erwin,* 155 F.3d 818, 824 (6th Cir. 1998) ("Although the Sixth Amendment and Rule 18 require that a defendant's trial take place in the *district* where the crime was committed, there is no constitutional or statutory requirement that a defendant's trial take place in a specific courtroom or *division* within a federal judicial district.").

> Specifically, Rule 18 provides:
>
> The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

"Although the text of Rule 18 refers only to considerations of convenience and the prompt administration of justice, the court may also look to other factors such as docket management, courthouse space and security, and pretrial publicity." *United States v. Mathis*, 2015 U.S. Dist. LEXIS 111250, *8-9 (W.D. Va. Aug. 21, 2015).[2] A more modest bar exists under Rule 18, and courts often utilize intradistrict transfer as an effective and efficient measure for ensuring a fair and impartial jury when one division has been saturated with prejudicial pretrial publicity. *See, e.g., United States v. Dickie,* 775 F.2d 607, 610 (5th Cir. 1985) (prompt administration of justice promoted

---

[2] *See also United States v. Cloud*, 2021 U.S. Dist. LEXIS 260839, *11 (E.D. Wash. Dec. 8, 2021) ("[T]he question presently before the Court is whether this case should be transferred to another division within the district—a less burdensome standard."); *United States v. Walters*, 2020 U.S. Dist. LEXIS 66400, *3 (S.D. Miss. April 15, 2020) ("The Court may also consider…pretrial publicity"); *United States v. Vasquez-Silva,* 2011 U.S. Dist. LEXIS 84002, *4 (S.D. Ind. July 29, 2011) ("[T]he considerations under Rule 18 can be broad enough to justify a change of division to obviate the difficulties in picking an unbiased jury"); *United States v. Lawson*, 2009 U.S. Dist. LEXIS 16032, *3 (E.D. Ky. March 2, 2009) (Rule 18 "vest[s] the trial court with the authority to set the location of the trial based on…the interests of justice"); *United States v. Cortez*, 251 F.R.D. 237 (E.D. Tex. 2007) (transferring case to "another division of this court" under Rule 18 "in the interest of due process and fairness").

"by avoiding problems raised by extensive publicity" that was not found in another division); *United States v. Balistrieri,* 778 F.2d 1226, 1229 (7th Cir. 1985) (affirming Rule 18 transfer because "it appeared that potential jurors in the Green Bay area had not been exposed, to any significant degree, to the same information."); *United States v. Lawson*, 2009 U.S. Dist. LEXIS 16032, *5 (E.D. Ky. March 2, 2009) ("And although the Court is unprepared to conclude that pretrial publicity in this case constitutes press corruption or has created a circus-like atmosphere, it has certainly been extensive and concentrated within the Frankfort jury division."); *United States v. Addonizio*, 313 F. Supp. 486, 494 (1970) ("[I]n view of the concentration of public interest and news coverage in the Newark area, the court is convinced that the jury selection process will be facilitated by the transfer of these proceedings from the Newark to the Trenton vicinage of this district"); *United States v. Abrahams*, 466 F. Supp. 552, 558 (D. Mass. 1978) (because of publicity where the corporation was based and the likelihood of juror taint being lower in a different division, even with stringent *voir dire*, the court transferred the case to different division in the district).

II.   <u>Justice Demands Intradistrict Transfer</u>

A. **Pretrial Publicity in the Jacksonville Division Has Been Pervasive and Overwhelmingly Negative, Has Pre-judged Mr. Zahn's Guilt, Has Disclosed Highly Prejudicial Inadmissible Testimony, and Has Been Inflamed by Political Bias Creating a Presumption of Guilt.**

   i.   **Widespread, unbalanced, and inflammatory pretrial publicity has saturated the Jacksonville community.**

Local Jacksonville-area media has described Mr. Zahn as an "architect of a brazen scheme," further repeating that he was the mastermind behind "perhaps the

greatest fraud in Jacksonville history"[3] and guilty of spinning a "web of lies."[4] Following the Indictments in the "citywide scandal – involving dozens of players, thousands of employees and potentially billions of dollars," First Coast News published a story entitled: *"I think a lot of people are breathing a sigh of relief: JEA Indictments,"* quoting Stephen Busey, who led the City Council investigation of JEA's aborted Invitation to Negotiate and the Performance Unit Plan.[5]  Coverage of Mr. Zahn isn't hidden in small print; it was and continues to be on the front page.[6]

Beyond its volume and pervasiveness, the tone of the media's coverage has been overwhelmingly negative in how it depicts Mr. Zahn.  A highly qualified social psychology expert, Dr. Bryan Edelman, reviewed over 600 news articles relating to Mr. Zahn and opined that "the Jacksonville Division jury pool has been exposed to inflammatory and prejudicial pretrial publicity surrounding Aaron Zahn, the controversial effort to privatize the JEA by issuing an 'invitation to negotiate' to

---

[3] Exhibit 3, at pp. 1504-1508; Jim Piggott, *Ex-JEA CEO Zahn faces 25 years in prison for fraud, but first, a family trip to the Bahamas*, NEW4JAX (Mar. 9, 2022), https://www.news4jax.com/news/local/2022/03/09/ex-jea-ceo-zahn-faces-25-years-in-prison-for-fraud-but-first-a-family-trip-to-the-bahamas/.

[4] Exhibit 3, at pp. 1544-1553.

[5] Anne Schindler, *I think a lot of people are breathing a sigh of relief': JEA Indictments*, FIRST COAST NEWS (Mar. 9, 2022), https://www.firstcoastnews.com/article/news/local/i-think-a-lot-of-people-are-breathing-a-sigh-of-relief-after-jea-indictments/77-3f5f6eca-1832-4257-91fa-d2dff73ec4ad.

