<div align="center">

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

</div>

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        CASE NO. 3:22-cr-23-BJD-MCR

AARON ZAHN and
RYAN WANNEMACHER,

        Defendants.

_____/

<div align="center">

**REDACTED[1]**
**REPORT AND RECOMMENDATION[2]**

</div>

    **THIS CAUSE** is before the Court on the United States' Post-*Kastigar*

Hearing Brief (Doc. 290 redacted; Doc. 291 sealed), Defendant Ryan

Wannemacher's Response to the Government's Post-*Kastigar* Hearing Brief

(Doc. 296 redacted; Doc. 297 sealed), and Defendant Zahn's Post-*Kastigar*

---

    [1] The unredacted version of this Report and Recommendation was filed under seal and *ex parte* on November 6, 2023.   (Doc. 310.)   The parties were given an opportunity to submit a joint proposed redacted version of the Report and Recommendation (*id.* at 1 n.1), which they did on November 9, 2023.

    [2] "Within 14 days after being served with a copy of [a Report and Recommendation on a dispositive matter], a party may serve and file specific written objections to the proposed findings and recommendations."   Fed.R.Civ.P. 72(b)(2).   "A party may respond to another party's objections within 14 days after being served with a copy."   *Id.*   A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made.   *See* Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

Hearing Brief and Response to the Government's *Kastigar* Brief (Doc. 298 redacted; Doc. 299 sealed), all of which were filed pursuant to the Court's May 26, 2023 Order (Doc. 264), after an evidentiary hearing held on May 15-19 and May 23-25, 2023, pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972).

## I.    Background

In December of 2019, a federal investigation was opened into the Jacksonville Electric Authority ("JEA") matters that became the subject of the present Indictment.   (Doc. 297 at 23.)   On January 13, 2020, the State Attorney's Office ("SAO") formally referred its investigative matter to the federal authorities.   (Doc. 299 at 29-30.)   In the meantime, on January 3, 2020, Mr. Wannemacher gave his sworn statement before attorneys from the Office of General Counsel ("OGC") of the City of Jacksonville ("COJ"), followed by Mr. Zahn's sworn statement before the OGC on January 21 and 22, 2020 (the "*Garrity* statements").   (Doc. 297 at 8.)

During multiple separate sessions between December of 2020 and March of 2022, twenty-five (25) witnesses testified before the federal Grand Jury.   (*See* Doc. 163.)   The first and also the last witness to testify was Federal Bureau of Investigation ("FBI") Special Agent Robert Blythe who testified on December 3, 2020; December 17, 2020; January 28, 2021; March 18, 2021; and March 2, 2022.   FBI Special Agent Angela Hill testified on

February 11, 2021; February 18, 2021; March 4, 2021; March 11, 2021; and March 18, 2021.   Paul McElroy, Husein Cumber, and Michael Brost testified on March 25, 2021.   Michael Weinstein and Joseph Edward Orfano testified on April 1, 2021.   Melissa Charleroy, Patricia Maillis, and Angela Hiers testified on April 8, 2021.   Jeffrey T. Rodda and Kyle Billy testified on April 15, 2021.   Kelly Flanagan, April Green, Glen Alan Howard, and Fred Newbill testified on April 22, 2021.   Camille Lee Johnson and Christian Andrew Allen testified on April 29, 2021.   David Wathen and Anton Derkach testified on May 13, 2021.   Jason R. Gabriel and Stephen Amdur testified on May 20, 2021.   Kevin Hyde and Lynne Rhode testified on August 19, 2021. Melissa Dykes testified on September 16, 2021.   After Special Agent Blythe's final testimony on March 2, 2022, the Grand Jury returned a two-count Indictment for conspiracy and wire fraud against Defendants, Mr. Zahn and Mr. Wannemacher, that same day.   (Doc. 297 at 89.)

The Indictment alleges that between at least March and November of 2019, Mr. Zahn and Mr. Wannemacher conspired to obtain by fraud certain property of the COJ and also committed wire fraud in connection therewith.[3] (Doc. 1-1 at 7-8.)   The manner and means of the conspiracy are described as

---

[3] The wire fraud count realleges and incorporates the allegations in Count One, and is premised on the live stream of the July 23, 2019 JEA Board Meeting on media platform IBM USTREAM, which caused wire transmissions outside the State of Florida.   (Doc. 1-1 at 26-27.)

follows:

a.     It was part of the conspiracy that Zahn would and did begin planning for an [Invitation to Negotiate (ITN)] and to effectuate a sale of JEA in or around 2018 before he was named the permanent CEO of JEA.

b.     It was further part of the conspiracy that Zahn and Wannemacher would and did breach their fiduciary duty owed to JEA, the JEA Board, and the COJ by failing to disclose material information and making, and causing to be made, false and fraudulent representations to the JEA Board and others about material facts concerning the development of a purported Long-Term Incentive (LTI) Performance Unit Plan (PUP) and formula for the PUP that would be linked to the ITN, knowing that if JEA was sold, the PUP would pay Zahn, Wannemacher, and others exorbitant sums of money from funds that would have otherwise gone to the COJ General Fund once JEA was sold.

c.     It was further part of the conspiracy that from at least in or around January 2019 through in or around June 2019, Zahn would and did make presentations about a purported LTI plan to the JEA Board Compensation Committee (a Committee of three JEA Board Members), and met individually with JEA Board Members regarding the LTI PUP, without ever disclosing the substantial impact and effect on PUP payouts if JEA was privatized or sold.

d.     It was further part of the conspiracy that Zahn and Wannemacher would and did press Law Firm A to render a legal opinion that an iteration of the LTI PUP involving an issuance of JEA bonds was legal under Florida law; disengage from Law Firm A when Law Firm A rendered a contrary written legal opinion in May 2019 and another verbal opinion in early July 2019 that the LTI PUP was not legal under Florida law; and then withholding Law Firm A's legal opinion from Law Firm B and Law Firm C.

e.     It was further part of the conspiracy that Wannemacher would and did prepare and save electronic worksheets, accessible to Zahn – titled "Performance Unit Scratch Sheet.xlsx" and

"Notes.xlsx" – which calculated that an increase of $4 billion to JEA's Book Value would substantially raise the value of a PUP unit from $0 to $11,500, and result in a total PUP payout of $345 million to those holding PUP units.

f.     It was further part of the conspiracy that Zahn and Wannemacher would not and did not disclose or reveal the substance of either worksheet – "Performance Unit Scratch Sheet.xlsx" or "Notes.xlsx" – to any JEA Board member, City Council member, the Council Auditor's Office, or lawyer involved in the ITN.

g.     It was further part of the conspiracy that Zahn would and did cause Company A to be hired and would not and did not disclose to Company A the true intent of the LTI PUP or any of its effects in enriching JEA executives, including Zahn and Wannemacher, if JEA was sold or privatized.

h.     It was further part of the conspiracy that Zahn, Wannemacher, Person A, and Person B would and did lead JEA Senior Leadership Team (SLT) Members, along with Company A, in crafting a bleak baseline scenario for JEA's future performance as a municipal utility.   Company A worked with JEA executives to create Scenario One (known as the Status Quo) as a prediction of JEA's performance in the electric and water business to calendar year 2030 if JEA did nothing to react to market forces or otherwise adjust its business model during that timeframe. Company A and JEA executives did not design Scenario One as a realistic option for the JEA Board to select.   Scenario One was delivered during the May 28, 2019 JEA Board Meeting.

i.     It was further part of the conspiracy that Zahn and Wannemacher would and did craft Scenario Two (known as the Traditional Utility Response) to falsely and fraudulently project that JEA was in a "death spiral" and that the only available adjustments in JEA's business included terminating up to 29% of the JEA workforce, significantly raising customer rates, reducing capital expenditures, and significantly reducing the annual contribution to the COJ General Fund, to year 2030.   Zahn, Wannemacher, and certain others would and did deliver Scenario Two during the June 25, 2019 Board Meeting to falsely and

fraudulently convince the JEA Board that a third scenario, Scenario Three (the ITN and Non-Traditional Utility Response), was necessary to avoid JEA's certain demise.

j.      It was further part of the conspiracy that, even before a scheduled July 2019 JEA Board Meeting, Zahn would and did begin meeting with and informing at least one potential purchaser of JEA that JEA would be exploring a sale or privatization.

k.      It was further part of the conspiracy that Zahn, Wannemacher, Person A, and Person B would and did present Scenario Three during the July 23, 2019 Board Meeting as the only feasible option for the JEA Board to select, which resulted in the JEA Board approving Resolution 2019-09 which authorized the ITN and Non-Traditional Utility Response.   Wannemacher labeled Scenario Three as "a once in a generation opportunity" and further stated that "no one will be left behind."

l.      It was further part of the conspiracy that, during the July 2019 JEA Board Meeting, Zahn and Wannemacher would and did falsely and fraudulently present to the JEA Board and others altered slides from a draft PowerPoint of Company B that bore Company B's logo to fraudulently represent that Company B had created and approved of the LTI PUP, when such was not the case.

m.      It was further part of the conspiracy that, during the July 2019 Board Meeting, Zahn would and did persuade and coerce the JEA Board to approve Resolution 2019-06, which authorized JEA to terminate 574 JEA employees (approximately 29% of its workforce) over a seven-month period unless Scenario Three was adopted.

n.      It was further part of the conspiracy that, during the July 2019 JEA Board Meeting, Zahn and Wannemacher would not and did not present any financial calculations or illustrative examples that would reveal the substantial payouts required under the proposed LTI PUP to Zahn, Wannemacher, and certain others and the corresponding detriment to the COJ General Fund if JEA was sold.

o.      It was further part of the conspiracy that Zahn and Wannemacher would and did purposely craft the language of Resolution 2019-10 so that the LTI PUP would be prospectively approved by the JEA Board and require no further consideration by the JEA Board.

p.      It was further part of the conspiracy that Zahn and Wannemacher would and did craft the language of the LTI PUP formula such that if JEA was sold for $3 billion or more in net profits, the PUP units would result in exorbitant payouts of tens of millions of dollars to Zahn, Wannemacher, and certain others to the detriment of the COJ General Fund.

q.      It was further part of the conspiracy that Zahn and Wannemacher would and did request that Law Firm C prepare PUP documents to facilitate JEA employees' enrollment in the PUP, using an LTI PUP share formula provided by Zahn and Wannemacher.

r.      It was further part of the conspiracy that Zahn and Wannemacher would and did falsely and fraudulently represent, and cause to be represented, to the JEA Board and others that any potential payouts under the LTI PUP would be modest, while having previously calculated and recognizing that a sale of JEA, as contemplated by Scenario Three (the ITN), would substantially raise the PUP payouts to Zahn, Wannemacher, and certain others by tens of millions of dollars to the detriment of the COJ General Fund.

s.      It was further part of the conspiracy that Zahn would and did design and establish minimum requirements for a successful ITN bid that would result in a net financial gain to the COJ and thereby ensure that the LTI PUP made substantial payouts to Zahn, Wannemacher, and certain others holding many PUP units if JEA was sold.

t.      It was further part of the conspiracy that Zahn would and did design and establish other minimum requirements for a successful ITN bid that would likely press and/or motivate Members of the City Council and voters in the COJ to approve

Zahn's plan to sell JEA . . . .

u.     It was further part of the conspiracy that Zahn and
Wannemacher would and did conceal from the JEA Board and
others that the proposed LTI PUP would overwhelmingly allocate
the potential 100,000 LTI PUP units to Zahn, Wannemacher, and
certain others.

v.     It was further part of the conspiracy that Zahn would and
did exclude other Members of the SLT from the process of
crafting or creating the LTI PUP and conceal from other SLT
members the substantial financial impact on the LTI PUP units
upon a sale of JEA.

w.     It was further part of the conspiracy that Zahn and
Wannemacher would and did intentionally conceal information
and make material misrepresentations and omissions to the
General Counsel's Office, the Council Auditor's Office, outside
consultants, and law firms, among others, as to the nature, effect,
and calculations of the LTI PUP upon a sale of JEA.

x.     It was further part of the conspiracy that the conspirators
would and did conceal, misrepresent, and hide the purpose of acts
performed in furtherance of the conspiracy.

(*Id.* at 8-15.)

Further, the overt acts of the conspiracy are included in paragraph 20

of the Indictment as follows:

a.     On or about March 18, 2019, Wannemacher prepared an
Excel spreadsheet titled "Performance Unit Scratch Sheet.xlsx"
using JEA financial statements from 2016 through 2018 to
perform an example LTI calculation in which Wannemacher
added $4 billion to JEA's Book Value for 2018.

b.     On or about June 18, 2019, Zahn presented the LTI PUP to
the JEA Board Compensation Committee Members and told them
that the plan was a self-funded plan that would provide payouts
over a three-year cycle in the range of approximately $3.4 million

8

total for all participating JEA employees, while omitting any discussion of how privatization of JEA would substantially increase LTI PUP payouts.

c.      On or about June 18, 2019, Zahn presented the LTI PUP to the JEA Board Compensation Committee Members via a PowerPoint presentation containing the insignia of Company B, when Company B had not authorized Zahn to do so, nor had Company B designed, created, or approved the LTI PUP presentation.

d.      On or about June 18, 2019, Zahn and Wannemacher falsely and fraudulently told the JEA Board Compensation Committee and showed a PowerPoint slide stating that the core function of the LTI PUP was to bring JEA employees to the 50th percentile in the market for pay of all utilities (whether municipal or IOUs).

e.      On or about June 18, 2019, Zahn falsely and fraudulently described the LTI PUP to the JEA Board Compensation Committee as a three-year plan and that payouts under the LTI PUP would be modest, when in fact LTI PUP payouts to select executives would have been exorbitant if JEA was sold.

f.      During the June 25, 2019 Board Meeting, Wannemacher reviewed Scenario One (the baseline or Status Quo that Company A assisted in developing), and Zahn began the presentation of Scenario Two, which Zahn created, by stating that in a Traditional Utility Response, there were only three adjustment tools: (i) cut costs and workforce; (ii) increase customer rates; and (iii) reduce capital expenditures.   Zahn then caused Person A to deliver the details of Scenario Two, which included the termination of 574 JEA employees (29% of the JEA workforce), significant rate increases until year 2030, and the likelihood of a significantly reduced or zero contribution to the COJ General Fund beyond 2023.

g.      During the June 25, 2019 Board Meeting, after hearing individual JEA Board Members express displeasure with scenario Two with comments such as Scenario Two being a "doom and gloom" outlook, Zahn told the JEA Board, "As I have told the employees, I am not here to implement the traditional utility

response.   I believe there is a lot of exciting opportunities if we just gain some alignment with our community."

h.      On or about July 1, 2019, Wannemacher sent an email to two lawyers at Law Firm A containing an attachment which was an iteration of the LTI PUP involving a bond issuance that provided for accelerated payments based on an "Extraordinary Mandatory Redemption," which was defined as: "In the event of repayment of substantially all of the debt outstanding under either subordinate bond resolution, the Benefit Bonds associated with such resolution will be subject to Extraordinary Mandatory Redemption.   In an Extraordinary Mandatory Redemption, the Current Year Value will be calculated based upon the expected Net position immediately after the Extraordinary Redemption." The only event that could pay off all outstanding debt is a sale of JEA.   Wannemacher took this action after Law Firm A provided a written memorandum on May 20, 2019 that such an LTI PUP plan was not in accordance with Florida Law, and then orally advised the same after receiving Wannemacher's July 1, 2019 email.

i.      On or about July 10, 2019, a conspirator prepared a spreadsheet titled "FY2020 LTI Estimate," which contained calculations relating to the LTI PUP through Fiscal [Y]ear 2022, and included an allocation of performance units by job level.

j.      On or about July 11, 2019, Wannemacher finalized the formula for the LTI PUP in connection with privatization of JEA and crafted the formula in connection with the minimum requirements for a successful ITN bid, such that substantial payouts to JEA executives under the LTI PUP, primarily himself and Zahn, were a certainty if JEA was sold.

k.      On or about July 17, 2019, Zahn caused a JEA employee to send an email wire communication to JEA Board Members advising them how they would receive the Board Meeting materials for the July 23, 2019 JEA Board Meeting.

l.      On or about July 18, 2019, Wannemacher prepared an Excel spreadsheet titled "Notes.xlsx," which calculated how 30,000 LTI PUP units each with a beginning value of $0 would

increase in value to $11,500 for a total payout of $345 million. This spreadsheet was never provided to the JEA Board, the Jacksonville City Council, the General Counsel's Office, the Council Auditor's Office, or the outside consultants and law firms.

m.    On or about July 19, 2019, Zahn authorized delivery of hard copies of the materials for the July 23, 2019 Board Meeting via courier to the JEA Board Members.

n.    On or about July 19, 2019, Zahn met with the CEO of a potential buyer in West Palm Beach, Florida and told the CEO and others attending that JEA would be exploring privatization.

o.    On or about July 22, 2019, Zahn falsely and fraudulently told JEA Board Member with initials A.A. that the LTI PUP payouts would be modest and in the range of $3.4 million per year for all participating JEA employees, while omitting any reference to how a sale of JEA would substantially increase LTI PUP payouts.

p.    On or about July 23, 2019, Zahn withheld authorization to post the complete July 23, 2019 Board package on the JEA internet website (including the portion dealing with the LTI PUP) until after the conclusion of the July 23, 2019 Board Meeting, when the full Board package was ready days earlier and the normal course was to post the full Board package on the JEA website before the monthly JEA Board meeting.

