UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                          CASE NO. 3:22-cr-23-BJD-MCR

AARON ZAHN
_____/

## UNITED STATES' SENTENCING MEMORANDUM

Aaron Zahn corruptly conspired to steal from the city of Jacksonville and perpetrate the largest fraud in the history of the city. When Zahn became the CEO of JEA, his sole focus was privatization, and obtaining substantial wealth during the process. The evidence at trial showed that Zahn engineered messaging to the JEA Board in 2019 to convince it that privatization was the only viable path forward for the historically successful municipal utility. Zahn publicly espoused that if privatization was not pursued, twenty-nine percent of JEA employees (upwards of 574 public servants) would lose their jobs.

The heart of the fraud was the Performance Unit Plan (PUP), a deeply flawed bonus plan that Zahn and others crafted to work in tandem with the privatization of JEA. While Zahn failed in his quest, the felonious conspiratorial agreement was made, and Zahn took substantial steps to implement the PUP. Culminating with the November 18, 2019 Memorandum to members of the City Council, the Council

1

Auditor revealed the true nature of the PUP and Zahn's hidden plan. While multiple additional steps had to occur before the privatization of JEA could fund the PUP with hundreds of millions of dollars, this is what Zahn spent his days as JEA CEO pursuing. Zahn violated his fiduciary duty to JEA and the COJ, and breached the public trust. This was grounded in greed and avarice.

This is a historic criminal case in the Jacksonville Division of the Middle District of Florida. The jury's verdict and the sentencing of this former CEO of Jacksonville's most coveted independent agency is momentous. Zahn tried to fleece the COJ of hundreds of millions of dollars via an independent city agency with a storied history and substantial value, one in which Zahn had no role in creating or contributing to. Zahn attempted to do it with a fake stock plan conjured up out of thin air. The formula was engineered to lead to the certainty of large payouts of "bonus" money if JEA was sold. The defense posits that this is a probation case. This case is the farthest thing from that.

## I. SENTENCING BACKGROUND

On March 14, 2024, the jury convicted Aaron Zahn of conspiracy to embezzle and steal municipal funds (Count 1) and wire fraud (Count 2). The sentence in this case will ultimately be decided pursuant to the factors set forth in 18 U.S.C. § 3553(a), of which the Court is well familiar. The sentencing guidelines issue is about the applicability of intended loss. The Court's decision will amount to an

approximate 22-level difference under § 2B1.1(b)(1). Regardless of the court's ruling on this issue, the court must assess the section 3553(a) factors and fashion a sentence that is sufficient, but not greater than necessary, to accomplish the statutory purposes of sentencing. The weighing of the section 3553(a) factors calls for a term of incarceration. The Government first discusses the intended loss issue, then why the section 3553(a) factors call for a multi-year term of incarceration.

## II.   THE PSR PROPERLY SCORES INTENDED LOSS

The Pre-Sentence Report (PSR) finds (in paragraph 46) that the loss in this case exceeds $25,000,000 but is less than $65,000,000, thus a 22-level increase under USSG § 2B1.1(b)(1)(L) is appropriate. The Probation Officer calculated this increase because of the sum of money that Zahn alone expected to receive from the PUP if JEA was sold, which was approximately $40 million. The PUP was discovered, the ITN cancelled, and JEA was never sold or privatized, but this figure represents Zahn's true intention, thus it is properly characterized as intended loss. While the Government has not lodged an objection to this calculation underrepresenting the intended loss to the COJ, the Government notes that it is nevertheless very conservative. The PUP (upon a sale of JEA) stood to payout hundreds of millions of dollars in bonus money, depending on the level of net proceeds to the COJ upon a sale or recapitalization of JEA. The intended loss could be much higher in this case.

Zahn objects to the 22-level enhancement. Zahn's position is that there is no

3

loss in this case, and that recent Eleventh Circuit case law dictates that this Court cannot score any intended loss. The defense posits there is no appropriate enhancement under § 2B1.1(b)(1), and that the resulting guidelines range is Criminal History Category I, Total Offense Level 7 (0 – 6 months). The Government's position is that the advisory guidelines range is properly calculated at Criminal History Category I, Total Offense Level 29 (87 – 108 months of imprisonment). Zahn faces a statutory maximum penalty of 5 years on Count One, and 20 years on Count Two.