[6]     On the day Mr. Zahn's Indictment was unsealed, multiple news stations went on the air with the breaking news. *See, e.g.*, Samantha Mathers, *LIVE: BREAKING NEWS: TWO FORMER JEA EXECUTIVES INDICTED,* ACTION NEWS JAX, (Mar, 07 2022), https://www.actionnewsjax.com/news/local/former-jea-ceo-cfo-federally-indicted-conspiracy-wire-fraud-charges/QVLD33JGXJFF5A2BP32YX4S6BE/.  They immediately posted stories on their front pages. *See, e.g., id.*  More yet posted on social media. *See, e.g.,* Twitter Post, Travis Akers, "#BREAKING: Federal prosecutors on Monday unsealed a grand jury indictment charging former JEA chief executive officer Aaron Zahn and finance chief Ryan Wannemacher with two counts each of conspiracy and wire fraud."; Twitter Post, Florida Times-Union Reporter Nate Monroe (Twitter-verified): "Breaking (significant Jacksonville news): Federal grand jury indicts former JEA executives on conspiracy, wire fraud, accusing them of trying to profit off sale of utility."

potential bidders, and the alleged 'secret' bonus plan." Declaration of Bryan Edelman, Ph.D. ("Edelman Decl."), attached as Exhibit 1, at 1:20-23.[7] He found that "the pretrial publicity has been overwhelmingly negative in how it depicts Aaron Zahn" and has "undermined Zahn's fair trial rights by helping to create a presumption of guilt." *Id.* at 1:24, 23:17-18. The prejudicial and inflammatory media coverage has "shifted the burden of proof to Mr. Zahn." *Id.* at 3:1.

Dr. Edelman details the media coverage tracking Mr. Zahn from the 2018 search for a new CEO for the JEA through the widely publicized end of the privatization effort and invitation to negotiate process. *Id.* at § V. From the beginning, the media portrayed Mr. Zahn as an outsider and "carpetbagger" who tried to defraud the Jacksonville public for his own financial gain. *Id.* at 11:6-12:12 (quoting articles regarding Mr. Zahn stating, "you can't trust him," "he's truly dangerous," and "[an] arrogant, city-slicker"). The media questioned the legitimacy and transparency of the CEO search due to Mr. Zahn's political connection to Mayor Lenny Curry. *Id.* at 12:13-13:16 (explaining that the media labeled the CEO search process as "rigged," and stating that it "lack[ed] transparency" and was "not clear the board did any due diligence"). The media coverage labeled Mr. Zahn as the "pied piper" of JEA and reported that he "created an atmosphere of mistrust" all while "building a fraudulent case to justify selling JEA" and approving "bid contracts worth millions of dollars to privatization consultants in violation of JEA's procurement rules." *Id.* The media also

---

[7] *See also* Telephone Survey Results: Descriptive Statistics, attached as Exhibit 2; Compilation of over 600 news articles collected by Dr. Edelman, attached as Exhibit 3.

closely tracked and reported on findings from the City and federal investigations without regard for Mr. Zahn's presumed innocence and included, as detailed below, inadmissible content from Mr. Zahn's *Garrity*-protected statements. *Id.*  The pretrial publicity focused on material with the potential to generate anger among JEA ratepayers and undermines Mr. Zahn's right to a fair trial.  *Id.*

The prejudicial media coverage will only increase as the trial approaches.  The media has followed nearly every development in this case, even technical scheduling issues and mundane discovery disputes.[8]  The fact remains, the Jacksonville division jurors and the Jacksonville press have not forgotten about this case. *See* Edelman Decl. at p. 25 (depicting August 2022 political advertisements targeting Florida House Candidate Jessica Baker due to her connection to the attempted sale of JEA, claiming that she was part of the process that eventually led to "JEA customers" having to pay "$13 million in legal bills" and connecting her to Aaron Zahn).  Despite the passage of time, Dr. Edelman explains, that the "biasing effect of pretrial publicity [does] not disappear." *Id.* at 9:11-12.   Negative pretrial publicity increases conviction rates because "attitudes developed from exposure to pretrial publicity serve as a filter through which later trial evidence is evaluated."  *Id.* at 13:17-15:11.

---

[8] *See, e.g, New trial date to be set for former JEA execs,* NEWS4JAX, (Mar. 22, 2022), https://www.news4jax.com/news/local/2022/03/22/new-trial-date-to-be-set-for-former-jea-execs/; Exhibit 3, at pp. 1634-1636; Jim Piggott, *Judge sets deadlines during court hearing for former JEA executives,* NEWS4JAX, (July 5, 2022), https://www.news4jax.com/news/local/2022/07/05/judge-sets-deadlines-during-court-hearing-for-former-jea-executives/.

ii.    **Investigative Reporting Has Already Tried the Defendants and Found Them Guilty**

Courts have recognized change of venue is appropriate where investigative reporting finds wrongdoing of the defendant and publicizes its findings to the community.  *See, e.g., United States v. Tokars,* 839 F. Supp. 1578, 1582 (N.D. Ga. 1993) ("what ma[de] this case unusual [wa]s the large amount of investigative reporting which was undertaken by the local media"); *United States v. McVeigh,* 918 F. Supp. 1467 (W.D. Ok. 1996) (the local media, through investigate journalism, conducted "their own investigations" of the defendant).