q.    On or about July 23, 2019, during the JEA Board meeting, which was live streamed on Facebook and IBM's USTREAM service, Wannemacher informed the JEA Board Members the minimum requirements for a successful ITN bid, and stated, "It becomes clear that any capitalization opportunity that hits these table stakes will truly be a once in a generation opportunity.   No one will be left behind."

r.    On or about July 23, 2019, during the JEA Board meeting, Zahn asked the JEA Board to approve Resolution 2019-06, which authorized the termination of 574 JEA employees pursuant to Scenario Two (Traditional Utility Response) if the JEA Board did

not authorize the ITN via Resolution 2019-09.

s.      On or about July 23, 2019, during the JEA Board meeting, Wannemacher presented the LTI PUP and falsely and fraudulently omitted any explanation of the LTI PUP formula in connection with a sale of JEA, knowing that the Board Members did not have sufficient information in the Board package to make that determination.

t.      On or about July 23, 2019, during the JEA Board Meeting, Zahn asked the JEA Board to prospectively approve the LTI PUP in Resolution 2019-10 with no further JEA Board oversight and without disclosing the substantial amount of LTI PUP payouts that would result if JEA was sold.

u.      On or about July 23, 2019, during the JEA Board Meeting, Zahn and Wannemacher falsely and fraudulently advised the JEA Board that the LTI PUP was an LTI that would cost JEA approximately $3.4 million per year on the low end or approximately $10 million per year on the high end over a three-year period, without disclosing the substantial increase in LTI PUP payouts that would result if JEA was sold.

v.      On or about July 23, 2019, during the JEA Board Meeting, Wannemacher falsely and fraudulently advised that the payouts under the PUP would not exceed 6% of JEA's entire payroll to employees having previously calculated and being fully aware that, in the event of a JEA sale, the LTI PUP payouts would substantially exceed that 6% amount.

w.      On or about July 23, 2019, at approximately 2:15 pm, Zahn caused a JEA employee to upload the entire Board Meeting materials for the July 23, 2019 Board Meeting on the JEA internet website.

x.      On August 14, 2019, in response to an email on August 9, 2019 from an auditor at the Council Auditor's Office that contained a list of twenty-two questions about the LTI PUP, Wannemacher responded via email and attached draft LTI PUP plan documents and stated in the email: "Attached are the latest drafts of the plan documents and award agreement that was

approved by the board.   This will answer many of these questions.   As we are still working on a number of other pressing items, can we circle up in a few weeks on any additional questions you may have after reviewing these documents." Wannemacher forwarded this response via email to Zahn, Person A, Person B, and a lawyer with the General Counsel's Office.

y.     On or about October 31, 2019, during a meeting with auditors in the Council Auditor's Office, Wannemacher continued to represent that any payments under the LTI PUP would be reasonable and modest, and failed to disclose to the Council Auditors that there would be a substantial increase in LTI PUP payouts if JEA was sold.

z.     On or about November 5, 2019, Zahn and Person B met with the General Counsel for the COJ seeking to obtain approval for the LTI PUP.   Zahn told the General Counsel that any LTI PUP payouts would be modest, and intentionally concealed the substantial increase in LTI PUP payouts if JEA was sold, knowing that a sale would net the COJ a profit between $3 billion and $6 billion.

aa.     On or about November 12, 2019, Zahn wrote a letter to the General Counsel because the General Counsel declined to approve the LTI PUP, which stated, in part, that the PUP was "indefinitely suspended" and that if an ITN option was selected as a result of strategic planning "the plan would be moot from a long-term incentive basis," knowing that the purpose of the LTI PUP was to pay JEA executives, namely Zahn and Wannemacher who created the LTI PUP, substantial payouts if JEA was sold – a fact that Zahn intentionally hid from the General Counsel.

bb.     On November 13, 2019, after receiving fifteen additional questions and a list of eight "concerns" from the Council Auditor's Office via email on October 31, 2019 (sent after the October 31, 2019 meeting) and a second email on November 7, 2019 from another auditor in the Council Auditor's Office seeking conformation [sic] of how to perform the LTI PUP calculation, Wannemacher responded with an email stating: "All, [w]e have decided to not move forward with the implementation of the performance units at this time."   Wannemacher attached Zahn's

13

letter to the General Counsel dated November 12, 2019.   In that email, Wannemacher did not answer any of the Council Auditor's additional questions or address the concerns set forth in the October 31, 2019 email and did not address the sample calculation set forth in the November 7, 2019 email from the Council Auditor's Office.

cc.   On or about November 13, 2019, after receiving another email from a Council Auditor asking Wannemacher to confirm the LTI PUP formula, Wannemacher emailed Council Auditor's Office employees a spreadsheet with a sample calculation of the LTI PUP over a three-year period showing modest gains for a performance unit, as if that was the only potential payout scenario under the LTI PUP.   This hid and concealed the substantial payouts to Zahn, Wannemacher, and others under the LTI PUP if JEA was sold or privatized.

dd.   On or about November 14, 2019, Wannemacher, after receiving additional questions about the LTI PUP calculation if JEA was sold and the COJ received $4 or $5 billion in net revenue, sent an email to Council Auditor's Office employees stating, in sum and substance: "As noted in my previous email, you have been notified that this was a DRAFT plan that is not being finalized or implemented.   In addition, as Aaron's letter noted, as a long-term incentive plan it would be moot in any recapitalization scenario.   No other questions or answers are necessary at this time."   Wannemacher knew the LTI PUP was not a draft plan and that the LTI PUP was designed to pay substantial payouts to Zahn, Wannemacher, and certain others if JEA was sold.

(*Id.* at 16-25.)

On November 14, 2022, both Defendants filed motions for a *Kastigar* hearing (Docs. 110/114 & 112/115), which were referred to the undersigned on December 16, 2022, after the Government filed its combined response on November 30, 2022 (Doc. 132).   After several status conferences and pre-

hearing briefs, the Court set the procedures for the *Kastigar* hearing and the date for the hearing to start on May 15, 2023.   (*See* Docs. 198, 218.)

During the *Kastigar* hearing, the Court heard testimony from twelve of the witnesses who testified before the Grand Jury: (1) Special Agent Robert Blythe; (2) Special Agent Angela Hill; (3) Paul McElroy; (4) Joseph Edward Orfano; (5) Jeffrey T. Rodda; (6) Kyle Billy; (7) Kelly Flanagan; (8) Glen Alan Howard; (9) Christian Andrew Allen; (10) Jason R. Gabriel; (11) Melissa Dykes; and (12) Lynne Rhode.[4]   (*See* Docs. 247, 249, 250, 251, 253, 258, 261, 262.)   The Court also heard testimony from the following witnesses who did not testify before the Grand Jury: (1) former SAO investigator Timothy Adams; (2) former SAO investigator John A. Zipperer; (3) Kevin Blodgett, a Special Investigative Committee ("SIC") attorney with the law firm of Smith Hulsey & Busey ("SHB"); (4) Pam Rauch with Florida Power & Light; (5) former JEA Chief Customer Officer Kerri Stewart; (6) Kim Taylor with the Council Auditor's Office ("CAO"); (7) City Council Member Ronald Salem; and (8) Daniel Nunn, an attorney with the law firm of Nelson Mullins Riley & Scarborough, LLP.[5]   (Docs. 251, 253, 258, 261.)

---

[4] Lynne Rhode only testified at the Diamond-Salem portion of the *Kastigar* hearing.

[5] Mr. Wannemacher only testified at the Diamond-Salem portion of the *Kastigar* hearing.   (*See* Doc. 247.)

## II.   Standard

"When the government seeks to prosecute a witness who previously has

given self-incriminating testimony pursuant to a grant of immunity, serious

Fifth Amendment questions are raised."   *United States v. Schmidgall*, 25

F.3d 1523, 1528 (11th Cir. 1994), *cert. denied,* 500 U.S. 941 (1991).   As stated

in *Kastigar*, the prosecution is prohibited from "using the compelled

testimony in any respect" that could "lead to the infliction of criminal

penalties on the witness."   *Kastigar v. United States*, 406 U.S. 441, 453

(1972).[6]   "Therefore, when presented with a *Kastigar* challenge, a court's

task is to determine whether any of the evidence used against the defendant

was in any way derived from his compelled immunized testimony."

*Schmidgall*, 25 F.3d at 1528.   The defendant "is not dependent for the

---

[6] *Kastigar* did not expressly discuss the propriety of non-evidentiary use. However, in *Byrd*, the Eleventh Circuit stated: "It is our view that the privilege against self-incrimination is concerned with direct and indirect *evidentiary* uses of compelled testimony, and not with the exercise of prosecutorial discretion."   *United States v. Byrd*, 765 F.2d 1524, 1531 (11th Cir. 1985) (emphasis in original) (rejecting *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973), where the Eighth Circuit determined that *Kastigar* forbids all prosecutorial use of defendant's immunized testimony, "not merely that which results in the presentation of evidence before the jury").

Subsequently, the District of Columbia Circuit found cases, such as *Byrd*, "troubling" insofar as they could be read as establishing a rule that *Kastigar* allowed non-evidentiary use of compelled testimony.   *United States v. North*, 910 F.2d 843, 859-60 (D.C. Cir. 1990) (*North I*), *withdrawn and superseded in part*, 920 F.2d 940 (D.C. Cir. 1990).   For purposes of the present Report, the undersigned will not follow the District of Columbia Circuit, or any other circuit, to the extent it has reached conclusions that are inconsistent with Eleventh Circuit precedent.

preservation of his rights upon the integrity and good faith of the prosecuting authorities." *Kastigar*, 406 U.S. at 460.

The government's burden of proof "is not limited to a negation of taint," rather, the prosecution has an "affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* "To establish legitimate independent sources, the government ha[s] to show that all evidence presented to the grand jury and at trial either was in the possession of the government prior to [defendant's] immunized grand jury appearance or was derived from a source independent of [defendant's] testimony (i.e., that [defendant's] testimony provided neither new direct evidence nor investigatory leads)." *United States v. Dynalectric Co.*, 859 F.2d 1559, 1579 n.27 (11th Cir. 1988); *see also United States v. Hampton*, 775 F.2d 1479, 1485 (11th Cir. 1985) (same)[7]; *United States v. Seiffert*, 463 F.2d 1089, 1092 (5th Cir. 1972) ("The Government must show how it acquired all of the evidence admitted

---

[7] In *Hampton*, the Eleventh Circuit stated:
Unless the government relies solely upon evidence obtained prior to the immunized testimony, . . . the principles of *Kastigar* generally require (as a practical matter) a showing that prosecuting officials and their agents were aware of the immunity problem and followed reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations.
*Hampton*, 775 F.2d at 1490.   However, in *Schmidgall*, the Eleventh Circuit distinguished *Hampton* and found that it "did not establish a *per se* rule of taint." *Schmidgall*, 25 F.3d at 1531-32.

below.").[8]

"To establish a 'wholly independent' source, the government must demonstrate that each step of the investigative chain through which the evidence was obtained is untainted."   *Schmidgall*, 25 F.3d at 1528. However, "[t]he government is not required to negate all abstract 'possibility' of taint."   *Byrd*, 765 F.2d at 1529; *see also United States v. Vander Luitgaren*, 556 F. Supp. 2d 1313, 1320 (M.D. Fla. 2008) ("While the government bears the burden of showing by a preponderance that a *Kastigar* violation did not occur, Defendant cannot raise theoretical *Kastigar* claims based upon every event that occurred post-proffer.").

"Although *Kastigar* notes that this is a 'heavy' burden in practical terms, subsequent cases controlling in this circuit have made it clear that, in legal terms, the government is only required 'to demonstrate by a preponderance of the evidence an independent source for all evidence introduced.'"   *Hampton*, 775 F.2d at 1485 (internal citations omitted); *see also Byrd*, 765 F.2d at 1529 (stating that the government is "only required to show that the evidence more likely than not was derived independently of [defendant's immunized] testimony").   Still, "mere denials of use by the

---

[8] As stated in *Schmidgall*, "[t]he protection against self-incrimination is violated whenever the prosecution presents a witness whose testimony is shaped—directly or indirectly—by immunized testimony, regardless of how or by whom the witness was exposed to that testimony."   *Schmidgall*, 25 F.3d at 1528.

prosecutors and other government agents are generally insufficient to meet the government's burden, even if made in good faith."   *Hampton*, 775 F.2d at 1485; *see also Schmidgall*, 25 F.3d at 1528 ("A government agent's denials that he made use of the immunized testimony, standing alone, are generally insufficient to meet the government's burden, even if made in good faith.").

Critically, "an indictment may be sustained despite the use of prohibited evidence if [the government's] use is found to have been harmless beyond a reasonable doubt."   *Hampton*, 775 F.2d at 1489 n.51.   The focus of such inquiry is "whether the evidence would have been sufficient to sustain an indictment even if [defendant's] immunized testimony had not been improperly used or presented."   *Byrd*, 765 F.2d at 1529 n.8.   "[E]xploration of the question of taint can be made . . . by review of the prosecution's evidence and of the grand jury transcript."   *United States v. Allen*, 864 F.3d 63, 100 (2d Cir. 2017) (citing *United States v. Hinton*, 543 F.2d at 1010 n.10 (2d Cir. 1976), *cert. denied*, 97 S. Ct. 493 (Nov. 29, 1976) and 97 S. Ct. 796 (Jan. 17, 1977)).   As explained in *Hill*:

> No reliable harmlessness determination can be made until a full evidentiary hearing is conducted into the derivative use issue as to all of the evidence used against [defendant].   Only after that hearing will the district court be able to reliably determine which evidence the government has failed to show was obtained independently and whether the admission of that evidence was harmless.

*United States v. Hill*, 643 F.3d 807, 879 (11th Cir. 2011).

19

### III.    The Parties' Arguments

### A.    The Government's Position

The Government argues that it has "clearly established independent sources for the evidence that it presented to the grand jury and that it will present at trial to prove the defendants' guilt."   (Doc. 291 at 1.)   According to the Government, the proper inquiry under *Kastigar* "is whether there is an independent basis for the factual allegations in the Indictment."   (*Id.* at 9.) While acknowledging that "some of [its] witnesses may have been exposed to the *Garrity* statements, mostly through articles in the media that most of them could no longer recall," the Government argues that it has presented independent sources for all of its evidence, including:

(1) a plethora of documents gathered independently by investigators[;]
(2) the witnesses' personal participation in JEA-related events (such as the ITN, JEA Board Meetings, and financial projections of JEA);
(3) the witnesses' firsthand conversations with the Defendants and others;
(4) the witnesses' firsthand knowledge of, and experience with, third-party businesses that interacted with JEA employees (like McKinsey & Co., Willis Towers Watson, NextEra, Morgan Stanley, and JP Morgan); and
(5) the witnesses' firsthand understanding of the LTI PUP (whether as Board Members receiving information about it, OGC lawyers deciphering it, or JEA employees evaluating it).

(*Id.* at 2.)

The Government points out that the Grand Jury transcripts "reveal a

compelling truth, that is, despite over one thousand pages of questions and

answers involving the twenty-five witnesses [who testified before the Grand

Jury], the [D]efendants cannot show the Court one single question and

answer that was somehow derived from the Defendants' *Garrity* statements."

(*Id.* at 3.)   The Government explains:

> At the outset of the federal grand jury investigation in early
> 2020, the Prosecution Team[9] decided to shield itself from the
> Defendants' *Garrity* statements.   To this day, no one on the
> Prosecution Team has read those statements.   There was no
> need for a filter review team.   The decision was made to conduct
> the grand jury investigation without reviewing the statements
> and to keep any such information out of the grand jury
> proceedings.

(*Id.* at 4.)

The Government acknowledges that it received Mr. Wannemacher's

*Garrity* statement from OGC on January 15, 2020.   (*Id.* at 4 n.5 (citing Doc.

268, Vol. 1 at 132:19–135:8).)   Despite the FBI's attempts to permanently

remove the statement from their file in September of 2021, it was not

---

[9] The Prosecution Team initially included: Assistant United States Attorney Andrew Tysen Duva ("AUSA Duva"); FBI Special Agents Robert Blythe and Angela Hill; and former SAO investigators Timothy Adams and John Zipperer. Investigator Adams left the SAO in late July 2021, and from that point forward was not involved in the investigation.   Investigator Zipperer retired from the SAO as a full-time investigator in May 2020, but remained engaged in a part-time status. On March 2, 2023, AUSA Arnold B. ("Chip") Corsmeier joined the Prosecution Team.   (*See* Doc. 179.)   On April 13, 2023, AUSA David Pardo filed a Notice of Appearance as "filter team AUSA", together with FBI Division Counsel Ann Shannon and Associate Division Counsel Angela Bray (also referred to as Cross Counsel Team).   (*See* Doc. 200.)

removed until sometime in March of 2022.   (Doc. 291 at 4 n.5; Doc. 270, Vol.

3 at 100:19-107:24.)   Although the Government did not obtain Mr. Zahn's

*Garrity* statement from OGC, it received volume II of the statement, without

solicitation, from a Tim Baker entity identified as Bold City Strategic

Partners, LLC ("BCSP").   (Doc. 291 at 4 n.5 (citing Gov't Ex. 60A); Doc. 270,

Vol. 3 at 99:15-101:5.)