### A. The use of intended loss is appropriate under Eleventh Circuit precedent, and *Dupree* did not abrogate that precedent.

Recent Eleventh Circuit case law does not vitiate intended loss. U.S.S.G. § 2B1.1(b) provides for increases in a defendant's offense level based on the amount of "loss" involved in economic offenses such as fraud. Application Note 3(A) to § 2B1.1 explains that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss is the "pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1, cmt. n.3(A).

The Eleventh Circuit has consistently affirmed district courts' consideration of intended loss as a proper measure of loss under § 2B1.1. *See, e.g.*, *United States v.*

4

*Willis*, 560 F.3d 1246, 1250–51 (11th Cir. 2009) (per curiam); *see also United States v. Moran*, 778 F.3d 942, 973–75 (11th Cir. 2015) (affirming district court's use of intended loss to calculate defendants' guidelines ranges); *United States v. Everett*, 368 F. App'x 952, 953–54 (11th Cir. 2010) (per curiam) (unpublished) (concluding that "the district court committed no error in enhancing the base offense level for the intended loss as opposed to the actual loss"). The Eleventh Circuit has interpreted the commentary's definition of loss as consistent with "the plain meaning of the text of" § 2B1.1. *United States v. Moss*, 34 F.4th 1176, 1190 (11th Cir. 2022) (quoting *United States v. Wilks*, 464 F.3d 1240, 1245 (11th Cir. 2006)). This court must follow precedent on § 2B1.1 "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

Further, neither *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), nor *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (*en banc*), undermines Eleventh Circuit precedent on § 2B1.1. In *Kisor*, the Supreme Court clarified the circumstances under which courts should defer to agency interpretations of their own regulations under *Auer v. Robbins*, 519 U.S. 452 (1997). 139 S. Ct. at 2408. The Court held that such deference is warranted only when a court has determined, "based on indicia like text, structure, history, and purpose," that "the regulation really has more than one

5

reasonable meaning" and the agency's interpretation "is of the sort that Congress would want to receive deference." *Id.* at 2424. But aside from clarifying the scope of *Auer* deference, *Kisor* did not address or undermine Eleventh Circuit precedent affirming the use of "intended loss" in sentencing calculations.

In *Dupree*, the Eleventh Circuit concluded that *Kisor*'s parameters for determining whether an agency's rule warrants deference applies to Sentencing Guidelines commentary. 57 F.4th at 1275. Applying *Kisor*, the Eleventh Circuit held that the text of U.S.S.G. § 4B1.2, which defines "controlled substance offense," unambiguously excluded inchoate offenses like conspiracy or attempt. *Id*. at 1277–78. It thus concluded that the Guidelines commentary defining the same term to "include[] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses" did not warrant deference under *Kisor*. *Id*. at 1273, 1279–80 (internal quotation marks omitted). *Dupree*'s application of *Kisor* analysis was limited to § 4B1.2 and therefore does not undermine to the point of abrogation Eleventh Circuit precedent affirming consideration of intended loss under § 2B1.1.

In fact, *Kisor* declined to overrule *Auer* in part to avoid such regulatory uncertainty, reasoning that "abandoning *Auer* deference would cast doubt on many settled constructions of rules." *Kisor*, 139 S.Ct. at 2422. Presuming that *Dupree* overruled every case that has applied the Guidelines commentary risks exactly the type of "full-scale disruption" of settled rules that *Kisor* sought to avoid. *Dupree*, 57

F.4th at 1287 (Grant, J., concurring) (refusing to read the majority opinion to presumptively overrule "every case that has applied the commentary").