In addition to Florida Times Union columnist Nate Monroe's twice-weekly column, which has focused almost exclusively on the JEA scandal, thorough and extensive reporting was completed by the Florida Times-Union writers Nate Monroe, Christopher Hong, David Bauerlein, and Mark Woods, in a series entitled:  *MONEY & POWER: The secret origins – and public collapse – of the campaign to privatize Jacksonville's electricity and water.*[9] The reporters explained their efforts:

> Over the past year, Times-Union journalists interviewed dozens of people across city government and in the private sector who were involved in the now-canceled JEA sale process or who worked with fired CEO Aaron Zahn in his role at JEA or in his previous jobs. The Times-Union has also reviewed tens of thousands of pages of documents, including bids from private companies, JEA legal and regulatory filings, financial data from investment banks, transcripts of sworn statements from senior executives, invoices charged by consultants, reimbursement reports for JEA's senior executives, and utility emails. The Times-Union also recently obtained hundreds of pages of previously unreleased text

---

[9] Nate Monroe, Christopher Hong, David Bauerlein, Mark Woods, *Money & Power*, THE FLORIDA TIMES-UNION, (July 24, 2020),
 https://stories.usatodaynetwork.com/moneyandpower/home/site/jacksonville.com/.

messages between JEA executives and managers.

First Coast News Reporter Anne Schindler explained that this extensive years-long investigative reporting was fundamental to the eventual charges: "Florida Times-Union columnist Nate Monroe['s investigative] reporting helped expose the JEA debacle."[10]   Other news organizations also engaged in extensive and thorough investigative reporting, which concluded Mr. Zahn was at fault.[11]

In addition to the news media investigation, Jacksonville City Council, for the first time in its history,[12] convened a "Special Investigatory Committee" on JEA Matters and the role of Mr. Zahn, which resulted in a "Report of the Special Investigatory Committee on JEA Matters December 2020," a 138-page document accusing Mr. Zahn of greed against the people of Jacksonville.[13]   The Report opens by editorializing that "Government without transparency is a breeding ground for mischief…" and goes on to decry "Aaron Zahn's greed, coupling the JEA sale effort

---

[10] Anne Schindler, *I think a lot of people are breathing a sigh of relief, JEA Indictments,* FIRST COAST NEWS (Mar. 9, 2022), https://www.firstcoastnews.com/article/news/local/i-think-a-lot-of-people-are-breathing-a-sigh-of-relief-after-jea-indictments/77-3f5f6eca-1832-4257-91fa-d2dff73ec4ad.

[11] *See, e.g.,* Action News Jax, *Investigation into JEA Sale, available at* https://www.actionnewsjax.com/news/local/investigation-into-jea-sale/4M2EWKF47WQAF4S7WCVUB5CMOM/; *From grand vision to grand jury: How we got to this point,* FIRST COAST NEWS, (Mar. 7, 2022), https://www.firstcoastnews.com/article/news/local/from-grand-vision-to-grand-jury-how-we-got-to-this-point/77-e2c1c970-e9fa-40f9-9997-3222c6b8e13c (including extensive chronology); *JEA: Timeline of abandoned sale leading to indictments*, JAX DAILY RECORD, (Mar. 8, 2022), https://www.jaxdailyrecord.com/article/jea-timeline-of-abandoned-sale-leading-to-indictments.

[12] David Jones, *'Something has gone wrong with JEA': Special city investigative committee meets for first time, commits to transparency*, FIRST COAST NEWS (Feb. 10, 2020), https://www.firstcoastnews.com/article/news/local/something-has-gone-wrong-with-jea-special-city-investigative-committee-meets-for-first-time-commits-to-transparency/77-9a97afc5-d37b-475b-939d-c906979b5889.

[13] City of Jacksonville, Office of the City Council, *Report of the Special Investigatory Committee on JEA Matters*, (December 2020), *available at* http://jeainvestigation.com/wp-content/uploads/2020/12/1.-SIC-Report-Online.pdf (hereafter "SIC Report" or "Report").

to the PUP—designed to have senior JEA employees benefit exorbitantly from a JEA sale." SIC Report, at 1-2.

The Report presents its allegations as established facts.  Purporting to be the final word on the matter, the report reads as if it was a verdict.  *See, e.g.*, Report at 3 ("In accordance with the Council President's Charge, this report, its appendices and chronology of supporting documents summarize what happened, how it happened and recommend legislative action to prevent such an effort in the future.").  As discussed herein, the Report contains prejudicial material that would be inadmissible in the trial and has been widely disseminated through coverage concentrated in the Jacksonville division.

The investigation was not conducted by an impartial judge or special master. Quite the opposite.  In a surprising show of candor, Deputy Counsel Sean Granat remarked: "I do want to point out that these [sworn] interviews were done with a singular focus of investigating Mr. Zahn's conduct. So there may have been other trails, other things that certainly could have been asked about, but we didn't at the time." (Feb. 24, 2022, Special Investigatory Committee on JEA, Transcript at p. 148)[14].  The "investigation's" purpose was to find wrongdoing on Mr. Zahn's part. The Report's findings were not subject to cross examination, tested by the rules of evidence, or tempered by an opposing side. *See Delaney v. United States,* 199 F.2d 107, 113 (1st Cir. 1952) (a congressional investigation of Delaney and "trial by newspaper"

---

[14]  Special Investigatory Committee on JEA, Session #2, (Feb. 24, 2020), *available at* http://apps2.coj.net/City_Council_Public_Notices_Repository/02-24-20JEAinvestigatory.pdf

did not have "defense cross-examination. Nor was the published evidence tempered, challenged, or minimized by evidence offered by the accused.").

Taken together, these widely publicized investigations have already tried Mr. Zahn and found him guilty. The multiple investigations into Mr. Zahn's tenure as CEO of JEA have impaired Mr. Zahn's right to a fair trial by creating a presumption of guilt among jurors in the Jacksonville division.[15]  *See* Edelman Decl. § 1:24.