     The Government explains that the publicly-available November 18,

2019 Memorandum by Council Auditor Kyle Billy to all Jacksonville City

Council Members, which exposed the true details of the LTI PUP and most

notably the payouts that would result from a recapitalization event, was

reviewed by Special Agent Blythe "within a month" after it was released, and

naturally led to the desire to review publicly-available JEA Board Meetings,

interview all Council Auditor employees who reviewed the Memorandum,

obtain communications with anyone involved in preparing or delivering the

LTI PUP to the JEA Board, and any communications about the LTI PUP,

including those with any Council Auditor's Office employees.   (Doc. 291 at

23-24.)   Specifically, "it led to the desire to interview Council Auditor Kyle

Billy and 'any other staff at the [C]ouncil [A]uditor's office that worked on

[the PUP analysis], including Jeff Rodda, Heather Reber, Kim Taylor, and

others.'"   (*Id.* at 24 (citing Doc. 268, Vol. 1 at 127:16-23).)   It also led, in part,

to the issuance of the Grand Jury subpoena to JEA on April 21, 2020.   (*Id.*

(citing Gov't Ex. 50 (JEA Grand Jury subpoena), items 1-2, 6-10, 14-16, 18;

Doc. 268, Vol. 1 at 142:10-160:2).)

The Government adds that the publicly available recorded Board

meetings on the JEA website from 2018-2019, particularly those that took

place on January 22, May 28, June 25, and July 23, 2019, led to the

identification of other entities, which led to additional Grand Jury subpoenas

issued at the same time on April 21, 2020 to Willis Towers Watson,

McKinsey, Morgan Stanley, JP Morgan Chase, NextEra Energy, and S&P

Global.   (Doc. 291 at 22, 24, 28 n.14 (citing Gov't Exs. 54-59).)   The

Government explains:

> The mention of Willis Towers Watson and the presence of
> McKinsey partner Anton Derkach during the January 22, 2019,
> Board Meeting led to these grand jury subpoenas.   Zahn or
> Wannemacher mentioning Willis Towers Watson or McKinsey in
> their *Garrity* statements is of no moment.   Mere mention of
> these entities does not render the statements themselves as the
> sole source of knowledge that these companies were involved.
> There were ample references to each entity in the public charge
> of this investigation to lead the Prosecution Team to subpoena
> the documents and later interview David Wathen (on May 14,
> 2020 - Govt. Ex. 61) and Anton Derkach (on January 29, 2021 –
> Govt. Ex. 62) and subsequently place both individuals before the
> grand jury (transcripts submitted *in camera*).   None of these
> investigative steps arose out of the Defendants' *Garrity*
> statements or references thereto in the news media.

(Doc. 291 at 28 n.14 (citing Doc. 269, Vol. 2 at 14:3-15, 40:12-48:16,

85:17-93:20).)

Also, the Government states that outgoing Board Chair Tom Petway's

comments at the end of the November 28, 2017 Board Meeting led to a string
of public events that resulted in the disclosure of the Performance Financial
Management ("PFM") Report dated February 14, 2018, divulged in a City
Council Meeting that same day.   (Doc. 291 at 24-25; Gov't Ex. 4 at 18-20
("According to the PFM Report, the gross value of JEA was between $7.5
billion and $11 billion, which meant that "net proceeds to the City could
range from $2.9 billion to $6.4 billion.").)   Further:

> The productions from JEA and Willis Towers Watson in response
> to the grand jury subpoenas, the interviews of David Wathen
> (Govt. Ex. 61), Angie Hiers (Govt. Ex. 70), and Pat Maillis (Govt.
> Ex. 69), and the grand jury testimony of Wathen, Hiers, and
> Maillis (all submitted *in camera*), provided a clear insight into
> the services that Willis Towers Watson provided as to long term
> incentive plans, and that Willis Towers Watson had no
> involvement in developing the LTI PUP.   *See generally* Vol. 2, p.
> 44, line 1 – p. 59, line 20; Govt. Exs. 21D – 21F, 21M, & 21N.

> Specifically, the Government obtained Willis Towers Watson's
> work product setting forth eight general frameworks for a modest
> long term incentive plan for JEA.   *See* Vol. 2, p. 48, line 25 - p.
> 59, line 20; Govt. Ex. 21E.   Obtaining these records showed that
> Willis Towers Watson's work was used, without its consent, as a
> veneer to lend false credibility to the LTI PUP, *see* Govt. Ex.
> 20(p)(1) – 20(p)(5); 20(q), which was delivered at the very end of
> the July 23, 2019, Board Meeting in a cursory and misleading
> fashion.   The Compensation Study PowerPoint (Govt. Ex. 21M),
> which was attached to a May 9, 2019, email sent to Aaron Zahn,
> Ryan Wannemacher, and others, was used to create the false
> impression with JEA Board Members that the total cost of the
> plan was approximately $3.4 to $4.6 million per year over a
> three-year period. Vol. 2, p. 76, line 22 – p. 77, line 24; Govt. Ex.
> 21M.

> After the Council Auditor outed the true nature of the LTI PUP

(Govt. Ex. 20(ff)) and the media reported on it, David Wathen sent the January 8, 2020, letter to Melissa Dykes disavowing that the LTI PUP (Resolution 2019-10) was Willis Towers Watson work product, and later confirmed in an interview (based on his personal knowledge) that Willis Towers Watson was never permitted to present at the June 18, 2019, Compensation Committee meeting or at any JEA Board Meeting. Vol. 2, p. 77, line 25 - p. 85, line 9; Govt. Ex. 21N, & 20(p)(5). As of January 8, 2020, Zahn had not yet provided any *Garrity* statement. The investigative leads set forth as to Willis Towers Watson were derived entirely independently of anything that Wannemacher stated during his January 3, 2020, statement.

[redacted].

. . .

[redacted]

. . .

This same investigative approach was employed with other germane third parties that were pertinent to the ITN and LTI PUP.   These entities were identified either during the publicly available JEA Board Meetings or via JEA's response to the grand jury subpoena (Govt. Ex. 50).   The entities include Morgan Stanley, JP Morgan Chase, NextEra Energy, and S&P Global, all of which received grand jury subpoenas at the same general time as the subpoenas issued to JEA, Willis Towers Watson, and McKinsey (April 21, 2020).   *See* Govt. Exs. 56 – 59.   The returns from these grand jury subpoenas led to critical interviews with representatives from each entity, including but not limited to, Eddie Manheimer (Morgan Stanley), Jason Gredell (JP Morgan Chase), Mark Hickson (Florida Power & Light), Pam Rauch (FP&L), and Jeff Panger (S&P Global), the substance of which were presented to the grand jury on March 2, 2022, via the testimony of Agent Blythe (transcript submitted *in camera*).   It was clear in early 2020, from the publicly available JEA Board Meetings and ITN process, that each entity had a critical and germane role.   The Defendants' claim that this path to interviewing these witnesses contains some level of taint is simply theoretical and not based on any facts.

(Doc. 291 at 28-35 (footnotes omitted).)

The Government also states that the Prosecution Team "compared publicly available forecasting that JEA performed and presented for a variety of purposes," including the 2018 Ratings Agency Presentation (Gov't Ex. 37), which led to the Grand Jury subpoena to S&P Global, issued on April 21, 2020 (Gov't Ex. 59).   (Doc. 291 at 34 n.21.)   This led to the production of S&P Global email communications with JEA personnel, which the Prosecution Team had from JEA's Grand Jury subpoena responses, and the interview of analyst Jeff Panger on December 17, 2020 who stated:

[H]e did not buy any of the "doom and gloom" forecast, and that

JEA's financial condition in 2019 was "very, very, quite strong." *Id.* at p. 55, line 8.   Panger reviewed email communications with Wannemacher in August 2019 (Govt. Ex. 40A & 40D) that were critical of JEA's presentations to the JEA Board.   *Id.*   Panger stated that S&P disagreed with JEA's projections to the JEA Board, and ultimately issued a Ratings Bulletin dated August 23, 2019 (Govt. Ex. 40B), that informed bond holders that S&P disregarded JEA's strategic planning presentation for bond ratings purposes.   *Id.*   Panger communicated significant disagreement with JEA's projections delivered to the JEA Board in May – July 2019, and noted that JEA's robust financial metrics were at significant odds with that presentation.   *Id.* None of this evidence was gleaned or derived from the January 2020 *Garrity* statements.

(Doc. 291 at 34-35 n.21.)

The Government further states:

The January 3, 2020, statement of Mr. Wannemacher





(Doc. 291 at 35-36.)

The Government next argues that SIC, comprising of attorneys

Stephen Busey, Lanny Russell, and Kevin Blodgett from SHB, which was

formed to investigate the PUP, the ITN, and the potential privatization of

JEA, did not taint the federal Grand Jury investigation.   (*Id.* at 37.)

Addressing the Performance Unit Scratch Sheet and the Notes.xlsx

spreadsheet, the Government states as follows:

> As the evidence at the *Kastigar* hearing established, the first
> time the version of the "Performance Unit Scratch Sheet"--adding
> over $4 billion to JEA's Book Value in 2018 (Govt. Ex. 20(a)(1))--
> and the "Notes.xlsx" spreadsheet--showing the growth of a
> Performance Unit from $10.50 to $11,500 and resulting in a value
> of $345,000,000 for 30,000 units (Govt. Ex. 20(l)(1))--came to light
> publicly was after the return of the Indictment.   This means that
> neither Zahn nor Wannemacher discussed these spreadsheets in
> any statements.   Nevertheless, the Defendants claim that these
> documents were somehow derived from *Garrity* statements in
> which the documents were never mentioned.
>
> In early June 2021, Assistant Council Auditor Jeff Rodda found
> these documents in a tranche of files that JEA produced to the
> SIC, which occurred after JEA made the same productions to the
> United States pursuant to the April 21, 2020, grand jury

subpoena to JEA (Govt. Ex. 50).   While Rodda was the first to decipher the documents and informed the Government of his interpretation of them in June 2021, the record is clear that the origin of them had nothing to do with the Defendants' *Garrity* statements, as the Government already had been provided with the documents by JEA.

(Doc. 291 at 8-9; *see also id.* at 39 (citing Doc. 270, Vol. 3 at 77:11-80:17) ("The Government received both spreadsheets from JEA pursuant to the April 21, 2020, grand jury subpoena, but had not understood their significance as of June 14, 2021.").)

The Government explains that its exhibits demonstrate it possessed the spreadsheets from an independent source:

Exhibit 20(a)(5) is the computer forensic report of FBI Computer Scientist Timothy McCrohan titled "Technical Analysis Report." This Report and the testimony of Agent Blythe show that Computer Scientist McCrohan retrieved these documents from the electronic productions that JEA made to the Prosecution Team pursuant to the grand jury subpoena.   Computer Scientist McCrohan evaluated different iterations of the "Performance Unit Scratch Sheet," including the iteration marked as Government Exhibit 20(a)(1), which added $4 billion to the Net Book Value for JEA in calendar year 2018.   The metadata for that version (Govt. Ex. 20(a)(1)) is contained on page 3 of Exhibit 20(a)(5), and shows the file path for the JEA production (GJS-1A30…/G Drive/1238/Performance Unit Scratch Sheet.xlsx). The metadata shows that "Ryan" created the document on 3/18/2019, and that an individual named Tori Simmons (an outside lawyer) modified the document on 5/20/2020 (ostensibly during document production efforts).

Further, page 9 of Exhibit 20(a)(5) shows the file path in the JEA production for Exhibit 20(l)(1), the "Notes.xlsx" file.   The file path is from Wannemacher's desktop, which JEA produced in response to the April 21, 2020, grand jury subpoena (Govt. Ex.

> 50), and shows the file path of (Q-20-LT-00181581-Ryan-Wannemacher…/Users/Ryan/Desktop/Freebird/Notes.xlsx).   The metadata illustrates that "Ryan" created this document on 7/11/2019, and last modified it on 7/18/2019.
>
> The Prosecution Team had both documents (never publicly reported on until after the return of the Indictment in March 2022) pursuant to JEA's grand jury subpoena productions.

(Doc. 291 at 39-40 n.22.)   Further, according to the Government, "the calculations and the high yield-numbers were addressed by the City auditors, called out by Joe Orfano to Zahn, and were thoroughly covered in the Diamond Salem hearing," and there was "no testimony in either of the defendants' exculpatory statements that was not already known."   (*Id.* at 41.)

The Government also argues that the Council Auditor employees testified based on their personal participation in the LTI PUP analysis.   (*Id.*)  It states:

> The critical Exhibits for the Court to analyze are the email communications spanning August 9 – November 14, 2019, which the Government obtained via grand jury subpoena to JEA.   *See* Govt. Exs. 20(x), 20(y)(1) - 20(y)(3), 20(bb), 20(cc)(1), 20(cc)(2), & 20(dd); *see also* Vol. 5, p. 86, lines 15 – 18; Vol. 7, p. 67, line 21 – p. 85, line 22.   Each Exhibit pertains to a similarly numbered overt act in Count One of the Indictment.   *See* Indictment (Doc. 1, ¶¶ 20x, 20y, 20bb, 20cc, and 20dd), all of which were presented to the grand jury via Jeff Rodda's testimony on April 15, 2021 (Exs. 2, 3, 4, 5, 6A, 6B, 7, & 8), and Agent Blythe's testimony on March 2, 2022 (Ex. 1, slide 49).
>
> . . .
> The entirety of these communications with Wannemacher were based upon the personal participation of the Council Auditors (including Jeff Rodda and Kim Taylor), documents that the

Council Auditors created, communications they initiated, were copied on, or received, and their individual and collective analysis of the LTI PUP based on their training and experience. These sources are entirely independent from Zahn's and Wannemacher's January 2020 *Garrity* statements.

To come full circle, Rodda's testimony went farther and delved into how he discovered the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)) and the "Notes.xlsx" spreadsheet (Govt. Ex. 20(l)(1)), which the Government had already received pursuant to the grand jury subpoena production from JEA (Govt. Ex. 50). As to the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)), the Government introduced Government Exhibits 20(l)(3) and 20(l)(4), previously discussed when addressing Kevin Blodgett's testimony. On June 14, 2021, approximately eighteen months after the *Garrity* statements of Zahn and Wannemacher, Rodda emailed Blodgett the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)), an iteration of similar documents that Rodda had seen while mining JEA documents, but different in the sense that it was the only one that contemplated a sale of JEA by adding $4 billion to the book value (net position) of JEA from the 2018 audited financial statements. *See* Govt. Ex. 20(l)(3) (native email format).

The metadata for this document shows that it was created on March 18, 2019, by "Ryan." *Id.*; Govt. Ex. 20(a)(5). Rodda found this version of the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)) after a conversation with Kevin Blodgett, which was spurred by AUSA Duva contacting Blodgett on June 7, 2021, via telephone. Rodda located the "Performance unit Scratch Sheet" (Govt. Ex. 20(a)(1)) from the files that JEA (via OGC) released to the SIC (over 12.5 gigabytes of files). Vol. 5, p. 114, line 22 – p. 118, line 24.[25] Rodda had seen a prior version of the Performance Unit Scratch sheet (without the $4 billion added to the net book value of JEA for 2018) in email communications between JEA and the Pillsbury law firm, and noticed the file size of the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)) was different. When he opened the file, that resulted in the discovery of the version based upon JEA recapitalization. Vol. 5, p. 118, line 18 – p. 120, line 24.

The native form of Government's Exhibit 20(l)(3) also contains a June 16, 2021, email from Jeff Rodda to Blodgett (copying Kim Taylor, Phillip Peterson, and AUSA Duva) that contains the "Notes.xlsx" spreadsheet (Govt. Ex. 20(l)(1)). [sic] 26 Vol. 5, p. 120, line 25 – p. 123, line 7.   During the Hearing, Rodda meticulously walked through his interpretation of the "Notes.xlsx" spreadsheet, which illustrated JEA's book value (column B) and showed the growth of 30,000 units from a value of $10.50 to $11,500 per unit, which resulted in a calculation of a total value of $345,000,000.   *Id.* at p. 123, line 3 – p. 127, line 8. Rodda used a metadata extraction tool to discern that "Ryan" created this spreadsheet on July 11, 2019, and last modified it on July 18, 2019, just five days before the July, 23, 2019, Board Meeting.   *Id.* at p. 126, lines 6 – 20.   The "Notes.xlsx" spreadsheet was not in the January 4, 2021 SIC Report, and not discussed in anything that Rodda had previously read.   *Id.* at p. 126, line 21 – p. 127, line 8.   Rodda testified that the only thing that led him to the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)) and the "Notes.xlsx" spreadsheet (Govt. Ex. 20(l)(1)) was his public records request from JEA and his communication with JEA employee Jasen Hutchenson.   *Id.*

Rodda read the *Garrity* statements of Zahn and Wannemacher. *Id.* at p. 79, lines 2 – 11. But as the above discussion demonstrates, Zahn's and Wannemacher's *Garrity* statements had nothing to do with Rodda's locating the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)) and the "Notes.xlsx" spreadsheet (Govt. Ex. 20(l)(1)).

(Doc. 291 at 43-44, 46-49.)

The Government points out that at the *Kastigar* hearing, Mr. Rodda

testified "with absolute certainty" in his mind that Defendants' *Garrity*

statements "had nothing to do with [him] finding the Performance Unit

Scratch Sheet that had the $4 billion," because when he "found all the

different versions of that file in that database – . . . there were six copies, four

different versions – five of them [were] 19 kilobytes and one of them was 14

kilobytes," and he "opened the 14 kilobyte file intentionally because it was

smaller."   (*Id.* at 51 (quoting Doc. 282, Vol. 6G at 8-9.)