### B. "Loss" unambiguously includes intended loss.

As recognized by the Eleventh Circuit, "whatever else *Dupree* did, it did not 'specifically and directly resolve' the question of whether § 2B1.1's definition of 'loss' is ambiguous." *United States v. Verdeza*, 69 F.4th 780, 794 (11th Cir. 2023). Thus, neither *Dupree* nor *Verdeza* decided whether § 2B1.1 is ambiguous.

The term "loss" in § 2B1.1 unambiguously includes intended loss. And even assuming the term "loss" is ambiguous, the Commission's authoritative interpretation in Application Note 3(A) is reasonable and entitled to deference.

Section 2B1.1(b) requires sentencing courts to increase the defendant's offense level by two-level increments if the "loss" exceeded certain dollar thresholds. U.S.S.G. § 2B1.1(b). Traditional interpretive tools, including the text, structure, history, and purpose of U.S.S.G. § 2B1.1, show that the term "loss," as used in that guideline, must include intended loss. *See Kisor*, 139 S. Ct. at 2415. This Court presumes that the term carries its ordinary meaning. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1214 (11th Cir. 2008). And dictionaries usually contain a word's ordinary meaning. *See In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018).

"Loss" can mean the "amount of something lost" or the "harm or suffering caused by losing or being lost." *American Heritage Dictionary of the English Language*

7

1063 (3d ed. 1992). Loss can also mean the "[d]imunition of one's possessions or advantages" or the "detriment or disadvantage involved in being deprived of something." *Oxford English Dictionary* 37 (2d ed. 1989). Or it can mean "[a]n undesirable outcome of a risk," "the disappearance or diminution of value," or the "failure to maintain possession of a thing." *Loss*, *Black's Law Dictionary* (11th ed. 2019). Black's Law Dictionary explains that loss may refer to anything from "actual loss" to "expectation loss" to "indirect loss" to "intangible loss" and even "unrealized loss." *Id.* "Loss" means different things in different contexts. Thus, "loss" under § 2B1.1 unambiguously encompasses intended loss. *See United States v. Bryant*, 996 F.3d 1243, 1259–60 (11th Cir. 2021) ("[O]ur interpretation of the Sentencing Guidelines is governed by traditional rules of statutory construction.") (internal quotation marks omitted).

  Finally, § 2B1.1 is consistent with and implements the Commission's goal to ensure defendants' sentences "reflect the nature and magnitude of the loss caused or intended by their crimes." U.S.S.G. § 2B1.1, cmt. (background). Here, Zahn fully intended to deprive the COJ of money it would have obtained from the sale of JEA, the COJ's seminal and most valuable asset. That was the heart of the conspiracy, that is, for Zahn to enrich himself based on a fake stock crafted out of thin air that was essentially guaranteed to pay unheard of dividends for Zahn and others. In other words, had the conspiracy worked and the PUP funded by the sale of JEA, it was a

certainty that Zahn would have been unjustly enriched to the tune of millions of dollars destined to the COJ. In this context of "loss," the intention is clear and the intended damage should be considered. Thus, there is no genuine ambiguity as to whether "loss" includes intended loss. This interpretation follows *Kisor's* command: to "carefully consider the text, structure, history, *and* purpose" of the guideline to determine its meaning. 139 S.Ct. at 2415-16 (emphasis added).

### C. Even if "loss" were ambiguous, Application Note 3(A)'s interpretation is reasonable and entitled to deference.

Even if this Court concludes that "loss" is genuinely ambiguous, the guidelines commentary provides a reasonable interpretation of the term "loss" and warrants deference. *See Kisor*, 139 S.Ct. at 2415-16.

In the commentary to § 2B1.1, the Sentencing Commission recognized that economic crime statutes generally "cover a broad range of conduct with extreme variation in severity." U.S.S.G. § 2B1.1, cmt. (background). The Commission uses loss as a "principal factor" in determining the appropriate offense level consistent with the "defendant's relative culpability." *Id.* In these circumstances, the Commission reasonably defined "loss" to mean "the greater of actual loss or intended loss," as it has since the Guidelines were first issued, to align the offense level according to the loss the defendant intended to inflict. The Guidelines also require that a defendant's offense level "shall be determined" based on "all harm that

9

resulted" from the defendant's criminal acts, as well as "all harm that was *the object* of such acts." U.S.S.G. § 1B1.3 (emphasis added). This directive means that the offense level should be determined based on intended as well as actual loss.