### iii.   Jacksonville's Political Leadership Has Incensed the Public Against Mr. Zahn.

A Jacksonville division jury will be pressured by the impassioned community and the prejudice engendered by the media coverage of this case and the political interests at issue. Multiple members of the City Council have publicly condemned Mr. Zahn's actions.[16]  For example, Councilman Diamond said: "I think everyone in Jacksonville would be outraged; we all know Aaron Zahn doesn't deserve another penny of public money, period." Councilman Wilson proclaimed: "What we know

---

[15] It should be noted that, while difficult if not impossible to quantify, the prejudicial effect and presumption of guilt created by the extensive media coverage has been greatly amplified by the extensive redistribution and repackaging of traditional media coverage on social media. Most if not all the reporters covering the story are active on the various media platforms and many, including columnist Nate Monroe and other Florida Times-Union writers, have routinely expressed their opinions on Twitter and other social media thus greatly extending the impact of this prejudicial coverage.

[16] On the day the Indictment was unsealed, there were reactions from every corner of City Hall.  *See, e.g*, The Florida Times-Union, *City Council members, Mayor Lenny Curry, public react to indictment of former JEA executives,* https://jacksonville.com/story/news/local/2022/03/07/jacksonville-leaders-mayor-public-react-indictments-jea-scandal/9413843002/ (Mar. 7, 2022) ("JEA releases a statement" that new leadership would not engage in "the type of actions that caused the investigation in the first place"); *id.* (Council member Priestly Jackson: stating that the indictment highlights the "level of corruption at the root"); *id.* (Council member Diamond: "What's alleged in the indictment lines up exactly with what our (City Council) investigatory committee found which was an attempt to steal hundreds of millions of dollars from the people of Jacksonville.").

- 11 -

now, which I believe is only the tip of the iceberg, has rocked Jacksonville, cast a dark cloud over our city, and damaged trust in our government."

Such political rhetoric is not proper discourse leading up to a criminal trial.  As the Supreme Court has explained: "[L]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. And the Court has insisted that no one be punished for a crime without a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, [and] excitement…" *Sheppard v. Maxwell,* 384 U.S. 333, 349-350 (1966).  Instead, legal trials should focus on the legal issues, immune from incendiary pressures by local political leaders proclaiming guilt.

The Government contributed to the atmosphere of presumed guilt.  At the Defendants' arraignment, the Government shackled the Defendants despite the Government's agreement to Defendants' pretrial release without conditions.



News Media Portrayal of Defendants' Arraignment on March 8, 2022[17]

Anne Schindler, Executive Producer, First Coast News observed:

> Today is the 1st time I've seen federal defendants arrive in handcuffs and shackles. That includes alleged drug dealers and sex offenders. A bit of

---

[17] Jim Piggott, *2 former JEA execs plead not guilty to conspiracy, wire fraud charges,* NEWS4JAX, (Mar. 8, 2022), https://www.news4jax.com/news/local/2022/03/08/2-former-jea-execs-to-face-federal-judge-on-conspiracy-wire-fraud-charges/.

calculated drama, perhaps, in this long running, high-profile JEA investigation.

The media has further perpetuated the significant political overtones of this case, with Mr. Zahn portrayed as aligned with the young conservative Mayor Lenny Curry against the Democratic Jacksonville establishment.[18] The Duval County Democratic Party issued a statement "welcom[ing]" the Indictment noting that "Zahn, Wannemacher, and others orchestrated the single largest attempted fraud in Jacksonville's consolidated history."[19]

### iv. The Disclosure of Inadmissible Evidence to the Jacksonville Division Prevents Defendants From Receiving a Fair Trial.

In determining whether a transfer is warranted, courts weigh heavily "whether the media accounts contained inflammatory, prejudicial information that was not admissible at trial." *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir. 1998); *see, e.g., Irwin v. Dowd,* 366 U.S. 717, 759 (1960) (due process required venue change where publicity included defendant's confession and unaccepted offer to plead guilty); *Rideau v. Louisiana,* 373 U.S. 723, 726 (1963) (finding denial of due process where illegally obtained confession was broadcast on the news); *United States v. Moody,* 762 F. Supp. 1485 (N.D. Ga. 1991) (granting venue change where defendant's past criminal record was broadcast in the news).

In January 2020, JEA, together with attorneys from Jacksonville's Office of

---

[18] Exhibit 3, at pp. 1518-1521.

[19] *See* Duval County Democratic Party, *Duval Dems Welcome the Federal Indictment of Former JEA Executives, available at* https://www.duvaldems.org/jea-indictments/.

General Counsel, compelled Mr. Zahn to testify about matters related to the allegations in the Indictment.  As a public employee, Mr. Zahn was compelled to provide a statement and signed a *Garrity* warning advising him that his statement could not be used against him in any subsequent criminal proceeding.[20] 

Mr. Zahn's protected testimony was used to justify his firing from JEA and widely disseminated to the public. *See* Defendant Aaron Zahn's Motion for a Kastigar Hearing, Doc. 112, at pp. 15, 18-22.

The news media disseminated Zahn's statement and stories regarding his alleged admissions permeated the coverage.[21]

- On February 3, 2020, New4Jax went on the air (and online with article and video) describing that its team "went through thousands of pages of documents detailing sworn testimony from Zahn for hours on Monday." Reporter Jim Piggott says ███████████████████████████████████[22]

---

[20] Mr. Zahn was promised "Any statements made by you during these interviews cannot be used against you in any subsequent criminal proceeding, nor can the fruits if any of your statements be used against you in any subsequent criminal proceeding." Statement of Rights ¶ 4, attached as Exhibit 4.