The Government adds that in his January 3, 2020 statement, Mr.

Wannemacher ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

As to former or current JEA executives Paul McElroy, Melissa Dykes,

and Joseph Orfano, all of whom testified before the Grand Jury, the

Government argues that their testimony was based on their personal

involvement in the events, their perspectives of JEA's financial condition, and

their reaction to the 2019 strategic planning.   (*Id.* at 56.)   Further, the

Government points out that Joseph Orfano testified he did not learn anything

new from Mr. Wannemacher's *Garrity* statement.   (*Id.* at 64.)

The Government similarly states that former JEA Board Members

Kelly Flanagan, Alan Howard, and Christian Andrew Allen, whose *Kastigar*

testimony mirrored their Grand Jury testimony, relied on their firsthand

understanding of the LTI PUP as Board members.   (*Id.* at 67.)   The

Government points out:

> During Wannemacher's brief LTI PUP presentation at the end of
> the July 23, 2019, Board Meeting, no one showed the Board
> Members the calculations contained in the "Performance Unit
> Scratch Sheet" (Govt. Ex. 20(a)(1)) or the "Notes.xlsx"
> spreadsheet (Govt. Ex. 20(l)(1)), despite that Wannemacher
> prepared both, and they clearly connected a potential ITN result
> to LTI PUP payouts in the range of hundreds of millions of
> dollars.   Vol. 5, p. 140, line 8 – p. 143, line 8 (Flanagan); Vol. 6,
> p. 174, line 1 – p. 175, line 12 (Allen); Vol. 7, p. 61, line 4 – p. 63,
> line 16 (Howard).   The Board Members all testified that had
> they known that Resolution 2019-10 (the Resolution authorizing
> the LTI PUP) would have been worth hundreds of millions of
> dollars in connection with a sale (or privatization) of JEA, none of
> them would have voted to pass the resolution.   Vol. 5, p. 143,
> lines 2 – 8 (Flanagan); Vol. 6, p. 174, line 1 – p. 175, line 12
> (Allen); Vol. 7, p. 36, line 16 – p. 37, line 25 (Howard).   Certain
> Board Members likewise expressed their familiarity with the
> Council Auditor's November 18, 2019, Memorandum (Govt. Ex.
> 20(ff)), which contained LTI PUP calculations at various levels of
> recapitalization, and was released well before any *Garrity*
> statements.   Vol. 5, p. 144, line 15 – p. 146, line 4 (Flanagan);
> Vol. 7, p. 35, line 24 – p. 37, line 25 (Howard).

(Doc. 291 at 68-69.)

The Government adds that Kelly Flanagan had an ample knowledge

base to pull from to communicate her personal recollections of the LTI PUP

being "buried" in "a marathon [Board] meeting," which was entirely separate

from and preceded any review of media articles relating to the *Garrity*

statements:

> Flanagan testified that while she learned of the estimated $3.4
> million amount per year pertaining to the LTI PUP during the
> July 23, 2019, Board Meeting, it was during the Diamond-Salem
> Hearing (which the Government views as not *Garrity* protected)

> that Flanagan realized there was a difference between the Willis
> Towers Watson slides in the July 23, 2019, Board package, and
> what was gathered and presented during the Diamond-Salem
> Hearing.  *Id.*  Flanagan also acknowledged reading the
> November 18, 2019, Council Auditor Memorandum (Govt. Ex.
> 20(ff)) before the Diamond-Salem Hearing, thus contributing to
> her personal knowledge of the LTI PUP representations and
> calculations.  *Id.*

(Doc. 291 at 70 n.34.)

Similarly, the Government states that former General Counsel Jason

Gabriel relied on his personal experiences, including his interactions with

Mr. Zahn, to indicate disapproval of the LTI PUP in November of 2019,

before the Council Auditor issued his November 18, 2019 Memorandum.   (*Id.*

at 70.)   Also, Mr. "Gabriel confirmed that 'everything [he] testified about

[before the Grand Jury] were things that [he] lived.'"   (*Id.* at 71; *see also id.*

at 79-80 ("I mean, I didn't put much stock in those interviews in terms of the

facts.   I lived all the parts of this, painful or not.   And so everything I've

been telling you has been from my individual interactions with the facts, not

from these exculpatory defense interviews.   . . .   Q. Did Mr. Zahn's Garrity

statement have any impact on your grand jury testimony?   A. No. I had

forgotten about it.")   Specifically:

> Gabriel had significant involvement with the various law firms
> (including Pillsbury Winthrop and Foley Lardner), who were
> contracted and associated with various facets of the ITN.   One
> law firm that Gabriel did not know about until March 2020 was
> the Nixon Peabody firm, a law firm in New York that first opined
> (via lawyer Elizabeth Columbo) on the iteration of the bond

issuance concept of an LTI plan, in what was referred to as the Nixon Peabody Memo dated May 20, 2019.

(*Id.* at 71-72 (internal citations omitted).)

The Government points out:

The Nixon Peabody Memorandum did not come to Gabriel's attention until March 2020, after SIC attorney Lanny Russell mined JEA billing records and noticed entries referencing Nixon Peabody['s] work product.   This caused Gabriel to query his deputies to determine when OGC received this memo.   The Prosecution Team received the Nixon Peabody Memorandum from OGC on or about March 23, 2020.   There were itemized requests regarding it in the grand jury subpoena issued to JEA on April 21, 2020.   The Nixon Peabody Memorandum was never presented to the JEA Board.   Further, the Government would have received it when it received the JEA production involving Ryan Wannemacher's emails.

(*Id.* at 72 n.35 (internal citations omitted).)   In addition:

Gabriel never saw the "Performance Unit Scratch Sheet" (Govt. Ex. 20(a)(1)) or the "Notes.xlsx" spreadsheet (Govt. Ex. 20(l)(1)) until AUSA Duva showed them to him one week before the *Kastigar* Hearing, which means that Gabriel never saw any discussions of those documents (which contemplate large LTI PUP payouts in connection with a sale of JEA) in any *Garrity* statements or in any reporting about the statements.   . . .



(Doc. 291 at 75-76 (some internal citations omitted).)

In conclusion, the Government asserts:

[F]irst, nothing from the Diamond-Salem hearing or the Zahn termination memo was presented to or discussed with the [G]rand [J]ury.   Second, and more important, as discussed above, all of the evidence and witness testimony, as presented to the grand jury and at the *Kastigar* Hearing, came from sources independent of anything that occurred at the Diamond-Salem hearing or that was contained in the termination memo. Likewise, the suggestion that a particular witness may have come to a particular conclusion after the Diamond-Salem Hearing or after the *Garrity* statements does not somehow mean that the witness'[s] testimony was tainted.   The government showed that all of the evidence, including the witnesses' testimony, came from independent sources and the Defendants did not rebut that showing despite ample opportunity to do so.

(*Id.* at 81.)

## B.   Mr. Wannemacher's Arguments Regarding His January 3, 2020 Statement[10]

Due to certain "gaps in the record" that are allegedly "fatal to the government's 'heavy burden' of proof," Mr. Wannemacher argues the Court should dismiss the Indictment against him and disqualify the Prosecution Team from involvement in any further prosecution of him; alternatively, the Court should strictly limit the evidence at trial to that established by the Government to be free of taint.   (Doc. 297 at 4-5.)   Mr. Wannemacher describes the gaps as follows:

The government devotes pages of briefing to summarizing [sic]

---

[10]  Mr. Wannemacher's *Garrity* statement was taken by a team of four attorneys from OGC, Stephen J. Powell, Sonya Harrell, Adina Teodorescu, and Sean Granat, and an investigator from the COJ's Office of Inspector General, Robert Linsner.

the days of testimony presenting less than all of what it presented to the grand jury.

But the government has not, and will not, address what is not of help to it, which is what is absent from this record: What about the fourteen witnesses[11] who testified before the grand jury whom the prosecution elected not to present at the *Kastigar* hearing?   How do we know the grand jurors themselves avoided the immunized statements or the press reports of them that "you really couldn't avoid"?   What was the impact of the multiple teams of investigators armed with access to the Defendants' immunized testimony conducting simultaneous overlapping investigations of the same subject matter, then feeding the results of their efforts to the prosecution team?

(*Id.* at 5.)

With respect to the precautions taken in this case, Mr. Wannemacher

states:

Special Agent Blythe testified that the prosecution team did not use the DOJ's standard procedures here because, he said, the prosecutor disagreed with the DOJ's standard policies in the context of this case.   Instead, at the prosecutor's instruction, the extent of the precautions the prosecution team employed to avoid *Garrity*-protected materials were the following: (1) not reviewing the Defendant's *Garrity* Statements; (2) declining the OGC's offer to provide them with Mr. Zahn's *Garrity* Statement; (3) requesting that copies of the Defendants' *Garrity* Statements be removed from the prosecution team's case file; and (4) avoiding reading newspaper articles that discussed the contents of the Defendants' *Garrity* Statements.   . . .

First, three of the four members of the prosecution team who

---

[11]  Mr. Wannemacher acknowledges that "[s]ome of the [G]rand [J]ury witnesses, such as Ms. Charleroy, testified in the [G]rand [J]ury about matters unrelated to the topics Mr. Wannemacher testified about in his *Garrity* Statement" and only "some of those witnesses appear to have or are known to have reviewed Mr. Wannemacher's compelled statements."   (Doc. 297 at 19 & n.11.)

testified denied having reviewed Mr. Wannemacher's *Garrity* Statement.   The remaining member of the prosecution team, Mr. Adams, couldn't "recall" reading Mr. Wannemacher's *Garrity* Statement, but was unable to specifically state that he had not read it.   . . .

Special Agent Blythe testified that the prosecutor's instruction to avoid articles discussing the Defendants' *Garrity* Statements was given in a conversation early in the investigation and was not documented.   . . .   Special Agent Blythe's recollection was that the prosecutor instructed him to avoid news articles if it was apparent from an article's title that it would discuss the *Garrity* Statements or if he could tell when reading an article that it was about to discuss the statements.   . . .

FBI administrative personnel saved news articles relevant to the investigation in the case file.   The case agent was unaware of anyone on the prosecution team instructing these administrative personnel to segregate articles containing *Garrity*-protected information.   . . .

The two State Attorney's Office investigators regularly received email links to news articles regarding the JEA matter.   Included among the articles sent to these prosecution team members were articles that discussed the contents of the Defendants' *Garrity* Statements.   Mr. Adams and Mr. Zipperer both acknowledged receiving a February 4, 2020 email with a link to a newspaper article about the Defendants' *Garrity* Statements.   While Mr. Zipperer denied having read the article, Mr. Adams could not say one way or the other whether he had read it.

(*Id.* at 25, 27-28 (internal citations omitted).)

As to the Grand Jury witnesses, Mr. Wannemacher points out that the

Government did not call at the *Kastigar* hearing the following individuals:

Husein Cumber, Camille Lee Johnson, April Green, Fred Newbill, Mike

Brost, Angie Hiers, Michael Weinstein, Anton Derkach, Pat Maillis, and

Stephen Amdur; thus, the extent to which they were exposed to or influenced by the *Garrity* statements is unknown.   (*Id.* at 19-22, 31 n.16.)   Mr. Wannemacher also points out that:

> One of the former JEA Board members who testified at the *Kastigar* hearing, Ms. Flanagan, informed the government through her counsel in advance of her *Kastigar* hearing testimony that she was concerned two portions of her grand jury testimony had been influenced by information she received from the OGC that she did not have an independent basis for.   Ms. Flanagan did not recall whether she reviewed the Defendants' *Garrity* Statements themselves, but she had several meetings with OGC attorneys that included information from the Defendants' statements.   She also reviewed news coverage and social media related to JEA, and she does not remember what she read or whether it discussed the Defendants' *Garrity* Statements.   Ms. Flanagan admitted that her recollection of the events related to this matter was a combination of her experiences, information she learned from the media, and information from the Defendants' compelled statements that the OGC disclosed to her. Ms. Flanagan explained that it is "very challenging to delineate" what she learned from where, and she was never given any instructions to try to do so.
>
> Ms. Flanagan's exposure to information about the Defendants' *Garrity*-protected material took place before she testified in the grand jury in April 2021.   . . .
>
> Although Ms. Flanagan through her counsel informed the prosecution team that there were two portions of Ms. Flanagan's grand jury testimony she was concerned were not independent, the case agent only took down information regarding one of those passages, and the *Kastigar* hearing record does not reflect what other portion of Ms. Flanagan's grand jury testimony that she thought may have been influenced by information she learned from the OGC.

(*Id.* at 32-33 (internal citations omitted).)

As to the grand jurors, Mr. Wannemacher argues that "the government made no effort at the *Kastigar* hearing to establish that the grand jurors were not exposed to the Defendants' compelled statements through news coverage, social media, the SIC Report, the Internet, or otherwise." (*Id.* at 18.) Specifically, "[w]hile the government has produced transcripts of grand jury testimony, Doc. 159, it has not produced the instructions given to the grand jury, and it is unknown whether the grand jury received any instructions that would have alerted grand jurors that they should avoid information about the Defendants' compelled statements." (Doc. 297 at 18, 81.)

Mr. Wannemacher further argues that the multiple teams of investigators were exposed to or influenced by Defendants' *Garrity* statements:

> Of the multiple sets of investigators who were probing this matter, only the prosecution team conducting the joint federal-state investigation that led to the Indictment was bound to avoid using the Defendants' compelled statements as a source of evidence. The government largely chose not to address at the *Kastigar* hearing how its investigation was influenced by these outside investigators. As discussed below, the evidence that was introduced at the *Kastigar* hearing showed that these investigative teams tainted the prosecution team by providing it with information and evidence derived from the Defendants' compelled statements.

(*Id.* at 14.) Mr. Wannemacher points out that the Government did not call Lanny Russell, Stephen Busey, Chris Dix, Lee Wedekind, Stephen J. Powell, Sonya Harrell, Adina Teodorescu, and Sean Granat to testify at the *Kastigar*

41

hearing.   (*Id.* at 15-17.)   As such, it is unclear how these individuals'
knowledge of Defendants' *Garrity* statements impacted the investigation in
which they participated.   (*Id.* at 16-17.)

    In response to the Government's argument that the flow of information
was "unidirectional," moving only from the SIC to the Prosecution Team, Mr.
Wannemacher states that: (1) "[t]here were no limitations on the types of
evidence and information SIC Counsel shared with the prosecution team,
other than not sharing the *Garrity* Statements themselves"; and (2) the two
spreadsheets—the "Performance Unit Scratch Sheet" and the "Notes.xlsx"
spreadsheet—were not discovered independently, but rather "after the
prosecutor sought the assistance of SIC Counsel, Mr. Blodgett, who had
reviewed the Defendants' compelled statements, and Mr. Blodgett reached
out to Mr. Rodda, who had reviewed the Defendants' compelled statements,
and Mr. Rodda was provided them by Mr. Hutchinson, whose exposure to the
Defendants' compelled statements is unknown on this record."   (*Id.* at 78-79.)

    Mr. Wannemacher explains:





(Doc. 297 at 47-48 (internal citations omitted).)

Mr. Wannemacher notes that his "responses at the Diamond-Salem hearing showed ████████████████████████████

████████████████████████████████████████

███████████████  (*Id.* at 48.)   He also states that at the Diamond-Salem hearing he testified ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

Further, in his *Garrity* Statement, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████



Mr. Wannemacher adds that Mr. Zahn later testified in his *Garrity*

statement ██████████████████████████████████████████████

███████████████████████   He explains:











[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(Doc. 297 at 87.)

[redacted]

[redacted]





[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

In response to the Government's suggestion that Mr. Wannemacher's statements could not have been useful because they were vague, self-serving, or untruthful, Mr. Wannemacher argues that [redacted]



[redacted]

[redacted]

[redacted]

(Doc. 297 at 91-92.)

In conclusion, Mr. Wannemacher argues:

> First and foremost, the Court should preclude the government from calling at trial any witness the government did not call at the *Kastigar* hearing. The government must meet its burden as [sic] "each" trial witness to show that the witness made "no use . .

. of any of the immunized testimony."   . . .

The government's introduction of the grand jury testimony does not suffice to satisfy this "heavy" burden.   Defendants who have provided compelled testimony must be permitted to inquire into not only "the *content*," but also "the *sources* of trial witnesses' testimony."   *North*, 910 F.2d at 872 (emphasis in original).   The absent witnesses' grand jury testimony is hearsay and the Defendants were not afforded any opportunity to cross examine them about their exposure to the Defendants' compelled statements, the source of their knowledge about the matters about which they testified, or whether their understanding of the facts could have been influenced by information they learned later.

Second, the Court should exclude any witness who did testify at the *Kastigar* hearing as to whom the Court finds the government did not meet its burden to show the independence of the witness's testimony.   The most obvious of these is Ms. Flanagan, who candidly acknowledged that she could not be confident [that] her understanding of the relevant events is independent of what she learned about the Defendants' compelled statements.   Doc. 272 at 164-65.   While other witnesses, with greater or lesser certainty, indicated a belief that their testimony was independent, nearly all of them also admitted that they had reviewed the Defendants' compelled statements or media coverage of them, and many of those acknowledged that their review of these materials would have affected their understanding of the events at issue here.   . . .