This case fits within those where a contrary interpretation (a resulting guidelines range of 0 – 6 months) would disparately impact defendants with similar culpability based solely on whether the scheme was thwarted in time to prevent actual loss. In other words, had Zahn's conspiratorial scheme worked and netted him a $40 million dollar payout, the defendant's interpretation would result in that version of Zahn facing an advisory guidelines range of 87 to 108 months in federal prison, and the version whose conspiracy was thwarted 0 to 6 months. In both instances, the crimes would be the exact same. As Judge Grant recognized in his concurring opinion in *Dupree*, this interpretation would constitute the "full scale disruption" that led to the slippery slope of overruling all cases that applied the guidelines commentary. Such a result is not reasonable.

Application Note 3(A)'s definition of "loss" is entitled to deference, as it reflects the Commission's "authoritative" and "official" position. *Kisor*, 139 S. Ct. at 2416 (internal quotation marks omitted). Further, the Commission has included intended loss in the Guidelines since their inception. *See* U.S.S.G. § 2F1.1(b)(1) (1987) (providing for an increased offense level for fraud offenses based on "estimated, probable or intended loss"). This has been a grounded and historic

inclusion since the advent of the guidelines, not some *ad hoc* litigation position that has recently developed.

### D. The Sentencing Commission has since amended § 2B1.1, which takes effect on November 1, 2024.

It is telling that the Sentencing Commission has amended § 2B1.1(b)(1) (effective November 1, 2024) to move the general rule establishing loss as the greater of actual loss or intended loss from the commentary to the guideline itself as Notes to the Table in § 2B1.1(b)(1). The definition of "intended loss" remains the same. While the defendant is correct that on the date of sentencing in this case (July 30, 2024), this Guideline will not be in effect, the Sentencing Commission's immediate reaction to *Dupree* and the potential evisceration of guidelines commentary across the board speaks volumes.

As set forth, since the inception of the Guidelines, calculations of intended loss have been included to shape guidelines exposure. If this and other courts rule in favor of the defense, this will constitute a small number of cases in the history of the Sentencing Guidelines that were treated unlike all others from 1987 to the present and those after November 1, 2024, where defendants in this small snapshot of time were not subject to intended loss calculations for economic crimes, including those crimes as corrupt as the offenses of conviction in this case. Such a result is not logical.

## III. THE SECTION 3553(a) FACTORS CALL FOR INCARCERATION

This sentencing hearing centers around the sentencing factors set forth in section 3553(a)(1-7). Regardless of this Court's decision on intended loss, the resulting sentence should be the same. As is pointed out in sentencing memoranda filed in nearly every federal sentencing, the guidelines are advisory. This Court's decision on intended loss should not change the ultimate sentence. The sentencing range the defendant advocates for (0 to 6 months) is woefully inadequate, and this defendant should not receive a sentence at the high end of the advisory guidelines range (108 months) if the Court overrules the defendant's objection on intended loss.

So, what is the appropriate sentence in this case? What sentence is sufficient, but not greater than necessary, to accomplish the statutory purpose of sentencing? These are always the critical inquiries at every federal sentencing. The section 3553(a) factors guide that determination.

The nature and circumstances of the offenses of conviction were entirely corrupt. This was not a nominal bonus plan that accidentally ballooned if JEA was sold or recapitalized. Zahn's engineering of an absurd golden parachute based on a made-up formula designed to guarantee wealth was purposeful, hidden, conniving, and corrupt. This was the greatest financial scandal involving a public asset in the history of Jacksonville. While it is true that Zahn has no criminal history and has otherwise lived a law-abiding life, there are those crimes that overshadow that. This

is one of them. The perpetration of these crimes requires punishment.