[21] A recent tweet by Nate Monroe of the Florida Times-Union underscores the widespread public dissemination of Mr. Zahn's full *Garrity* Statement: "the bizarre quirk about this is that the defense will file the sworn statements of JEA's former CEO [Mr. Zahn] and CFO [Mr. Wannemacher] under seal for the judge to review; but they've been public records for more than two years and there's no mystery about what's in them." (https://twitter.com/NateMonroeTU?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor).

[22] News4Jax, *News4Jax received thousands of sworn statements by former JEA CEO Aaron Zahn,* (Feb. 3, 2020), *available at* https://www.youtube.com/watch?v=V9-xGvyL1a0.

- Also on February 3, 2020, ActionNews JAX published an article: "Fired JEA CEO's testimony revealed: Aaron Zahn questioned over bonus plan" and directly quotes from Mr. Zahn's sworn testimony -- ████████████████████ ████████████████████████████████████████[23]

- On February 4, Florida Times Union published an article in print and online titled "Fired JEA CEO Aaron Zahn ████████████████████ ████████████████." The article described Mr. Zahn's statements under oath, explaining Zahn ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████[24]

- Over a year after Mr. Zahn's sworn interview, on April 15, 2021, the Florida Times-Union published an article explaining what "Zahn…told city attorneys in the second day of a two-day, under-oath interview that ██████████████ ████████████████████████████████████████████ ██████████████"[25]

- Then again, on May 20, 2021, the Florida Times-Union published an article repeating that Mr. Zahn "said in a January 2020 sworn interview with the Office of General Counsel attorneys that ████████████████████████████ ████████████████████████████████████████████████████ ██████████████████."[26]

- On March 7, 2022, the day Mr. Zahn's Indictment was unsealed, the Florida Times-Union published yet another article stating that Mr. Zahn "made one key disclosure before he was ousted by JEA: In a sworn interview with city lawyers, Zahn revealed ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████"[27]

---

[23] Exhibit 3, at pp. 1804-1806.
[24] Exhibit 3, at pp. 1807-1810.
[25] Exhibit 3, at pp. 1815-1816.
[26] Exhibit 3, at pp. 1817-1818.
[27] Exhibit 3, at pp. 1819-1824.

While Mr. Zahn's compelled ████████████████████

might *logically* be part of a case against him, it cannot *lawfully* be part of a case against

him without running afoul of the Fifth Amendment.

**B.    A scientific survey confirms that the Jacksonville jury pool has firm opinions regarding Mr. Zahn that *voir dire* cannot absolve; in contrast, the Tampa division jury pool presents a fair venue.**

As a result of the pervasive and inflammatory pretrial publicity coverage, an

attitude of hostility against Mr. Zahn exists within the Jacksonville community.[28]  This

community-wide attitude has been scientifically measured and quantified by a

recognized expert in the field.  Trial Innovations, Inc., a well-renowned jury research

firm, conducted a community attitude survey quantifying the impact of the pretrial

publicity in this case.[29]  The survey shows a large percentage of respondents in the

Jacksonville division are aware of the case and believe the Defendants are guilty.

Between July 24, 2022, and August 28, 2022, Trial Innovations, Inc., supported

by Research Strategies, Inc., administered a survey of 401 juror-eligible residents in

randomly selected households in the Division of Jacksonville and 212 juror-eligible

residents in the Division of Tampa by using telephone polling according to scientific

practices for survey research in general and venue studies in particular.  Experienced

interviewers conducted the survey, asking respondents questions based on the media

---

[28] "Consistent, with the pretrial publicity, many survey respondents used negative, pejorative descriptors related to greed, dishonesty, lack of integrity, and corruption," including labeling Mr. Zahn as "a crook," "dishonest," "criminal," and even flat out "guilty."  Edelman Decl., at § VI.

[29] A community attitude survey is telephone survey which uses a random digit dialing methodology to evaluate case recognition, familiarity with widely reported news content, and prejudgment. Respondents are screened to ensure that they are jury eligible and representative of the jury pool. Edelman Decl., at p. 2, n. 1.

coverage of the allegations in this case.  Fifty three percent (53%) of respondents from the Jacksonville Division recognized the allegations at issue against defendant Zahn and, of those, 68% had a preconceived notion that defendant Zahn was guilty, with 47% indicating that the defense would have a difficult time convincing them that Zahn was *not* guilty.   Edelman Decl. 2:15-3:0.  Thirty-six percent (36%) of the potential Jacksonville division jury pool has indicated that Mr. Zahn is definitely guilty or probably guilty.  *See* Exhibit 2.

In contrast, only 3% of the jury pool in the Tampa division were even aware of the case.   *Id.* at 3:10-13, 27:12-18.   In cases like this, where there is a "significant difference in prejudice" between the Jacksonville division and the Tampa division, the Court can eliminate the risk of prejudice by transferring the trial to the Tampa division. *See, e.g., Weidner,* 2003 U.S. Dist. LEXIS 8616, *44 (D. Kan. May 16, 2003) (granting venue change where 44.8% of potential jurors in Topeka perceived Defendant Wittig was guilty whereas only 18.2% perceived Defendant Wittig as guilty in the Kansas City division).

After conducting an extensive analysis of the survey results, Dr. Edelman concludes: "given the nature of the pretrial publicity – and its apparent negative impact on the jury pool – I believe the 'presumption of innocence' has been threatened." Edelman Decl., at 3:14-16.  He further opines that "an intra-district transfer would be an appropriate prophylactic measure to mitigate the prejudicial impact of pretrial publicity."  *Id.* at 3:17-18.  Dr. Edelman details the extensive problems selecting a fair and impartial jury in venues saturated with media coverage.  *Id.* at § IV, VII.  He

explains that prospective jurors in cases with extensive media coverage enter the courtroom with case-specific knowledge, which is difficult to fully identify in *voir dire*. *Id.* at 33:4-12.  Pretrial publicity influences evaluations of the defendant, perceptions of criminality, sympathy toward the defendant, pretrial judgments regarding guilt, and final verdicts.  *Id.* at 8:18-21.  There is a body of research showing a statistically significant relationship between pretrial publicity and verdicts.  *Id.* at 8:17-10:15 (citing four empirical analyses and a meta-analysis encompassing 44 research studies on pretrial publicity demonstrating significant pretrial publicity taints the verdict).