Third, for the same reasons explained above regarding absent witnesses, the Court should also exclude any exhibit the government did not introduce in the *Kastigar* hearing.   Absent the [sic] any evidence regarding the source of an exhibit or an opportunity to test the government's explanation regarding how the exhibit was discovered, the government has not met its burden under *Kastigar*.

Fourth, the government having failed to meet its burden to show that the discovery of the Nixon Peabody Memo and the spreadsheets having were derived from the Defendants'

compelled statements, . . . these exhibits should be excluded.

Fifth, just as any witness unable to testify independently of their knowledge of the Defendants' compelled statements must be excluded, so too must any witness unable to testify independently of their knowledge of the tainted Nixon Peabody Memo and spreadsheets exhibits, which are the fruits of the Defendants' compelled statements.

In light of the government's complete failure to meet its burden to show that the Indictment is untainted, the question of what evidence will be admissible at trial is likely moot.   Should the Court hold that this case may proceed to trial, however, it should strictly limit the trial testimony and exhibits to those as to which the Court finds the government has met its burden to show their independence.

(Doc. 297 at 101-03.)

## C.   Mr. Zahn's Arguments Regarding His January 21-22, 2020 Statement

Mr. Zahn argues that the Indictment must be dismissed and the Prosecution Team disqualified because "the Government's investigation, Indictment, and a potential trial are impossibly free of taint due to, but not limited to the Prosecution Team":

- Being influenced at the inception of the case by the OGC [January 28, 2020] Termination Letter containing the fruits of Zahn's testimony;
- Failing to adopt "reliable procedures" to protect its investigation and Mr. Zahn's Fifth Amendment rights;
- Failing to show that Jacksonville based grand jury was untainted by Mr. Zahn's testimony and its fruits;
- Failing to call and vet fourteen of the twenty-three grand jury witnesses at the *Kastigar* hearing; and
- Failing to demonstrate that its entire investigative chain – the outside sources and evidence it used and relied on and

> the witnesses whom it interviewed – were wholly
> independent of any influence by Zahn's testimony.

(Doc. 299 at 8.)

According to Mr. Zahn, the January 28, 2020 "Termination Letter unquestionably makes 13 key findings of fact about Mr. Zahn's conduct that correspond to numerous allegations in the Indictment":



(Doc. 299 at 32.)

Mr. Zahn argues:

> A review of Mr. Zahn's *Garrity* testimony reveals a direct link
> between that testimony and the Indictment's allegations: Mr.
> Zahn testifies about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> ▓▓▓▓▓▓▓   The Government bears the burden of breaking that
> direct link from Mr. Zahn's *Garrity* testimony to the subsequent
> investigation and prosecution.   It didn't.   . . .

Beyond spurring the ████████ narrative and motivating the Prosecution Team's search for and understanding of the evidence, evidence revealed during Mr. Zahn's *Garrity* testimony forms the basis of the Indictment's allegations.   As the Comparison Chart in Exhibit 1 demonstrates there are at least eleven areas where Mr. Zahn's *Garrity* testimony is substantially similar to what was ultimately alleged in the Indictment.   There is more than a general similarity: Mr. Zahn's testimony disclosed the same specific evidence which the Indictment trumpets as its proof of criminality.

As to the pivotal question of Mr. Zahn's intent, during his *Garrity* interview, Mr. Zahn testified that ████████████████████ ████████████████████████████   The Indictment mirrors this testimony where it alleges that Mr. Zahn failed to disclose ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████

The Indictment's mirroring and overlapping of testimony and topics from Mr. Zahn's *Garrity* testimony shows that his testimony was helpful to the investigation and prosecution against him.   The Government originally promised that it would meticulously go through every overt act alleged in the Indictment to prove that the alleged overt acts were not devised in any way based off Mr. Zahn's testimony.   *See* Gov. *Kastigar* Resp., Dkt. 132 at 22 ("the Government can show . . . [it] developed the overt acts in the Indictment from wholly independent sources").   However, the Government failed to discuss every overt act in its Brief, much less convincingly prove how it was not possible that any of Mr. Zahn's testimony provided any investigative lead. The Government failed even under its own standard.

(Doc. 299 at 35-37.)   Further:

[B]etween the 12 days that Mr. Zahn finished testifying on January 22, 2020, and . . . the release of his testimony to the press and social media on February 3, 2020, literally thousands of people – many of them key witnesses in this matter – had read the Termination letter which contained the fruits of Mr. Zahn's testimony and made 24 factual findings against him.   The

> widespread review of Mr. Zahn's testimony occurred within 14
> days of the FBI opening a matter relating to JEA when the
> federal investigation was "in its infancy."   Blythe, Dkt. 268,
> 122:1[.]

(Doc. 299 at 40.)   Mr. Zahn adds that "in characterizing and quoting his

testimony, the media divulged, and disseminated widely, *the* "one key

disclosure" from Mr. Zahn's *Garrity* testimony that could only be gleaned

from peering into his mind: ██████████████████████."   (*Id.* at 46

(emphasis in original).)

Next, Mr. Zahn argues that the four procedures adopted in this case to

protect the investigation were "willfully inadequate."   (*Id.* at 58.)   He

describes the procedures as follows:

> [1] As an initial matter, the Prosecution Team decided not to
> review Mr. Zahn's *Garrity* testimony.   Blythe, Dkt. 275, 56:18-
> 20.
>
> [2] Next, the Prosecution Team decided not to get Defendants'
> *Garrity* testimony. *Id.* at 99:14-16.
>
> [3] Then, when the Prosecution Team did obtain copies of
> Defendants' *Garrity* testimony[,] the Prosecution Team decided to
> "segregate" the transcripts of Mr. Wannemacher and the second
> volume of Mr. Zahn's testimony that had been received from the
> FBI's document review tool.   *Id.* at 107:10-24.
>
> [4] The final "step" was to "avoid articles . . . that you can tell
> have to do with the statements." *Id.* at 108:2-17.

(Doc. 299 at 58.)

Mr. Zahn points out that it is unclear when these procedures were

implemented.   (*Id.* at 59-60.)   He also points out that a filter team was

instituted only two weeks before the *Kastigar* hearing, over a year after the

March 2022 Indictment, and over three years after the investigation began.

(*Id.* at 58-59.)   According to Mr. Zahn:

> The Government did not adopt an independent filter team that
> was truly independent of the Prosecution Team and whose goal
> was to protect the Defendants' Fifth Amendment rights as
> described in *Bowen*.   *See* Court's order permitting cross-counsel
> access to *Garrity* materials, Dkt. 237.   Instead, the Government
> sought to have it both ways: counsel to handle the cross/re-direct
> examinations of witnesses ("cross-counsel") who testified about
> the immunized statements and to serve as filter counsel.   *See*
> Defendants' Response to Government's Motion to Partially
> Unseal Pleadings Containing Garrity Materials (Dkt. 216) at 7
> (describing the filter team's hybrid role and questions about
> same).   Cross-counsel participated in the prosecution of
> Defendants at the *Kastigar* hearing and in drafting the
> Government's brief.

(Doc. 299 at 59 n.52.)

Further, Mr. Zahn states that "the Government did not take any

measures when interviewing witnesses who may have been exposed to

Defendants' *Garrity* testimony and their fruits."   (*Id.* at 60 ("Not one FBI 302

or Memorandum of Interview reflects nor did any *Kastigar* hearing witness

testify that the Government inquired of them whether they had read

Defendants' testimony or the fruits thereof and what impact it might have

had on their testimony.").)   He adds that "the *Prosecution Team*, as opposed

to a neutral filter team, decided for themselves, individually, what it meant

to comply with the Prosecutor's admonition 'not to read media articles containing *Garrity*'" (*id.* at 60), and the agents and investigators never testified how they accounted for the fruits of any *Garrity* testimony (*id.* at 62). For these reasons, Mr. Zahn argues, "the Court should not credit [the Prosecution Team's] testimony that they have not been exposed to or used Defendants' *Garrity* testimony or its fruits."   (*Id.* at 63.)

Mr. Zahn adds:

The Prosecution Team interviewed approximately eighty witnesses (the Interviewed Witnesses), of which only twenty-three testified before the grand jury.[12]   However, during the *Kastigar* hearing, the Government only presented the testimony of nineteen witnesses, with just thirteen of them being fact witnesses (the *Kastigar* Fact Witnesses).[13]   This means that the Government failed to provide any evidence regarding the impact of the compelled testimony on the remaining sixty-one Interviewed Witnesses.   Additionally, the Government did not provide any evidence regarding the testimony of fourteen of the twenty-three fact witnesses who testified before the grand jury.[14]

---

[12]  Twenty-five total witnesses testified before the grand jury, two being members of the Prosecution Team.

[13]  Of the nineteen witnesses presented by the Government at the *Kastigar* hearing, four were members of the Prosecution Team and two were offered to rebut Mr. Wannemacher's Diamond-Salem testimony, leaving only 13 testifying fact witnesses.

[14]  The Government failed to present testimony of the following witnesses who testified before the grand jury: (1) Stephen Amdur, (2) Michael Brost, (3) Melissa Charleroy, (4) Husein Cumber, (5) Anton Derkach, (6) April Green, (7) Angelia Hiers, (8) Kevin Hyde, (9) Camille Lee Johnson, (10) Patricia Maillis, (11) Fred Newbill, (12) David Wathen, and (13) Michael Weinstein.   Lynne Rhode was called as a witness by Mr. Wannemacher for the Diamond-Salem segment of the hearing but was not questioned regarding her potential taint from Mr. Zahn's testimony – meaning she was really the fourteenth grand jury witness not called.

All thirteen *Kastigar* Fact Witnesses acknowledged that the compelled statements were reported in the media, with most of them admitting to reading news accounts reporting and quoting from the compelled statements.   Eight *Kastigar* Fact Witnesses also acknowledged reading the compelled statements directly. Ten *Kastigar* Fact Witnesses also read the January 28, 2020 Termination Letter that was derived from Mr. Zahn's *Garrity* testimony or watched the Board presentation where the letter was read.   *See* Witness Exposure summary chart, Exhibit 3.

. . .   Moreover, of those fact witnesses that it did call, the Prosecution did not make a sufficient effort to determine whether the witnesses who admittedly were exposed to Defendants' testimony were NOT influenced as it obtained only generalized denials.   Furthermore, the Prosecution did not thoroughly elucidate the coordination between its team and parallel investigations, such as the OGC and SIC investigations, which used Defendants' protected testimony to obtain additional evidence.   The Government also did not present any evidence regarding one witness, Jason Hutchinson, who located a spreadsheet ("Notes.xlsx") that is key to the Government's theory of proof.

(*Id.* at 67-68.)

Mr. Zahn continues:

Numerous witnesses were interviewed prior to the issuance of grand jury subpoenas, while others were interviewed during the ongoing production from subpoenaed entities.   *See*, *e.g.*, DX139 (Rodda); DX222 (Phillips); DX68-1, 68-2 (Brooks); DX145 (Dykes); DX146 (Flanagan).   The Government did not provide any evidence regarding the source of the information provided by these witnesses or their exposure to *Garrity* testimony.
. . .
Witnesses who were likely exposed to the *Garrity* testimony or its fruits also brought documents to the Government's attention, which were then sourced back to productions by JEA and other entities that received grand jury subpoenas.   *See* Hill, Dkt. 275, 82:10-17.   Agent Hill confirmed that when a witness provided a

document that the Government had not seen, they would go back into the voluminous grand jury subpoena responses to find information about the document.  *Id*. at 85:4-12.  This method of "sourcing back" documents provided by witnesses to other sources fails to address the *Kastigar* problem created by relying on tainted witnesses to provide the Government with investigatory leads.

(Doc. 299 at 76-77, 78 (footnotes omitted).)

In addition, Mr. Zahn argues that "the Government failed to prove that several of the key pieces of evidence supporting the Indictment (and later disclosed to nearly every witness) were derived from sources wholly independent of the *Garrity* testimony."  (*Id*. at 121.)  These pieces of evidence included the Performance Unit Scratch Sheet (Gov't Ex. 20A1), the Notes.xslx spreadsheet (Gov't Ex. 20L1), and the Nixon Peabody Memo (Gov't Ex. 28).  (Doc. 299 at 121-31.)  Although Defendants did not discuss the spreadsheets in their *Garrity* testimony, Mr. Zahn claims that "[i]n the absence of insulating procedures, the fact that the Government lawfully obtained the evidence pursuant to a grand jury subpoena is insufficient to demonstrate an independent source for key documents supporting an Indictment, especially when the information contained in the documents was discussed in the immunized testimony and the documents were found in the location identified by the defendant."  (*Id*. at 121-22.)  He explains that:



It is undisputed that in June 2021, the Prosecutor, hoping to answer questions from his supervisors, reached out to Kevin Blodgett at SHB and requested that Mr. Blodgett provide the Government with any additional information that may help them with the prosecution of the case.   Blodgett, Dkt.271, 161:4-24. . . .   The Prosecution made this request, despite, or perhaps *because*, of the fact that they knew Mr. Blodgett and the other lawyers at SHB had read *Garrity* testimony and from that could find additional evidence that had eluded the Prosecution Team.

Because Mr. Blodgett had not been given any limiting instruction, he compounded the violation of Defendant's Fifth Amendment rights by turning to Mr. Rodda, who likewise had read the protected testimony and had not been cautioned not to share evidence derived therefrom with the Prosecution.   *See* Blodgett, Dkt. 271, 185:21-25, 160:24-162:9.   Mr. Blodgett explained to Mr. Rodda that the Prosecutor was looking for additional PUP-related documents.   Dkt. 271, 162:10-14; Rodda, Dkt. 272, 117:12-118:2; Dkt. 273, 123:7-17.



Mr. Rodda claims that at the time of the Prosecution Team's

request, he had been archiving the data [sic] the [Council Auditor's Office] in connection with the JEA investigation. Rodda, Dkt. 272, 116:13-117:5.   According to Mr. Rodda, Mr. Blodgett's request led him to find a version of GX20A1 in the data provided to him by OGC, which he believed contemplated sale. *Id.* at 117:12-129:19.   Mr. Rodda responded to the Prosecutor's request for additional evidence regarding the PUP by engaging in a careful review of spreadsheets within the over 12.5 GB of data that were provided to him by the OGC, containing detailed information, which included transcripts, interviews, and exhibits. *Id.* at 116:13-25. ██████████████████████████████████

████████████████   Rodda, Dkt. 273, Sealed, 8:21-23.   But Mr. Rodda did not default to an in-depth review of that material.   Instead, ████████████████████████████████████████████

████████████████   Mr. Rodda narrowed his efforts to respond to the Prosecution Team by carefully reviewing the spreadsheets. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████   *See* GX 20(a)(5); Blythe, Dkt. 269, 112:23-113:23; ████████████████ .

In response to the Prosecutor's request, Mr. Rodda sent to Mr. Blodgett the spreadsheet that became GX20A1—the version of the "Performance Unit Scratch Sheet That Contemplates a Sale." DX25, p. 20; *see also* Ind. ¶ 20(a).   Mr. Blodgett then sent this evidence to the Prosecutor, who responded: "This is very helpful. It is exactly the kind of information that I am looking for." DX25, p. 18.[15]

---

[15] Responding to the Prosecutor's request for additional documents, Mr. Blodgett also provided GX20H1.   *See* DX25, p. 25.   At the *Kastigar* hearing, when asked how he received this document, Agent Blythe failed to disclose the source of the document and instead testified that he "accessed the properties from a copy of the document provided by JEA in the subpoena production."   Blythe, Dkt. 269, 123:4-18.   This testimony is incomplete, at best, and does not satisfy the Government's burden because it fails to prove that each step of the investigative chain through which the evidence was obtained is untainted.   *Schmidgall*, 25 F.3d at 1528. This exhibit was presented to the grand jury through Agent Blythe on March 2, 2022 and identified in the Indictment at Paragraph 20(h).   *See* Dkt. 159,

After discovering problems with the metadata associated with the spreadsheet provided by Mr. Rodda, the Prosecutor still did not turn to his investigative team or to the subpoena response received from JEA; he turned back to Mr. Rodda and Mr. Blodgett to locate another version of that spreadsheet.   DX25, p. 34.   Mr. Rodda then called Jason Hutchinson, a lawyer who according to Mr. Rodda "does public records for JEA and works, I believe, in compliance.   He is an attorney."   Rodda, Dkt. 272, 122:09-16.   Mr. Rodda requested that Mr. Hutchinson send him the "original" version of GX20A1.   Mr. Hutchison complied and also sent a second spreadsheet titled "Notes.xlsx."   *Id.* at 122:22-123:2.   The second spreadsheet became GX20L1. *See also* Ind. ¶ 20(l). Yet, the Government put on no evidence at the *Kastigar* hearing regarding Mr. Hutchinson's exposure to the *Garrity* testimony or how Mr. Hutchinson identified this document, instead, the Government seeks to misrepresent the acquisition of GX20L1 by falsely attributing the discovery to Jeffrey Rodda. . . . As previously noted, Mr. Rodda was clear that the "Notes.xlsx" spreadsheet (GX20L1) was not discovered by him but rather by Jason Hutchison who emailed it to him.   Rodda, Dkt. 272, 122:22-123:2.