In addition to the intended loss figures discussed above, there were other financial ramifications for JEA, which JEA will submit in a more detailed victim impact statement prior to the sentencing. The following is a bullet point synopsis of those:

- Net Present Value of JEA's Increased Financing Cost of Project J Bonds as a result of Downgrades:  **$49,618,839**

- Net Present Value of JEA's Increased Financing Cost of Electric/Water & Sewer Bonds as a result of Downgrades:  **$13,561,410**

- Payments to Certain Outside Vendors for ITN[1]:  **$7,892,979.66**

- **Total**:  **$71,073,228.66**

These expenses occurred, in substantial part, because of the corrupt actions of then CEO Zahn. While the Government is not advocating that these figures are used in the "loss" calculation, they are nevertheless relevant to the consequences that flowed from the nature and circumstances of the offenses of conviction.

A multi-year sentence of incarceration for Zahn reflects the seriousness of the

---

[1] This $7,892,979.66 figure excludes the following: (1) legal fees paid to the Nelson Mullins law firm representing JEA in civil litigation with Zahn; (2) legal fees paid to the law firm of Holland & Knight related to the Plant Vogtle lawsuit; and (3) nearly $10 million in payments to attorneys under JEA's Directors and Officers liability policy for the defense of the defendants in this case, and the representation of various current and former employee witnesses.

offense, promotes respect for law, and provides just punishment. The defendant's advocacy for probation (based on a guidelines range of 0 to 6 months) simply does not. Such a result would be a substantial outlier in public corruption/fraud cases. It would send no deterrent message. It would send the message to public officials that one can conspire and attempt to fleece the City of Jacksonville, but if you fail, there will be no incarceration consequences. That is the wrong message; one that this court should not send.

    Instead, this court should impose a sentence that sends a specific and general deterrent message (as the statute requires), that is, if any city government or independent agency leader commits crime, steals or attempts to steal from taxpayer or ratepayer money, violates his or her fiduciary duties, and breaches the public trust, there will be an incarceration consequence. The truth in almost any public corruption/fraud case is that the official or leader has no criminal history, and has otherwise led a law abiding life. Local governments typically do not appoint known felons or law violators to run independent agencies or hold positions of public trust. That Zahn had no criminal record, or has not violated the law before, is of little to no moment. The public and the ratepayers must be assured that leaders (like Zahn) in these positions will not do these things. General and specific deterrence call for a multi-year term of incarceration in this case.

    As in all sentencing hearings, this court has an important calling in this case. It

must balance the section 3553(a) sentencing factors. The outcome must reflect the truly unique circumstances of this historic and serious case in Jacksonville and the Middle District of Florida. That balance is well above the defendant's request for probation and below the high end of the guidelines. A reasonable, fair, and just sentence in this case is somewhere in between those numbers. The Government will expand on this memorandum and orally request a specific sentence during the sentencing hearing.

## CONCLUSION

Local governments cannot be poisoned with fraud, deceit, and corruption. The courts play an important role in keeping that at bay. Those who breach the public trust in the historic manner that Aaron Zahn did deserve punishment. That punishment goes beyond a ruined reputation, and that he will never hold such a position of power again. The punishment is not to ruin, but to hold Zahn accountable; to ensure that no one in our city's history attempts (or succeeds) at such a corrupt endeavor ever again. Multi-year incarceration is fair and just in this case.

        Respectfully submitted

        ROGER B. HANDBERG
        United States Attorney

        */s/ Tysen Duva*
        Tysen Duva
        Assistant United States Attorney
        Florida Bar No. 0603511
        Arnold B. Corsmeier
        Assistant United States Attorney
        Florida Bar No. 869139
        300 N. Hogan Street, Suite 700
        Jacksonville, Florida 32202
        Telephone: (904) 301-6300
        Facsimile:   (904) 301-6310
        E-mail: Tysen.Duva@usdoj.gov
              Chip.Corsmeier@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

  Counsel of Record for Aaron Zahn

        *s/ Tysen Duva*
        Tysen Duva
        Assistant United States Attorney