Despite admonitions to set-aside prejudice from pretrial publicity, the content of pretrial publicity generates juror bias.  *Id.*  This is, in part, because it is difficult for prospective jurors to predict how case-specific knowledge and opinions may affect them over the course of a trial.  *Id.* at 33:7-8.  There is a tendency among prospective jurors to favor and quickly recall first-formed pro-guilt arguments and dismiss or suppress counterarguments.  *See id.* at 8:2-10 ("Attitudinally supporting arguments will be more closely attended to, evaluated as persuasive, integrated into the existing network of attitudes and beliefs and made easily accessible during deliberations.").  Worse yet, jurors exposed to pretrial publicity can have source attribution errors where they misattribute information learned from the media as if it were evidence they learned at trial.  *Id.*

The difficulty in identifying potential prejudice during the jury selection process limits the effectiveness of *voir dire* at remedying the effects of prejudicial pretrial publicity.  *Id.* at § VII.  Prospective jurors in cases with extensive media coverage enter

the courtroom with case-specific knowledge, but during *voir dire*, the jurors often have difficulty recalling every detail they have read, seen, or heard about a case and tend to downplay their knowledge of the case. *Id.* at 36-11-39:7. When asked open-ended "recall" questions, jurors often have an incomplete recognition and do not remember what they probably heard in the media. *Id.* But, when asked questions about specific prejudicial media items, the jurors recall additional details of the media coverage. *Id.* It is not that prospective jurors intend to be disingenuous; it is the result of an inherent limitation in how memory works. *Id.* at 37:13.

This limitation has been shown to impact cases with high-profile media coverage, and a similar pattern was found in this case. *Id.* at 38:22-39:16. The survey found that "62% of those familiar with the case had read, seen, or heard that ███ ████████████████████████████████████████████ ███████████████████████████████ – *a "fact" necessarily derived from Mr. Zahn's protected testimony. Id.* But only five—or two percent (2%) of prospective jurors— mentioned this detail when first asked the common "recall" question posed during *voir dire. Id.* The potential jurors' knowledge of prejudicial facts is directly tied to presumptions of guilt—81% of prospective jurors who had read, seen, or heard that ████████████████████████████████████████████ ███ believe he is guilty, and 63% reported that Mr. Zahn would have a difficult time convincing them otherwise. *Id.* at 45:12-14.

The Supreme Court has explained that when potential jurors hear such

significant and inadmissible testimony, they cannot forget it:

> The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man…No doubt each juror was sincere that he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father…You can't forget what you hear and see.

*Irwin,* 366 U.S. at 759.   A prospective juror's inability to provide a full account of everything he or she knows about a case undermines the effectiveness of *voir dire*. Edelman Decl., at 34.  The problem is exacerbated in cases, like here, where there is extensive reporting around inadmissible content or disputed facts.  *Id.*  Defendants in cases with significant negative publicity are stuck with an untenable predicament – either not discover the full extent of a prospective juror's knowledge or divulge the particulars of prejudicial or inadmissible evidence in front of the venire.  *Id.* at 42:3-10.

For these reasons, *voir dire* should supplement, not supplant, a fair and impartial venue.  *See United States v. Holder*, 399 F. Supp. 220, 227 (D.S.D. 1975) ("[W]hen the probability of prejudice is great because of deeply rooted passions or recent massive publicity, the efficacy of *voir dire* in screening the prospective jurors is diminished. In such a situation the court may become satisfied even prior to *voir dire* that the probability of a fair trial in the district is minimal."); *United States v. Tokars,* 839 F. Supp. 1578, 1584 (N.D. Ga. 1993) ("Of course, the difficult task would be ascertaining which prospective jurors in fact are unbiased. Where the negative publicity has been so intense, the court's task would be made more difficult by prospective jurors' subconscious recollection of news coverage"); *Delaney v. United States,* 199 F.2d 107,

112-113 (1st Cir. 1952) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction. One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by pervasive pre-trial publicity"); *United States ex rel. Bloeth v. Denno,* 313 F.2d 364, 372-373 (2d Cir. 1963) ("[M]erely going through the form of obtaining jurors' assurances of impartiality is insufficient…It is true that there was drawn from jurors, even those who stated that it would take evidence to alter their opinions of guilt, the statement that they felt they could act impartially. This, however, placed on those individuals a burden we think impossible to be borne, in the light of the nature of the publicity, the high proportion of jurors holding opinions of guilt, the length of time the opinions had been held and their persistence.").

Where inadmissible information is broadcast to the community, the proportion of selected jurors who have seen it is immaterial.  In *Rideau,* the Court held that a venue change was warranted even where only three jurors had seen the confession months before trial.  The Court emphasized:

> [W]e do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised interview.

373 U.S. at 727.

In a case such as this, where a high level of prejudicial pretrial publicity has

solidified community opinion against Defendants and a scientific survey confirms that the jury pool is poisoned, *voir dire* alone will not identify and eliminate entrenched juror bias to protect Mr. Zahn's right to a fair and impartial jury. *See Cloud*, 2021 U.S. Dist. LEXIS 260839, at *12-13 (finding venue transfer to be "an additional precaution to ensure a fair and impartial trial" and explaining "[w]hile the Court generally believes in the ability of this division's citizens to remain impartial and adhere to Court instructions, it is not willing to take an unnecessary risk in this case, where a forum within the same district is available.")