. . .   Over a year after the Government received the initial subpoena response from JEA and more than six months after the Government began its presentation to the grand jury, the Prosecution had not discovered any spreadsheets or other documentation reflecting Defendants or other members of the SLT performing calculations or modeling reflecting the potential PUP payouts ███████████████████████████████

████████████████████████████████████████.[16]  But Mr.

---

3/2/22, Blythe, Tr. 29:9-30:10.   Mr. Blodgett also sent a lengthy communication detailing "additional areas of inquiry" regarding the PUP and early work performed on privatization.   *See* DX25, at pp. 54-57.  ████████████████████

████████████████████████████████████████ Exhibit 1.

[16] At the *Kastigar* hearing, Agent Blythe testified that prior to June 2021 the Government had seen other iterations of the "Performance Unit Scratch Sheet" but "hadn't caught on to this version of that document."   Blythe, Dkt. 269, 111:12-23; *see also id*. at 135:1-21, Dkt. 271, 34:12-35:2.   The difference with "this version" is

Blodgett and Mr. Rodda had no such impediment.   They both
knew that Mr. Zahn's protected testimony reflected that



(Doc. 299 at 122-29 (footnotes omitted or renumbered).)

Mr. Zahn also addresses the Nixon Peabody Memo, in relevant part, as

follows:

> At the *Kastigar* hearing, Agent Blythe testified that this so-called
> "Nixon Peabody Memo" was found in a desk drawer in OGC
> attorney Kort Parde's office.   Blythe, Dkt. 269, 94:13-21.   But, in
> fact, in the correspondence from OGC to Special Agent Blythe in
> March 2020 providing the Government with the Nixon Peabody
> Memo, there is no mention of finding it in a desk drawer.   *See*
> DX228.   Ms. Teodorescu performed an electronic search of JEA's
> email servers based on a request from Lanny Russell of SHB.
> *Id.*; *see e.g.*, Gabriel, Dkt. 275, 97:23-98:6 (confirming the Nixon
> Peabody Memo was found by Ms. Teodorescu in email archive
> then also later found in Ms. Parde's desk drawer).   Importantly,
> both Ms. Teodorescu and Mr. Phillips were present during Mr.
> Zahn's *Garrity* testimony when he testified ███████████
> ████████████████████████████████████████
> ████████████████   As counsel for the SIC, Mr. Russell presumably also
> read Mr. Zahn's *Garrity* testimony and related news coverage,

───────────────

material, as alleged in the Indictment, it "added $4 billion to JEA's Book Value for
2018."   *See* Dkt. 1 ¶ 20(a).

but the Government did not put on any evidence regarding Mr. Russell's exposure to the *Garrity* testimony or what influence the testimony had on his request for the Nixon Peabody Memo.

Like the spreadsheets, the Nixon Peabody Memo was presented to the grand jury by Agent Blythe on March 2, 2022, identified in the Indictment in Paragraph 20(h), and presented to witnesses interviewed by the Government.

(Doc. 299 at 129-31.)

## IV.   Analysis

As an initial matter, to the extent the Government argues that Mr. Wannemacher's January 3, 2020 statement is not subject to *Garrity* protections (*see* Doc. 291 at 5, 13-21), the undersigned finds this argument to be without merit.   As Mr. Wannemacher points out:

[T]he record shows that the reason the prosecution has treated Mr. Wannemacher's *Garrity* Statement as being *Garrity*-protected since before the Defendants were even indicted is that OGC attorney Mr. Phillips – a member of the agency that had taken the statement – informed the case agent on the day the OGC produced the statement to the government that it was a compelled interview as to which Mr. Wannemacher had been given his *Garrity* rights.   *See* DX9.   The OGC's position on this point is unchanged since that date over three and a half years ago: the City's General Counsel testified at the *Kastigar* hearing that Mr. Wannemacher was interviewed under *Garrity* protections.   Doc. 275 at 159.

(Doc. 297 at 67.)

Further, at the *Kastigar* hearing, after considering arguments by the parties at sidebar, this Court denied Cross-Counsel's motion to unseal the first eight pages of the transcript of Mr. Wannemacher's January 3, 2020

statement. (Doc. 291 at 20; Doc. 297 at 69.) As defense counsel explained during the sealed portion of the *Kastigar* hearing, [redacted]

[redacted]

> [redacted] 



(Doc. 282, Vol. 6G at 59:2-13.)

Under the circumstances described above, although "Mr. Wannemacher was *notified* of his termination on December 27, 2019," at that time no decision or commitment had been made as to whether his termination would be with or without cause.   (Doc. 297 at 70 (emphasis in original).)   As shown earlier, Mr. Wannemacher's ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████); *see also* Gov't Ex. 43B at 2 ¶1.4, 4-6 ¶3.1 (providing that Mr. Wannemacher's duties included, *inter alia*, cooperating with the instructions of JEA's CEO and the Board, and allowing for Mr. Wannemacher's

termination either with or without cause, with Mr. Wannemacher's willful breach of his duties under the agreement being a basis for termination with cause.)   As such, based on the foregoing, the undersigned recommends that Mr. Wannemacher's January 3, 2020 statement is *Garrity* protected.

The Court now turns to Defendants' arguments for dismissing the Indictment and disqualifying the Prosecution Team.   It is undisputed that at the *Kastigar* hearing, the Government did not present all evidence that had been presented to the Grand Jury.[17]   Thus, the Court needs to determine

---

[17] The following individuals testified before the Grand Jury, but not at the *Kastigar* hearing: (1) Husein Cumber; (2) Camille Lee Johnson; (3) April Green; (4) Fred Newbill; (5) Michael Brost; (6) Melissa Charleroy; (7) Angela Hiers; (8) Michael Weinstein; (9) Anton Derkach; (10) Patricia Maillis; (11) Kevin Hyde; (12) David Wathen; (13) Stephen Amdur; and (14) Lynne Rhode who only testified about the Diamond-Salem issues.   Defendants argue that the extent to which these individuals were exposed to or influenced by Defendants' *Garrity* statements is unknown and, thus, the Court needs to exclude them from the trial because Defendants did not have an opportunity to cross-examine them about the *Garrity* issues.   Mr. Wannemacher acknowledges, however, that "[s]ome of the grand jury witnesses, such as Ms. Charleroy, testified in the grand jury about matters unrelated to the topics Mr. Wannemacher testified about in his *Garrity* Statement" and only "some of those witnesses appear to have or are known to have reviewed Mr. Wannemacher's compelled statements."   (Doc. 297 at 19 & n.11.)   The Government does not seem to address this issue other than to say that the Grand Jury transcripts, which have been filed under seal, "reveal a compelling truth, that is, despite over one thousand pages of questions and answers involving the twenty-five witnesses [who testified before the Grand Jury], the defendants cannot show the Court one single question and answer that was somehow derived from the Defendants' *Garrity* statements."   (Doc. 291 at 3.)   In light of the undersigned's recommendation below, the Court will assume without deciding that some or all of these 14 witnesses may have been exposed to or influenced by Defendants' *Garrity* statements.   However, the undersigned does not reach the question of whether some or all of these 14 witnesses should be excluded from the trial, because the Government has met its burden to show that the Indictment should be sustained as any use of tainted evidence was harmless beyond a reasonable doubt.

whether the evidence that was actually presented at the *Kastigar* hearing

was sufficient to sustain the Indictment against Defendants.   *See Byrd*, 765

F.2d at 1529 n.8 (stating that the focus of the court's inquiry is "whether the

evidence would have been sufficient to sustain an indictment even if

[defendant's] immunized testimony had not been improperly used or

presented); *Allen*, 864 F.3d at 98-99 (stating that "if the government has

presented immunized testimony to the grand jury, the indictment should be

dismissed unless the government establishes that the grand jury would have

indicted even absent that testimony").   In other words, even assuming that

the evidence not presented at the *Kastigar* hearing was tainted, the

Indictment would be sustained if the Government's use of such evidence was

harmless beyond a reasonable doubt.[18]   *Hampton*, 775 F.2d at 1489 n.51.

---

Mr. Zahn further argues that witnesses who did not even testify before the Grand Jury but were interviewed by the Prosecution Team prior to the federal Grand Jury subpoenas were issued, such as OGC attorneys Jon Phillips (who was present during Mr. Zahn's *Garrity* testimony) (Def. Ex. 222) and Jody Brooks (Gov't Ex. 68A, 68B), should have been called at the *Kastigar* hearing and questioned about their *Garrity* exposure.   (*See* Doc. 299 at 76-77.)   Mr. Wannemacher makes a similar argument about the following individuals who testified neither before the Grand Jury nor at the *Kastigar* hearing: Lanny Russell, Stephen Busey, Chris Dix, Lee Wedekind, Stephen J. Powell, Sonya Harrell, Adina Teodorescu, and Sean Granat.   (Doc. 297 at 14.)   The undersigned does not believe that the Government needed to call such witnesses at the *Kastigar* hearing in order to meet its burden as no more than a theoretical *Kastigar* claim can be made with respect to their involvement in this case.

[18] By arguing that there is an independent basis for the factual allegations in the Indictment, it appears the Government implicitly contends that the Court should engage in a harmlessness determination.

Here, the evidence elicited at the *Kastigar* hearing shows that the

Prosecution Team, not including the Cross-Counsel Team, has never read

Defendants' *Garrity* statements.[19]   In order to avoid exposure to the *Garrity*

statements, the Prosecution Team implemented the following procedures: (1)

not reviewing Defendant's *Garrity* Statements (Doc. 270, Vol. 3 at 99:3-13);

(2) not requesting Mr. Zahn's *Garrity* Statement from the OGC (*id.* at 99:15-

18); (3) when the Prosecution Team nevertheless received Mr.

Wannemacher's *Garrity* statement and Volume 2 of Mr. Zahn's *Garrity*

statement, those statements were segregated and then permanently

removed, physically and electronically, from FBI's file and document review

tool (*id.* at 100:19-101:10); and (4) avoiding media articles that discussed the

contents of Defendants' *Garrity* Statements (*id.* at 101:11-14).   While

additional procedures could have been implemented to prevent any exposure

or taint, the procedures that were in place were reliable and did not result in

a violation of Defendants' constitutional rights.   Defendants seem to argue

that any exposure to their immunized testimony, whether by the Prosecution

Team, the outside investigators, the witnesses, or the grand jurors

---

[19] Timothy Adams, who was on the Prosecution Team from early 2020 until
he left the State Attorney's Office in July of 2021 and did not testify before the
Grand Jury, had no recollection of reading Defendants' *Garrity* statements or
related newspaper articles during the relevant time.   (Doc. 271, Vol. 4 at 103:15-25,
116:12-25, 117:18-20, 133:7-9.)

themselves, should result in the dismissal of the Indictment.[20]   Not so.

Addressing "the significance of mere exposure to some or all of the

[immunized] testimony," the court in *Poindexter* explained:

> Defendants in their zeal treat this as if even the tiniest exposure
> to a witness or grand juror constituted exposure to an incurable
> disease.   Such is clearly not the case.   Exposure to a fleeting
> snippet means nothing.   It has no evidentiary coherence or
> impact.   Even more significant exposure is trivial where the fact
> is already known through independent evidence.   Surely the law
> is built at least partly on common sense and it cannot be—
> contrary to defendants' assertions otherwise—that a prosecutor
> who inadvertently overhears mention of a fact already confirmed
> by his own independent investigation can be said to have made a
> prohibited use of immunized testimony.   Clearly the defendants'
> Fifth Amendment rights are not then affected.   Similarly, the
> defendants' Fifth Amendment rights are not infringed if a
> witness hears immunized testimony and yet testifies solely to

---

[20] Mr. Zahn states:
All thirteen *Kastigar* Fact Witnesses acknowledged that the compelled
statements were reported in the media, with most of them admitting to
reading news accounts reporting and quoting from the compelled
statements. Eight *Kastigar* Fact Witnesses also acknowledged reading
the compelled statements directly. Ten *Kastigar* Fact Witnesses also
read the January 28, 2020 Termination Letter that was derived from
Mr. Zahn's *Garrity* testimony or watched the Board presentation
where the letter was read.
(Doc. 299 at 67-68.)   The Court notes, however, that some of the *Kastigar* witnesses
who were exposed to Defendants' *Garrity* statements did not testify before the
Grand Jury.   These include, but are not limited to, Ronald Salem (*see* Doc. 273, Vol.
6 at 145:20-146:3), Daniel Nunn who primarily testified about Diamond-Salem (*see*
Doc. 283, Vol. 6S at 19:4-5), and Kerri Stewart (*see* Doc. 273, Vol. 6 at 20:18-27:4,
28:12-23).   Pam Rauch was another *Kastigar* witness who did not testify before the
Grand Jury.   She testified that she did not read or become aware of Defendants'
*Garrity* statements (Doc. 272, Vol. 5 at 50:25-51:12, 53:23-54:3, 57:1-58:1, 64:21-
65:12), and her testimony was based on her "recollection from having directly
participated in those events" (Doc. 272, Vol. 5 at 65:9-12). ██████████   The rest of the
witnesses who testified at the *Kastigar* hearing, but not before the Grand Jury, are
discussed throughout this Report.

facts personally known to the witness.

> Even where extensive publicity was generated which included references to testimony given under use immunity, there is no basis for applying a different standard than that stated by the Supreme Court in considering the effect of use immunity on an individual defendant's Fifth Amendment rights.

*United States v. Poindexter*, 698 F. Supp. 300, 314 (D.C. 1988); *see also*

*United States v. North*, 920 F.2d 940, 946 (D.C. Cir. 1990) (*North II*) ("In our case, for instance, the district judge might find that a particular witness'[s] exposure to immunized testimony was so peripheral—let us say he only saw a newspaper headline—that the judge could safely find that the witness'[s] testimony was not tainted by the exposure, and therefore there is, in that situation, *no* use of the immunized testimony against the defendant.") (emphasis in original).

> The Eleventh Circuit has also elaborated on this point:

> Of course, there is still an arguable threat that [the prosecutor] will advertently or inadvertently derive some benefit in the preparation of the case by virtue of consulting with investigative agents . . . or others who have been exposed to the immunized testimony during the course of the governmental investigation, but that possibility exists as a practical matter in every case in which an immunized witness is subsequently prosecuted for the transactions about which he has testified.   So long as the government can demonstrate by a preponderance of the evidence that this did not in fact occur, or that if it did, it was harmless beyond a reasonable doubt, then clearly any conviction ultimately obtained would not be invalidated.

*Byrd*, 765 F.2d at 1532.[21]   *See also United States v. Caporale*, 806 F.2d 1487, 1518 (11th Cir. 1986) ("The essence of [defendant's] argument is that the government can never establish an independent source when the prosecutor has read the immunized testimony prior to trial.   The focus of the inquiry under *Kastigar*, however, is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant.").

Also, in *Vander Luitgaren*, Judge Conway explained:

> [T]he Supreme Court in *Kastigar* rejected the argument that the indictment should be dismissed in all cases where the same grand jury hears a defendant make immunized testimony and later indicts that defendant.  . . .  If it does not violate the Fifth Amendment to have the same grand jury hear a defendant's immunized testimony out of his own mouth and then later indict him, it does not violate the Fifth Amendment to have a testifying witness who is aware of Defendant's immunized statements testify before the grand jury.

*Vander Luitgaren*, 556 F. Supp. 2d at 1319-20.[22]

---

[21] The court further explained that "[w]hile *Kastigar* does emphasize that 'immunity from use and derivative use leaves the witness and the Federal Government in *substantially* the same position as if the witness had claimed his privilege in the absence of a grant of immunity,'" *Kastigar* "did not explicitly mandate that the position of the parties remain absolutely identical in every conceivable and theoretical respect" as "[t]hat would place a virtually insurmountable burden of proof upon the government, and would approach (if not result in) *de facto* transactional immunity."   *Byrd*, 765 F.2d at 1530.

[22] Mr. Wannemacher argues that "the government made no effort at the *Kastigar* hearing to establish that the grand jurors were not exposed to the Defendants' compelled statements through news coverage, social media, the SIC Report, the Internet, or otherwise."   (Doc. 297 at 18.)   He states that "[w]hile the

Here, the Government has shown that the allegations in the Indictment are based on evidence and leads independent from Defendants' *Garrity* statements.   Prior to the *Garrity* statements, on November 18, 2019, Council Auditor Kyle Billy issued a publicly available Memorandum to all Jacksonville City Council Members, which exposed the details of the LTI PUP and the payouts that would result from a recapitalization event, which was reviewed by Special Agent Blythe "within a month" after it was released. (*See* Doc. 291 at 23-24.)   The Council Auditor's Memorandum led the Prosecution Team to review publicly available JEA Board Meetings, interview Council Auditor employees who reviewed the Memorandum (such as Jeff Rodda, Heather Reber, and Kim Taylor), obtain communications with anyone involved in preparing or delivering the LTI PUP to the JEA Board, and any communications about the LTI PUP, including those with any Council Auditor's Office employees.   (*See id.*)   It also led, in part, to the

---

government has produced transcripts of grand jury testimony, Doc. 159, it has not produced the instructions given to the grand jury, and it is unknown whether the grand jury received any instructions that would have alerted grand jurors that they should avoid information about the Defendants' compelled statements."   (Doc. 297 at 18, 81.)   However, as shown above, this argument does not support dismissal of the Indictment.   *See Vander Luitgaren*, 556 F. Supp. 2d at 1319-20; *see also North*, 910 F.2d at 872 (finding that a *Kastigar* hearing was not required "concerning possible exposure of individual grand jurors through the media," but only as to witness exposure), *withdrawn and superseded in part*, 920 F.2d 940 (D.C. Cir. 1990); *cf. Hinton*, 543 F.2d at 1010 ("The prospect of peering into the grand jurors' minds, or of examining them individually, to ascertain whether Hinton's testimony was improperly used, is both impractical and unpalatable.").

issuance of the Grand Jury subpoena to JEA on April 21, 2020.   (*See* Doc.