The Government and the Court only stand to benefit by transferring this matter to a division not saturated by prejudicial pretrial publicity.[30]

## C. The Jacksonville Jury Pool has an Actual and Perceived Pecuniary Interest in this Case Which Warrants the Case's Transfer.

If all the foregoing reasons were not enough, another factor tips the scales decidedly in favor of transfer – the potential monetary interests of potential Jacksonville division jurors. Mr. Zahn ran the public utility that provides Jacksonville-area residents with electricity, water, and sewer.[31] Jacksonville Division residents thus have an impermissible personal interest in the case.

---

[30] *See United States v. Haldeman,* 559 F.2d 31, 150 (D.C. Cir. 1976) (MacKinnon, J., concurring in part and dissenting in part) ("Why the Government and the trial court would want to hazard a criminal trial in which the evidence of guilt was as strong as it was here by insisting on trial in a jurisdiction where presumptive prejudice existed to the extent that it did here, defies reason…The Government had absolutely nothing to lose by trying the case in a community where presumptive prejudice was at a minimum, and to say that it did have something to lose is to admit that the case should have been transferred.").

[31] JEA serves an estimated 478,000 electric, 357,000 water, and 279,000 sewer customers between Duval, Clay, Nassau, and St. Johns counties, all within the Jacksonville division of the Middle District of Florida. *See* https://www.jea.com/About/.

Courts have found that when the jurors may have or may perceive themselves to have a personal stake in the outcome of the case involving a public utility, change of venue is warranted. *See, e.g., Kimball v. Public Utility Dist. No. 1 of Douglas County,* 391 P.2d 205, 258 (Wash. 1964) (affirming venue change because residents of the county where the lawsuit was pending were customers of the defendant, a public utility company, and therefore had an interest in the outcome of the litigation); *Long Island Lighting Co. v. New England Petroleum Corp.,* 362 N.Y.S. 2d 350 (N.Y. Spec. Term. 1974) (venue change granted where potential jurors were power company customers because of possible current and future interest in the company and their own rates); *United States v. White,* 590 F.3d 1210, 1212 n.1 (11th Cir. 2009) (noting "an unbiased jury could not be seated in the Southern Division, because the venire consisted mainly of Jefferson County residents, who would likely blame their increased sewer rates on [the defendant]").

*United States v. Wittig,* 2004 U.S. Dist. LEXIS 12285 (D. Kan. June 30, 2004), and *United States v. Weidner,* 2003 U.S. Dist. LEXIS 8616 (D. Kan. May 16, 2003), are factually analogous to the present case. In *Wittig*, former executive officers of a public utility – Westar Energy – were charged with fraud and received extensive coverage, including "public disfavor of Westar executive compensation packages" and "Westar's unsuccessful business deals." 2004 U.S. Dist. LEXIS 12285, at 5. Indeed, "[m]uch of the media coverage scrutinized the actions and role of Wittig in his capacity as Chairman and CEO of Westar." *Id.* "Local Kansas City television personalities claimed that their 'investigative' reporting had helped bring Wittig's alleged wrongs to

light." *Id.* at 8.  The court described the case:

> Highly and simply summarized, the primary themes of the coverage have been 1) the financial struggles of Westar, attributable to the misfeasance and malfeasance of its corporate officers, including Lake, and most particularly, attributable to the alleged excess and greed of defendant Wittig, Westar's former CEO; and 2) Westar's positive future outlook now that Wittig is no longer at its helm. The indictment in this case characterizes defendant Wittig and defendant Lake's conduct as 'systematically looting' Westar, a characterization that has been repeatedly asserted in the media coverage.

*Id.* at 12-13.  The defendants demonstrated that there were many Westar ratepayers in the Topeka area, "who perceive that they have a direct and personal interest in Westar."  *Id.* at 17; *United States v. Weidner,* 2003 U.S. Dist. LEXIS 8616, *41-42 (D. Kan. May 16, 2003) ("in the Topeka division, there is a higher incidence of residents who are ratepayers of Westar Energy, who consider Westar Energy *their* utility company, and who perceive that they have a direct and personal interest in Westar Energy… [there is a] perception of having been harmed by Westar Energy's management").

The court "exercised its discretion to order an intradistrict transfer, based on the markedly lessor recognition, prejudice, and salience in the Kansas City division as compared with the Topeka division."  *Wittig,* 2004 U.S. Dist. LEXIS 12285, at 37. Finding "much greater salience, or community interest in Topeka, where there are more Westar ratepayers and stockholders, with a perceived personal stake in these matters." *Id.* at 45.

Just like in *Wittig* where much of the possible local venire received services from the public utility, JEA is *the* public utility in Jacksonville.  It is "Jacksonville's most

important agency — the source of our electricity and our drinking water; a major employer with a workforce of about 2,000 strong; a $2 billion company with a footprint that touches our air, our water and our earth."[32]   Mr. Zahn is accused of both excess[33] and greed[34], costing the city, the taxpayers, and ratepayers a huge sum of money. *See* SIC Report, at 2-3 (Zahn's "ultimate cost to the JEA and the City was millions of dollars").   Jacksonville jurors may very well want retribution against Mr. Zahn for his alleged mishandling of their utility and attempted looting of JEA's coffers.   As reflected in the Indictment, the citizens of Jacksonville are the very victims of the fraud that the Indictment alleges.   They cannot be said to be indifferent and impartial to Mr. Zahn's fate.   *See Dyer v. Calderon,* 151 F.3d 970, 982 (9th Cir. 1998) ("the quality of indifference which, along with impartiality, is the hallmark of an unbiased [jury]").   According to the media, Mr. Zahn continues to cost JEA, the City of Jacksonville, ratepayers, and taxpayers money.[35]   The Duval, Clay, Nassau, and St. Johns county ratepayer-victims

---

[32] Exhibit 3, at pp.1544-1553 (describing how prior JEA CEOs had stabilized JEA's finances, but this was disrupted by Zahn, who damaged JEA in a multitude of ways).