291 at 24; Gov't Ex. 50, items 1-2, 6-10, 14-16, 18; *see also generally* Doc. 268,

Vol. 1 at 142:10–160:2.)

Then, the publicly available recorded Board meetings on the JEA

website from 2018-2019, particularly those that took place on January 22,

May 28, June 25, and July 23, 2019, led to the identification of other entities,

which led to additional Grand Jury subpoenas issued at the same time (April

21, 2020) to Willis Towers Watson, McKinsey, Morgan Stanley, JP Morgan

Chase, NextEra Energy, and S&P Global, and subsequent interviews of

David Wathen on May 14, 2020 (*see* Gov't Ex. 61), Anton Derkach on January

29, 2021 (*see* Gov't Ex. 62), Eddie Manheimer with Morgan Stanley on March

31, 2021 (*see* Gov't Ex. 64), Jason Gredell with JP Morgan Chase on March 5,

2021 (*see* Gov't Ex. 63), Mark Hickson with NextEra Energy on June 30, 2021

(*see* Gov't Ex. 65), Pam Rauch with Florida Power & Light,[23] and Jeff Panger

with S&P Global on December 17, 2020 (*see* Gov't Ex. 67).[24]   (*See* Doc. 291 at

---

[23] The interview of Ms. Rauch does not seem to be on the record.   (*See* Doc.
289.)

[24] Mr. Wannemacher's *Garrity* statement ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

22, 24, 28 n.14, 32-34; Gov't Exs. 54-59.)

In particular, the Grand Jury subpoena to S&P Global was issued on April 21, 2020 (Gov't Ex. 59) after the Prosecution Team compared publicly available forecasting that JEA performed, including the 2018 Ratings Agency Presentation (Gov't Ex. 37).   (Doc. 291 at 34 n.21.)   This led to the production of email communications between S&P Global and JEA personnel (which the Prosecution Team had from JEA's Grand Jury subpoena responses), and the interview of analyst Jeff Panger on December 17, 2020, who stated that: (1) JEA's financial condition in 2019 was "very, very, quite strong"; (2) S&P Global disagreed with JEA's projections presented to the JEA Board; and (3) S&P Global ultimately issued a Ratings Bulletin dated August 23, 2019 (Gov't Ex. 40B), informing bond holders that S&P Global disregarded JEA's strategic planning presentation for bond ratings purposes. (Doc. 291 at 34-35 n.21.)   Mr. Zahn's *Garrity* statement █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████   (Def. Ex. 1 at 150:5-151:14.)

Further, as the Government points out, outgoing Board Chair

───────────────

████████████████████████████████████████████████████████

████████████████████████████████████

Tom Petway's comments at the end of the November 28, 2017 JEA

Board meeting led to a string of public events that resulted in the

disclosure of the PFM Report, dated February 14, 2018, divulged in a

City Council Meeting that same day, which reported that "the gross

value of JEA was between $7.5 billion and $11 billion," with net

proceeds to the City from $2.9 billion to $6.4 billion.   (Doc. 291 at 24-

25; Gov't Ex. 4 at 18-20.)

Also, as a result of the productions made by JEA and Willis Towers

Watson in response to the Grand Jury subpoenas, the interviews and Grand

Jury testimony of David Wathen (Gov't Ex. 61), Angela Hiers (Gov't Ex. 70),

and Patricia Maillis (Gov't Ex. 69), the Government became aware that Willis

Towers Watson had no involvement in developing the LTI PUP, but its work

was used, without its consent, to lend false credibility to the LTI PUP that

was presented at the very end of the July 23, 2019 Board Meeting.   (*See*

*generally* Doc. 269, Vol. 2 at 44:1–59:20; Gov't Exs. 21D-21F, 21M-N.)   In

addition, the Compensation Study PowerPoint (Gov't Ex. 21M), which was

attached to a May 9, 2019 email sent from Ms. Maillis to Mr. Zahn, Mr.

Wannemacher, and others, was used to create the false impression with JEA

Board Members that the total cost of the plan was approximately $3.4 to $4.6

million per year over a three-year period.   (Doc. 269, Vol. 2 at 76:22-77:24;

Gov't Ex. 21M.)

After the Council Auditor's Memorandum was released, Mr. Wathen sent a letter to Ms. Dykes on January 8, 2020, disavowing that the LTI PUP (Resolution 2019-10) was Willis Towers Watson work product, and later confirmed in an interview, based on his personal knowledge, that Willis Towers Watson was never permitted to present at the June 18, 2019 Compensation Committee meeting or at any JEA Board Meeting.   (*See* Gov't Ex. 21N ("Willis Towers Watson provided JEA Management a draft discussion document for the June 18, 2019 Compensation Committee meeting.   The document was not a fully developed long-term incentive plan design but a strawman design that required further discussion and refinement, a discussion that Willis Towers Watson never had with the Compensation Committee and/or full Board as was initially planned. Several months have passed and we learned via media stories that a final long-term incentive plan design had been developed.   Based on our reading of the media stories, the final plan design is one Willis Towers Watson never would have proposed nor endorsed, yet we are identified in the media as being involved with the final long-term incentive plan design as we were the compensation consultant engaged by JEA.  . . .   [W]e request that you do not indicate that Willis Towers Watson provided support to JEA in the development of the final long-term incentive plan design"); *see also* Gov't Ex. 20P5 (Resolution 2019-10 approving the LTI PUP); Doc. 269, Vol. 2 at 77:25-

85:9.)   Importantly, Mr. Wathen's letter was sent before Mr. Wannemacher's

January 3, 2020 *Garrity* statement became public in the beginning of

February 2020 and before Mr. Zahn gave his *Garrity* statement on January

21-22, 2020.

The Government has also shown that the SIC, led by attorneys Stephen

Busey, Lanny Russell, and Kevin Blodgett, did not taint the federal Grand

Jury investigation.   (*See* Doc. 291 at 37.)   As an initial matter, none of these

attorneys testified before the Grand Jury.   Mr. Blodgett testified at the

*Kastigar* hearing, stating that although the SIC sent a request for

documents, treated as a public records request, to JEA on or about February

10, 2020, that production was put on hold until after JEA complied with the

Grand Jury subpoena issued on April 21, 2020.   (Doc. 271, Vol. 4 at 153:6-

156:7 (also stating that since the SIC's request for documents was treated as

a public records request, "documents that were exempt under public records

law, including confidential or proprietary information . . . particularly from

the consultants who participated in the strategic planning . . . were, at least

preliminarily, withheld from the SIC committee in response to its document

request," but "the DOJ got all of those documents without an exemption

process or the delay associated with it").)   The SIC also requested documents

from witnesses it interviewed and from interested third parties, including the

ITN bidders and some of the consultants who assisted with strategic

planning and PUP development; watched publicly available Board meetings; reviewed other public documents, such as the Council Auditor's Memorandum; and also sent some supplemental document requests to JEA. (Doc. 271, Vol. 4 at 153:14-21, 167:6-19, 169:15-172:24.)

Mr. Blodgett testified that he read Mr. Zahn's *Garrity* statement on May 28-29, 2020, and Mr. Wannemacher's *Garrity* statement on May 31, 2020.   (Doc. 271, Vol. 4 at 154:12-14.)   However, he never had any discussions with the Prosecution Team about those statements; the flow of information was "unidirectional" from the SIC to the Prosecution Team and only if the Prosecution Team requested it; and it was understood that in order to not interfere with the DOJ's prosecution, it was preferable for the SIC to refrain from interviewing certain witnesses, such as Ms. Dykes.   (Doc. 271, Vol. 4 at 157:5-21, 169:5-14, 182:6-9.)

Moreover, when Mr. Duva reached out to Mr. Blodgett on June 7, 2021 to ask for additional documents regarding the PUP that could bolster the Government's case, which led Mr. Blodgett (who no longer had access to the Relativity database) to contact Mr. Rodda, Mr. Rodda proceeded to look for the documents without any input from Mr. Blodgett, which ultimately resulted in the discovery of a version of the Performance Unit Scratch Sheet contemplating a sale and the Notes.xlsx spreadsheet, neither of which was previously seen by Mr. Blodgett.   (Doc. 271, Vol. 4 at 161:4-165:22 ("It's the

first time I can recall seeing either of those spreadsheets.").)   When Mr.
Blodgett voluntarily provided additional areas of inquiry to the Prosecution
Team in his June 30, 2021 email, he was relying solely on the documents
referenced in that email and there was nothing in there disclosing
Defendants' *Garrity* statements.   (Doc. 271, Vol. 4 at 194:14-200:25 ("At this
time[,] I actually had a very limited amount of information available to me, so
it wasn't the universe that I had available at the time of the investigation
because I did not have Relativity any longer.").)

Further, as to the Council Auditor employees, such as Jeffrey Rodda,
Kyle Billy, and Kim Taylor,[25]  the Government has shown that their
testimony was based on their personal participation in the LTI PUP analysis,
including documents that they created, communications they initiated, were
copied on, or received, and their individual and collective analysis of the LTI
PUP based on their training and experience.   (Doc. 291 at 41.)   Of particular
significance here is Mr. Rodda's role in "deciphering" the Performance Unit
Scratch Sheet and the Notes.xlsx spreadsheet.   (*Id.* at 8-9 ("While Rodda was
the first to decipher the documents and informed the Government of his
interpretation of them in June 2021, the record is clear that the origin of
them had nothing to do with the Defendants' *Garrity* statements, as the

---

[25]  Only Jeffrey Rodda and Kyle Billy testified before the Grand Jury.

Government already had been provided with the documents by JEA."); *see also id.* at 39 ("The Government received both spreadsheets from JEA pursuant to the April 21, 2020, grand jury subpoena, but had not understood their significance as of June 14, 2021.") (citing Doc. 270, Vol. 3 at 77:11-80:17).)

As an initial matter, Defendants acknowledge that: (1) ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and (2) the spreadsheets were in the Government's possession from productions made under the Grand Jury subpoena.[26]  (*See, e.g.*, Doc. 297 at 60 ("▮▮▮▮



---

[26] The Court is unpersuaded by Mr. Zahn's argument that the Government's "sourcing back" of documents to productions made by JEA and other entities in response to the Grand Jury subpoenas, "fails to address the *Kastigar* problem created by relying on tainted witnesses to provide the Government with investigatory leads."  (Doc. 299 at 78.)   It can hardly be said that the witnesses, even if tainted, provided investigatory leads where the documents were already in the Government's possession pursuant to productions made in response to a Grand Jury subpoena.   *Cf. Vander Luitgaren*, 556 F. Supp. 2d at 1321 ("That the government received a second production of documents regarding Mr. Rodriguez–Vasquez from Banco Popular after the proffer does not negate the fact that the documents were produced pursuant to a pre-proffer subpoena (dated March 2, 2006).").

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

Instead, Defendants argue that the information contained in the spreadsheets was discussed in their *Garrity* statements.   Yet, "[t]he government is free to use a piece of information that appears in an immunized document if it can accomplish its 'affirmative duty' of proving that the information was 'derived from a legitimate source wholly independent of the compelled testimony.'"   *United States v. Ponds*, 454 F.3d 313, 328 (D.C. Cir. 2006) (citing *Kastigar*, 406 U.S. at 460).   Thus, the Indictment will stand, even where the Government is aware of the immunized statements, so long as it did not use those statements in any way to build its case against Defendants.   *See Kastigar*, 406 U.S. at 453; *Schmidgall*, 25 F.3d at 1528; *Caporale*, 806 F.2d at 1518 ("The focus of the inquiry under *Kastigar* . . . is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant.").

████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████.[27]

Defendants further argue that their *Garrity* statements indicated that

they ███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

---

[27] Subsequent to Defendants' *Garrity* statements, it was discovered based on the meta data of the Performance Unit Scratch Sheet that it was saved in JEA's Executive Team folder, in a subfolder labeled "Zahn" (…jea.com\Root\SLT\Executive Team\Zahn\Performance Unit Scratch Sheet.xlsx).   (*See* Gov't Exs. 20A2, 20A3.)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████

More importantly, even ignoring any ambiguities in the *Garrity*

testimony, Mr. Wannemacher acknowledges that his responses at the

Diamond-Salem hearing, which are not *Garrity*-protected, showed that: ████

██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████ As the

undersigned has already found that Mr. Wannemacher's testimony at the

Diamond-Salem hearing was not subject to *Garrity* protections, the

Government could properly use that testimony to build its case against

Defendants.   Mr. Wannemacher's Diamond-Salem testimony provided an

independent basis for the Government to build its case.

In addition, to the extent Mr. Wannemacher's *Garrity* testimony

referenced ███████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████   the Government could

rely on such publicly available information that predated the *Garrity*

statements to build its case.

Further, the calculations were also addressed by CAO.   (Doc. 291 at

41.)   Initially, on November 18, 2019, the Council Auditor, Kyle S. Billy,

issued his Memorandum about JEA's PUP to all Council Members, in which

he recommended that the PUP be either formally rescinded or amended by

the JEA Board due to its weaknesses and concerns.   (Gov't Ex. 20FF.)   The

Memorandum described, *inter alia*, how the PUP would work and included

calculations at various levels of recapitalization demonstrating the possible

costs of the PUP if a recapitalization event occurred.   (*Id.*)   Mr. Billy

explicitly stated at the *Kastigar* hearing that his testimony about his

November 18, 2019 Memorandum and January 23, 2020 Memorandum was

not based on or derived from Defendants' *Garrity* statements or anything he

had heard at the Diamond-Salem hearing.   (Doc. 274, Vol. 7 at 131:10-25.)

Subsequently, Mr. Rodda from the same office was instrumental in

"deciphering" the Performance Unit Scratch Sheet that contemplated a sale

and the Notes.xlsx spreadsheet, which came to light in June of 2021.   As

stated herein, the Government has shown it had a legitimate, independent

source for these spreadsheets.   *See Byrd*, 765 F.2d at 1529 (stating that the

government is "only required to show that the evidence more likely than not

was derived independently of [defendant's immunized] testimony").

Specifically, Mr. Rodda testified that since he had been tasked with

creating an archive with all the information related to a potential sale of JEA

in late 2020 or early 2021, he requested from OGC all files that had been

released to SHB, and was reviewing them.   (Doc. 272, Vol. 5 at 116:13-

117:5.)   By going through the list of documents provided by OGC, Mr. Rodda

saw that there were four different versions of the Performance Unit Scratch

Sheet.[28]   (*Id.* at 118:11-119:22.)   At that time, Mr. Rodda was aware that a

Performance Unit Scratch Sheet existed because he had made a public

records request in March of 2021 as part of his work reviewing all invoices

---

[28] The Technical Analysis Report performed subsequently by FBI Computer
Scientist Timothy D. McCrohan, which analyzed the metadata of the Performance
Unit Scratch Sheet, among other documents, showed there were four different
versions.   (Gov't Ex. 20(a)(5).)   All versions of the Performance Unit Scratch Sheet
were created on March 18, 2019 by "Ryan," but one was last modified on March 27,
2019 by "Ryan" (Willis Towers Watson Production 5-20-2020/JEA subpoena
response.zip/JEA subpoena response/2/March 2019/Follow up.msg/Performance
Unit Scratch Sheet.xlsx), two others were last modified on April 1, 2019 by "JEA
User" (G Drive/1088/Public Record Request Docs/Performance Unit Scratch Sheet
(002).xlsx), and another one was last modified on May 20, 2020 by Tori Simmons (G
Drive/1238/Performance Unit Scratch Sheet.xlsx).   (*Id.*)

from law firms hired by the OGC, but he did not know there was a version of the Performance Unit Scratch Sheet that added $4 billion to the book value of JEA from a recapitalization/privatization event.   (*Id.* at 119:5-120-24.)

The meta data of the document revealed that the version of the Performance Unit Scratch Sheet with the added $4 billion was last modified by an individual named Tori Simmons.   (*Id.* at 121:21-122:24.)   When Mr. Rodda found out that Ms. Simmons was not a JEA employee, he reached out to JEA employee Jason Hutchinson, who worked in compliance and public records and was an attorney, in order to request the original version of that document.   (*Id.* at 121:21-122:24.)   The meta data of the original version of the Performance Unit Scratch Sheet with the added $4 billion showed that it was created on March 18, 2019 by a user named "Ryan" and modified on March 21, 2019 by a user named "WANNRF," before it was modified by Ms. Simmons.   (*Id.* at 128:3-9.)   When Mr. Hutchinson sent the original version of the Performance Unit Scratch Sheet with the added $4 billion, he also sent the Notes.xlsx spreadsheet to Mr. Rodda.[29]   (*Id.* at 122:22-123:7 (citing Gov't

---

[29] Defendants seem to lead the Court on a path to theoretical *Kastigar* claims by arguing that because Mr. Hutchinson did not testify at the *Kastigar* hearing, the record does not show whether he had reviewed or been exposed to Defendants' compelled statements.   *See Vander Luitgaren*, 556 F. Supp. 2d at 1320 ("Defendant cannot raise theoretical *Kastigar* claims based upon every event that occurred post-proffer."); *see also Byrd*, 765 F.2d at 1529 ("The government is not required to negate all abstract 'possibility' of taint.").   Even assuming *arguendo* that Mr. Hutchinson had been exposed to Defendants' immunized statements, that would not help Defendants' case, because he was merely responding to Mr. Rodda's request for

Ex. 20L1).)