[33] Kent Justice, *Inspector general report recommends 13 changes to JEA policies, procedures,* New4JAX, (Feb. 18, 2022), (reporting on audit report which criticized Zahn for overspending, with "questionable reimbursements"), *available at* www.news4jax.com/news/local/2022/02/19/inspector-general-report-recommends-13-changes-to-jea-policies-procedures/.

[34] The Associated Press, *Utility executives accused of conspiring to steal millions,* (Mar. 7, 2022) ("According to the grand jury indictment, the top officials at the Jacksonville Electric Authority worked together to devise a lucrative bonus plan that would have paid them millions if the city-owned utility were sold"), *available at* https://www.ledger-enquirer.com/news/business/article259146893.html.

[35] Nate Monroe, *JEA insurer earmarked nearly $3 million for defense lawyers for two former executives, records show,* THE FLORIDA TIMES-UNION, (Aug. 19, 2022) https://www.jacksonville.com/story/news/columns/nate-monroe/2022/08/19/jea-insurer-earmarked-millions-former-jea-ceo-cfo-defense-records-show/10357234002/ (explaining that JEA "has paid a premium of about $134,000 each year for the insurance that is set to increase by $106,000 for the coming year because of 'claims made for attorney fees associated with investigations and activities subsequent to the failed privatization of JEA,' according to a report by the Jacksonville City Council Auditor.").

have a disqualifying relationship to this case.

### D. Convenience Factors are Neutral and Outweighed by the Effects of Prejudicial Pretrial Publicity.

As shown, the prompt administration of justice will be served by transferring this case within the district to the Tampa division.[36]  The convenience factors of Rule 18 are neutral.  Defendant Zahn now lives in the Tampa area while Defendant Wannemacher lives outside the Middle District of Florida.  The alleged victim is JEA and the City of Jacksonville, a municipal agency, and a municipal government.  *See United States v. Barnes*, 2021 U.S. Dist. LEXIS 62644, *7 (D.V.I. March 31, 2021) ("the Court is hard pressed to weigh a government entity's physical location in a test measuring convenience").

Witnesses may have to make a three-hour commute to Tampa for their testimony.  This is similar to the commute the court did *not* find unduly burdensome in *United States v. Cloud*.  2021 U.S. Dist. LEXIS 260839, *11 ("The Court is sympathetic to any inconvenience that transferring the case to Spokane will cause,….[however] it is not such a distant forum that commutes will be onerous. With these concerns in mind, [the] Court is convinced that any inconvenience is outweighed by the effects of the pretrial publicity—which militate in favor of transferring this matter to Spokane.").  The court in *United States v. Joyce* explained that inconvenience of witnesses is outweighed by avoiding adverse publicity to help "preserve the bedrock

---

[36] Mr. Zahn is not moving for an alternative judge in this matter.  He is seeking only to transfer the trial to a location outside of the Jacksonville division to preserve his right to a fair and impartial jury.

American principle that a defendant is presumed innocent when he starts his trial." 2008 U.S. Dist. LEXIS 45362, *14 (W.D. Pa. June 10, 2008) (finding "the interests of justice" required transfer and that a two-hour drive was not an undue burden).

### III.   <u>Conclusion</u>

The volume and prejudicial nature of the publicity in this case has had the demonstrated effect of dictating a community-wide hostile attitude against Mr. Zahn that cannot be overcome by *voir dire*.   The proliferation of inflammatory media portraying Zahn's inadmissible testimony and the stake jury pool ratepayers perceive in the outcome of this trial prevent obtaining a fair and impartial jury in the Jacksonville division.   An alternate venue exists within this division that eliminates the perceived bias and does not impose substantial additional burden on the parties or the judicial system.   No harm will come from changing divisions.   *See Denno*, 313 F.2d at 372-373 ("No harm would have been done…in bringing [the defendant] on trial before a jury assuredly unprejudiced…").   For the foregoing reasons, Mr. Zahn respectfully asks the Court transfer trial in this matter to the Tampa division.

Dated: November 14, 2022            Respectfully submitted,

                                   _/s/   A. Brian Albritton_
                                   A. Brian Albritton   |   Florida Bar No. 0777773
                                   Raquel R. Jefferson   |   Florida Bar No. 0103758
                                   Mitchell L. McBride   |   Florida Bar No. 1025234
                                   **PHELPS DUNBAR LLP**
                                   100 South Ashley Drive, Suite 2000
                                   Tampa, FL  33602-5311
                                   Phone:  813-472-7557; Fax:  813-472-7570
                                   E-mail:  brian.albritton@phelps.com,
                                   raquel.jefferson@phelps.com,
                                   mitchell.mcbride@phelps.com

                                   Eduardo A. Suarez   |   Florida Bar No. 752540
                                   Diego M. Pestana   |   Florida Bar No. 1004436
                                   **THE SUAREZ LAW FIRM**
                                   1011 West Cleveland Street
                                   Tampa, Florida 33606-1913
                                   Phone: (813) 229-0040
                                   Email:  esuarez@suarezlawfirm.com,
                                   dpestana@suarezlawfirm.com
                                   **COUNSEL FOR DEFENDANT AARON ZAHN**

## CERTIFICATE OF SERVICE

On November 14, 2022, I electronically filed the foregoing using the Court's

CM/ECF system.

                                   _/s/   A. Brian Albritton_