The Notes.xlsx spreadsheet showed the increase of value of the 30,000 PUP units.   (*Id.* at 126:3-5 (stating "it starts off at zero dollars with a 10 percent increase in book value and increases in value all the way up to $11,500, or $345 million").)   The meta data of the Notes.xlsx spreadsheet, which Mr. Rodda extracted by using a software called EXIF, showed that it was created on July 11, 2019 by a user named "Ryan" and was modified on July 18, 2019 also by "Ryan."   (Doc. 272, Vol. 5 at 126:6-20; *see also* Gov't Ex. 20(a)(5).)   The Notes.xlsx was not in the SIC Report released in early January of 2021.   (Doc. 272, Vol. 5 at 126:21-23.)   According to the Technical Analysis Report issued by FBI Computer Scientist Timothy D. McCrohan on May 3, 2023, the Notes.xlsx spreadsheet originated from Mr. Wannemacher's desktop and had the following file path "…Ryan/Desktop/ Freebird/Notes. xlsx."   (Gov't Ex. 20(a)(5).)   JEA had already produced Mr. Wannemacher's desktop to the Prosecution Team in response to the April 21, 2020 Grand

---

documents in his capacity as JEA's custodian of records, and Mr. Rodda unequivocally and persuasively testified that nothing in Defendants' *Garrity* statements led him to the two spreadsheets.   (Doc. 282, Vol. 6G at 8:21-9:16 ("If I thought that I had been influenced or used the *Garrity* statements in what I did post to that, in finding these spreadsheets, I would tell you.  . . .  But I can tell you with absolute certainty that in my mind they had nothing to do with me finding the Performance Unit Scratch Sheet that had the $4 billion.").)   Also, with so many versions of the documents, it was not unreasonable for Mr. Hutchinson to provide additional documents that seemed related to the PUP and ITN, including the Notes.xlsx spreadsheet, and let Mr. Rodda decipher the pertinent ones.

Jury subpoena.   (*See* Gov't Ex. 50.)

As Mr. Rodda testified, the only thing that led him to discover the Performance Unit Scratch Sheet with the added $4 billion was his public records request to JEA based on his review of invoices from the law firm of Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury").   (Doc. 272, Vol. 5 at 127:4-8.)   He also testified that he did not know the Notes.xlsx spreadsheet existed until Mr. Hutchinson sent it to him.   (*Id.* at 127:4-8.)   Notably, Mr. Rodda attended the Diamond-Salem hearing where, as stated previously, Mr. Wannemacher testified, without *Garrity* protections, that: ███████████

████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████   As such, it was not at all unusual for Mr. Rodda, a *summa cum laude* graduate in economics and accounting who has been employed by CAO since 2013 (*id.* at 67:3-12), to look for spreadsheets when reviewing the documents produced in response to his public records request. Based on the foregoing, the Government has shown it had a legitimate source for the Performance Unit Scratch Sheet and the Notes.xlsx spreadsheet wholly independent from Defendants' immunized testimony.

The Court now turns to the Nixon Peabody Memo, which is a draft

memorandum titled "Long-Term Employee Incentive Program" that was

emailed by attorney Elizabeth Columbo from the Nixon Peabody law firm

(i.e., "Law Firm A" in paragraph 20(h) of the Indictment) to Mr.

Wannemacher and Mr. Herschel Vinyard, Jr., among others, on May 20,

2019.   (Gov's Ex. 28.)   This memorandum opined that a potential long-term

incentive program in the form of bonds based on JEA's value would not "be

able to clear legal hurdles under Florida law."   (*Id.* at 3.)   It explained:

> Under Florida law, JEA would be legally required to make the
> Program available to all employees – which would include high-
> level employees who are involved or influence many if not all
> significant financial and operating decisions.   But, under Florida
> conflict of interest laws, no employee could participate in the
> making of a financial decision if he or she has a financial interest
> in that decision without first disclosing the financial interest and
> concluding that the financial interest is not in substantial conflict
> with the duties that [sic] employee has to act first and foremost
> in the public interest.   In our view, we believe this creates an
> unresolvable dilemma where JEA would either have to exclude
> several employees from the Program thereby rendering the
> Program in violation of Florida law or several employees would
> be unable to carry out their responsibilities under Florida conflict
> of interest laws.
>
> In addition, the narrowly focused goals of the Program could
> present challenges whether the Program is in furtherance of a
> legitimate "public purpose."   . . .

(*Id.* at 11.)

With respect to this memo, the email chain, filed as Defendants'

Exhibit 228, shows as follows:

- On March 9, 2020, Lanny Russell from SHB emailed Jason Gabriel,

then General Counsel of the COJ, to request the Nixon Peabody Memorandum prepared for JEA concerning its Long-Term Employee Incentive Program.   Mr. Russell attached the invoice from the Nixon Peabody law firm relating to the preparation of the Memorandum.

- Minutes later, Mr. Gabriel emailed his staff: "Does anyone know what memo is being referred to and if so, can we please retrieve? Please let me know."

- A few minutes later, Adina Teodorescu, Assistant General Counsel, responded: "I have attached the most recent email I found about the memo (the memo is attached to that e-mail).   I will bring you a hard copy."

- On March 23, 2020, OGC attorney Jon Phillips emailed the Nixon Peabody Memorandum to Special Agent Blythe.

(Def. Ex. 228; *see also* Doc. 269, Vol. 2 at 94:13-95:5; Doc. 159, Gabriel Grand Jury Testimony at 42-43.)

Although the Nixon Peabody Memorandum was initially found in the email archives of the OGC, eventually, it was also located in Kort Parde's hard-copy file, who at that time was no longer employed as an Assistant General Counsel.   (Doc. 275, Vol. 8 at 97:23-98:10; *see also* Doc. 269, Vol. 2 at 94:13-95:5; Doc. 159, Gabriel Grand Jury Testimony at 43-44 (also stating that the Nixon Peabody Memorandum seemed "to have been shared between

Lynne Rhode . . . and Kort Parde, but it also seem[ed] to have died there because she had never raised it to anyone else"); Doc. 159, Rhode Grand Jury Testimony at 16-17 (stating that Herschel Vinyard gave a copy of the memo to Lynne Rhode who then provided a hard copy to Kort Parde on June 3, 2019).)

[redacted] (Doc. 297 at 43.)

[30] Mr. Russell did not testify before the Grand Jury either.



[redacted]

Contrary to Defendants' position, it was not at all unreasonable for SIC counsel, who was tasked with investigating "all matters relating to JEA's strategic planning, which included the PUP" and providing "policy and legislative recommendations . . . based on the investigation" (Doc. 271, Vol. 4 at 151:25-152:6), to leave no stone unturned in their investigation, including reviewing bills from outside law firms, such as Nixon Peabody. Defendants'

argument to the contrary is merely a theoretical *Kastigar* claim.[31]

Regardless, since the memo was initially emailed to Mr. Wannemacher and

Mr. Vinyard by Ms. Columbo on May 20, 2019, the Government points out

that it would have received it anyway from the JEA production involving Mr.

Wannemacher's emails pursuant to the April 21, 2020 Grand Jury subpoena

even if Jon Phillips had not emailed it to Special Agent Blythe on March 23,

2020.   *See Poindexter*, 698 F. Supp. at 307 (noting that *Kastigar* is concerned

with "direct or derivative use leading to evidence that would *not* otherwise

have been found") (emphasis added).   Based on the foregoing, the Court is

satisfied that the Government has shown it had a legitimate source for the

Nixon Peabody Memorandum wholly independent from Defendants'

immunized testimony.

Furthermore, the Government has demonstrated it had a legitimate,

independent source for the evidence supporting the allegations in the

Indictment.   Specifically, each Exhibit in the 20 series that the Government

presented at the *Kastigar* hearing pertains to a similarly numbered overt act

---

[31] Ms. Dykes's testimony at the *Kastigar* hearing also undermines
Defendants' argument that Mr. Russell's hypothetical familiarity with Defendants'
*Garrity* statements prompted him to mine the bills of JEA's bond counsel early in
the SIC investigation, ultimately leading to the discovery of the Nixon Peabody
Memorandum.   Ms. Dykes, who was familiar with Defendants' *Garrity* statements,
testified that although she recalled "a conversation where Nixon Peabody had been
doing some work for JEA on the long-term incentive program," she "was not aware
that this memo existed."   (Doc. 274, Vol. 7 at 230:1-15.)

in Count One of the Indictment.   (*Compare* Doc. 1, ¶ 20 *with* Gov't Exs.
20A1, 20A2, 20A3, 20A4, 20A5, 20B1, 20B2, 20F1, 20F2, 20F3, 20H1, 20H2,
20i1, 20j, 20K, 20L1, 20M, 20N, 20P1, 20P2, 20P3, 20P4, 20P5, 20Q, 20r, 20s,
20t, 20W, 20X, 20Y1, 20Y2, 20Y3, 20AA1, 20AA2, 20AA3, 20AA4, 20AA5,
20BB, 20CC1, 20CC2, 20DD, 20EE.)   Many of these exhibits are either
public records or were produced in response to the Grand Jury subpoenas.

Further, JEA executives Paul McElroy, Melissa Dykes, and Joseph
Orfano, who testified both before the Grand Jury and at the *Kastigar*
hearing, based their testimony on their personal involvement in the events,
their perspectives of JEA's financial condition, and their reaction to the 2019
strategic planning.   (*See generally* Doc. 271, Vol. 4; Doc. 274, Vol. 7 at 181-
183, 186-189, 199, 206-207, 215; Doc. 285, Vol. 8G at 8:23-10:20, 13:5-16:4,
17:6-20:6.)   Mr. Orfano testified that he did not learn anything new from Mr.
Wannemacher's *Garrity* statement.   (Doc. 274, Vol. 7 at 199:12-20.)   Mr.
Orfano also testified that he was familiar with the Council Auditor's
November 18, 2019 Memorandum (Gov't Ex. 20(ff)), which contained LTI
PUP calculations at various levels of recapitalization, and was released well
before the *Garrity* statements.   (Doc. 274, Vol. 7 at 200:17-201:9.)

Former JEA Board Members Kelly Flanagan, Alan Howard, and
Christian Andrew Allen, whose *Kastigar* testimony mirrored their Grand
Jury testimony, relied on their firsthand understanding of the LTI PUP as

Board members.   (*See generally* Doc. 272, Vol. 5 at 152, 155-156, 168-169;

Doc. 273, Vol. 6 at 176:6-14, 188:3-16, 189:1-22; Doc. 274, Vol. 7 at 38-39, 42-

48, 55-56, 62-63.)   Ms. Flanagan and Mr. Howard also expressed their

familiarity with the Council Auditor's November 18, 2019 Memorandum

(Gov't Ex. 20(ff)), which contained LTI PUP calculations at various levels of

recapitalization, and was released well before the *Garrity* statements.   (*See*

Doc. 272, Vol. 5 at 144:15-146:4; Doc. 274, Vol. 7 at 35:24-37:25.)

As to Ms. Flanagan, Mr. Wannemacher points out that she informed

the Prosecution Team that there were two portions of her Grand Jury

testimony that she was concerned might not have been independent from

Defendants' immunized statements, but the case agent only took down

information regarding one of those passages, namely, her testimony that the

LTI PUP was "buried" in "a marathon [Board] meeting" on July 23, 2019.

(Doc. 297 at 32-33; Doc. 272, Vol. 5 at 169-170 (also stating that the

Prosecution Team informed Ms. Flanagan that Cross-Counsel was available

to speak with her about her questions or concerns, but she chose not to).)

Although Mr. Wannemacher states that the *Kastigar* hearing record does not

reflect what was the other portion of Ms. Flanagan's Grand Jury testimony

that she thought might have been influenced by information she learned at

the Diamond-Salem hearing, from the media coverage, and/or from the OGC

about Defendants' *Garrity* statements, defense counsel does not explain why

they did not inquire about these issues on cross examination.

Regardless, the undersigned agrees with the Government that Ms. Flanagan had ample independent bases to pull from to communicate her personal recollection of the LTI PUP being "buried" in "a marathon [Board] meeting," which were separate from and preceded any review of media articles related to Defendants' *Garrity* statements.   (Doc. 291 at 70 n.34.) Specifically, Ms. Flanagan testified that while she learned of the estimated $3.4 million amount per year pertaining to the LTI PUP during the July 23, 2019 Board Meeting, it was during the Diamond-Salem Hearing (which was not *Garrity* protected) that she realized there was a difference between the Willis Towers Watson slides in the July 23, 2019 Board package and what was gathered and presented during the Diamond-Salem Hearing.   (*Id.*)   Ms. Flanagan also acknowledged reading the November 18, 2019 Council Auditor's Memorandum (Gov't Ex. 20(ff)) before the Diamond-Salem Hearing, which contributed to her personal knowledge of the LTI PUP representations and calculations.   (Doc. 291 at 70 n.34.)

Similarly, former General Counsel Jason Gabriel relied on his personal experiences, including his interactions with Mr. Zahn, the other OGC attorneys, and the Council Auditor's Office, to indicate disapproval of the LTI PUP.   (*See* Doc. 275, Vol. 8 at 91:21-92:1 ("Everything I testified about [before the Grand Jury] were things that I lived."), 94:17-20, 95:21-24,

115:20-25; Doc. 285, Vol. 8G at 23:1-9, 26:1-27:1, 31:24-32:4 ("I mean, I didn't

put much stock in those interviews in terms of the facts. I lived all the parts

of this, painful or not.   And so everything I've been telling you has been from

my individual interactions with the facts, not from these exculpatory defense

interviews."), 32:11-20 (reflecting Mr. Gabriel's testimony that essentially he

did not learn anything new from the *Garrity* statements), 32:21-23 ("Q. Did

Mr. Zahn's *Garrity* statement have any impact on your grand jury testimony?

A. No. I had forgotten about it."), 34:22-35:4 (reflecting Mr. Gabriel's

testimony that he was present at the Diamond-Salem hearing in December of

2019, where Mr. Zahn had indicated that "once he realized the payments

were so high, that he was going to potentially shut down this whole thing").)

Mr. Gabriel also had significant involvement with the various law firms,

including Pillsbury and Foley & Lardner, who were contracted and associated

with various facets of the ITN.   (Doc. 275, Vol. 8 at 100:13–104:21; Gov't Ex.

31A (a June 28, 2019 letter engaging Pillsbury for legal services to JEA

relating to general corporate and transactional matters); Gov't Ex. 32B (a

July 22, 2019 letter engaging Foley & Lardner for legal services to JEA

relating to labor, employment, collective bargaining, procurement, regulatory

matters, securities, and general corporate and transactional matters).)

Mr. Zahn argues that ten *Kastigar* fact witnesses have been tainted

because they either read the January 28, 2020 Termination Letter[32] and/or watched the Board presentation where the letter was read out publicly, and the letter contained the fruits of Mr. Zahn's *Garrity* statement.   (Doc. 299 at 40, 68.)   Mr. Zahn has also provided the Court with a sealed comparison chart showing similarities between the Termination Letter and the allegations in the Indictment.   (*See* Doc. 299-2.)   However, Mr. Zahn has not identified any particular statement in the Termination Letter that could have been gleaned solely from his *Garrity* statement and that would have been useful to the prosecution.   The statements that were potentially useful to the Government's case were also available in publicly recorded JEA Board meetings and the accompanying materials, in documents or other evidence involving CAO, in legal memoranda, forecasting, and communications that the Government received in response to the Grand Jury subpoenas, as well as in other sources as detailed earlier.

Therefore, the Government has established that its witnesses' testimony and the documentary evidence was based on or derived from sources independent of anything that was contained in Defendants' *Garrity*

---

[32] The Government acknowledges that Special Agent Blythe, Mr. Duva, and some of the witnesses were familiar with the Termination Letter, but asserts that the letter was not presented to the Grand Jury, and the witnesses' testimony was based on sources independent of anything that was contained in the letter.   (Doc. 279, Vol. 4G at 23:4-6; Doc. 280, Vol. 4S at 9:24, 10:11, 19:23-25; Doc. 291 at 81.)

statements.   In other words, even if the Termination Letter contained the fruits of Mr. Zahn's *Garrity* statement, the Indictment would still stand because the Government had a legitimate, independent source for its evidence that formed the basis for the Indictment.

## V.    Recommendation

In sum, based on the exhibits and testimonial evidence presented at the *Kastigar* hearing and filed in connection therewith, the undersigned recommends that the Government has shown an independent basis for the factual allegations in the Indictment even assuming that some of the evidence presented to the Grand Jury was tainted.   To the extent the Government used any evidence that was tainted by Defendants' *Garrity* statements or the fruits thereof, such use was harmless beyond a reasonable doubt as the evidence was otherwise sufficient to sustain the Indictment against Defendants.

**DONE AND ENTERED** at Jacksonville, Florida, on November 13, 2023.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Hon. Brian J. Davis
United States District Judge

Counsel of Record