## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                          **Case No. 3:22-cr-00023-BJD-MCR**

**AARON ZAHN,**

      **Defendant.**

_____/

### DEFENDANT AARON ZAHN'S SENTENCING MEMORANDUM

In conjunction with Defendant's Objections to the Presentencing Report (PSR), we submit this Sentencing Memorandum on behalf of Defendant Aaron Zahn.

### I.    PRELIMINARY STATEMENT

As demonstrated in the letters from those who know him best, Aaron is an exceedingly thoughtful and caring person who has touched many lives and contributed to the welfare of others and society in myriad ways. Aaron is a non-violent, first-time offender. He is a devoted husband and father to three young children, demonstrating a steadfast commitment to improving the communities around him. Incarceration is neither necessary to protect the public nor to deter Aaron from future offenses.

The breach of trust underlying Aaron's conviction resulted in no actual loss to any victim, and no restitution is sought. The PSR's Guidelines recommendation improperly relies on a 22-level enhancement based on an alleged intended loss. This loss enhancement is unsupported by the clear text of the 2B1.1 Guideline, is highly speculative, and lacks any evidentiary basis. A proper application of the Guidelines results in a total offense level of 7—a Zone A offense level. Moreover, even if intended

loss could properly be considered, as courts across the country recognize in similar white-collar fraud cases, the PSR's Guidelines recommendation substantially overstates the seriousness of the offense, warranting a downward departure.

Aaron poses no danger to society.  He has remained out of custody with an impeccable pretrial services record for more than five years.  The prosecution and conviction in this case have wreaked substantial havoc on Aaron's personal life and family, as well as his ability to maintain any professional engagement. The relentless media criticism from 2018 to present ensures that Aaron will continue to be punished for the rest of his life as his public reputation has been forever destroyed.

In sum, a "multi-year" sentence of incarceration would be greater than necessary to serve the purposes of 18 U.S.C. § 3553(a)(2).

## II.   AARON's ZAHN'S PERSONAL HISTORY

### A.   Early Life and Education

Aaron was born on September 20, 1979, in Minneapolis, Minnesota. The only child of Barbara and Fredrick Zahn, Aaron also has a half-brother and sister, Tim and Molly, from this father's previous marriage. Aaron grew up close to his older siblings by spending summers with them at the family's lake home in northern Minnesota.

> "From the beginning we wanted Aaron to be a confident person whose daily life was filled with happiness and goodness …The year he turned two we moved to Ohio. He left behind his brother and sister. It was a lonely time, but we kept the family unit together by spending summers in northern Minnesota. We'd purchased a cabin that would be our roots. A place where family would always be welcome." - Barbara Zahn

Aaron first attended preschool and elementary school in Orange, Ohio. From an early age, Aaron exhibited a propensity to challenge himself. His parents recognized his boundless energy and at age 5 enrolled Aaron in competitive swimming and soccer, to channel his energy positively and to instill discipline and teamwork. Aaron would pursue his interest in these sports for the next 15 years.

> *"That is Aaron's true character – generous, kind, and making everyone around him feel 'worth it.'" - Cuyler Beall*

> *"Aaron has consistently demonstrated qualities of honesty, integrity, and compassion in his interactions with me and others. His genuine concern for the well-being of those around him and his willingness to extend a helping hand to those in need are qualities that I deeply admire and respect." - Zackery Jackson*

Aaron's childhood years were marked by a series of challenges and achievements that shaped his character and ethical framework. The family moved to Chatham, New Jersey, when Aaron was in the fifth grade. Fifth grade was challenging for Aaron as he struggled to integrate with a new set of children. Many of the children had grown up together. Aaron found himself the target of relentless teasing because as a child his head always appeared a bit too large in contrast to his body. Aaron's mom used this jarring opportunity to remind Aaron to always "treat others how you want to be treated." The years 1985-1986 became foundational in how Aaron would grow to be kind and generous to people despite physical differences or social status.

> *"Aaron has turned a simple act of kindness into a teaching moment for our children. At first, he would ask Ethan to give the bag of essentials to the person. Then, he would ask Ethan if he knew their name. Of course, our 10-year-old didn't ask the name of a homeless person. But now he does. Then Aaron would ask if the person knew Ethan's name and whether the person was having a good day. Aaron took an act of generosity and taught my son and daughters about the importance of being an equal human despite circumstances." - Mary Branan Zahn*

## B.     Adolescence and Formative Years

It was during his middle and high school years in Chatham, that Aaron excelled in academics and athletics.  Aaron was a talented swimmer, capable of competing at the highest levels.  Aaron worked hard for himself and his team under the mentorship of his coach, Jim Wood, who later coached the United States Olympic swim team.

> *"Aaron was a swimmer from the beginning. As the story goes, my sister threw him in the lake at 9 months of age and he took off. By the time he was in high school, he was training two hours a day in the morning before school every day, with meets on the weekends. His goal was to swim for the US team at the Olympics."* – Patricia Skold

> *"We continued to watch Aaron grow and attended some of his swim meets, as he was an excellent competitive swimmer. For many teenage years, he was up at the crack of dawn, swimming for a couple of hours, and then headed for school. He was on track to represent the US at the Olympics"* – Brian Johnston

A significant personal challenge occurred in 1996, the summer before Aaron's senior year. During a camping trip, Aaron was severely injured when a gasoline can exploded, burning much of this upper body and resulting in a grueling recovery. His injuries ended Aaron's dream of becoming an Olympic swimmer and became a pivotal moment in Aaron's life. Despite the disappointment, Aaron used this setback to focus more intently on his studies, leading to his eventual admission to Yale University.

> *"He would never swim for Yale. He would never make the Olympic team. He is young the doctors told my sister. He will grow new skin. Disappointed but determined, Aaron eventually made it to Yale. He worked and studied with unhuman discipline to make the most of this second chance."* - Patricia Skold

## C.     Higher Education at Yale University

After graduating from the Hawken School at the top of his class, Aaron pursued a pre-med course load at Yale before switching to a degree in psychology and

philosophy, a decision driven by his desire to understand human behavior and ethics. Aaron attended Yale because of its superior academics and its commitment to producing leaders who contribute to their communities. Marked by academic rigor and an expanding worldview, Aaron's time at Yale was transformative.

> "Aaron has always been an overachiever. He did this through hard work. Getting college students to volunteer for anything is always a struggle but not Aaron. Whenever work needed to be done, he would volunteer." - Theodore Englar Woodward

Aaron's academic excellence and community service was recognized through multiple awards and honors. Despite his philosophy and psychology major, Aaron maintained rigorous courseloads in mathematics and sciences to bridge the theoretical with the practical. Those studies provided fundamentals for later work in finance, environmental services, and utilities. He was lauded for his insightful analysis and his ability to integrate theoretical knowledge with real-world applications.

> "Aaron is regarded as a visionary, often assisting others in conceptualizing, and refining their business strategies. His contributions are marked by a keen understanding of business dynamics and an altruistic desire to see others succeed." - Edwin Perkins

> "Aaron possesses a rare combination of intelligence, ethical integrity, creativity, and diligence. His approach to work is not just about achieving personal success but also about uplifting those around him." - Thayer Smith

## D.    Professional Development and Career Path

Following his graduation in 2001, Aaron embarked on a professional career in finance in New York City, where he excelled in various roles at IDM/Babson Capital (2001–2003), General Growth Properties (2003-2005), and as an investment

professional for two hedge funds in New York City (2005-2008). He quickly distinguished himself professionally through his analytical skills and ethical approach.

Unfortunately, the financial success came at a high cost. The demands of a New York finance career are great. In the spring of 2008, Aaron witnessed a colleague crying after receiving a bonus. The story around his colleague's emotions was unsettling. Here was a man that had received a bonus greater than some people's lifetime earnings. Yet, his colleague was in his third marriage and had children he rarely saw. His life was work, and he was trapped in work.

It was time for a life reset. Aaron quit his job with no prospects in mind. He packed his truck and drove back to Minnesota where he lived with his Godmother, Jean Schlemmer. He spent almost a year determining how to calibrate his life to be meaningful. In the meantime, Aaron became a yoga instructor and took pilot lessons. Aaron spent a significant amount of time at the lake in northern Minnesota and dove into his books on theology, philosophy, and life.

Aaron resolved his future would need three elements. First, the ability to spend time with and create a family. Second, a career that had purpose beyond money creation. Third, a role in society that allowed him to improve the world for others.

Leaving finance behind, Aaron transitioned into the environmental sector, applying his financial acumen to promote sustainable practices in water management and energy. His passion became "Infrastructure Innovation." He advised federal, state, local, and private sector leaders on the potential economic, social, and environmental effects of infrastructure innovation. As the CEO of an environmental

technology company, BCR Environmental Corporation, Aaron led innovative projects that significantly reduced waste and improved recycling processes. Under his leadership, the company developed innovative technologies that transformed waste into renewable products, significantly changing the industry and contributing to environmental conservation. The company's reduced the cost of biosolids management for Florida cities by an average of 40%, eliminated over 15,000 MW/year of energy consumption, and addressed critical environmental health and safety issues. Aaron transformed the company from a single-site pilot into a major player in the environmental technology and public-private partnership (PPP) sectors.

> *"I can honestly testify that without Aaron's expertise, determination, honesty, and integrity in executing all the provisions of our agreement with Biochem we would have failed in launching this new sludge treatment process. I have retired from CCUA, but CCUA now has this sludge treatment process operating at all their wastewater treatment plants. During my experience with Aaron, I only saw honesty, integrity, and determination to succeed in the execution of his duties."* - Ray O. Avery

### E.    Impact and Recognition

Aaron's commitment to environmental sustainability resulted in his recognition as a thought leader in that area. He has been a featured speaker at national and international conferences, where he has advocated for innovative approaches to environmental management and sustainability. Aaron advised the United States Environmental Protection Agency, the Florida Department of Environmental Protection, the Committee for Economic Development, Leadership Florida and various state and local leaders on the economic, social, and environmental impacts of infrastructure innovation. His efforts helped shape policies and initiatives that balance

development with environmental stewardship and his contributions have been recognized with numerous awards, including "Environmental Excellence Award" and "Florida Governor's Business Ambassador Award."

> *"One of Aaron's dreams was to improve the environment and community of northeast Florida for the benefit of future generations. Jacksonville had become our home. It was where we wanted to raise our family." - Mary Branan Zahn*

## F.   Extensive Community Engagement

Aaron's commitment to community involvement is deeply rooted in his upbringing and was significantly shaped during his college years. His transition from college to the professional world provided him with new platforms to make a positive impact. Aaron has consistently leveraged his professional success to contribute to community development and environmental stewardship.

> *"Aaron has always offered his time & resources without hesitation. Whether it was a home improvement project, challenge with our business, or just needing a pep-talk, we could always count on Aaron to be there. He continually offered this support without ever asking for anything in return. He brought us and our neighbors together for wholesome family events and he even stepped up to improve our community as HOA Vice President. In his HOA position he was known to be a good listener, who was fair, considerate, and able to solve difficult problems. Under his leadership, relationships within our neighborhood were strengthened and friendships developed." - Paul and Amber Napier*

> *"Aaron is a person of exceptional character, deeply committed to his family, friends, and community. His actions, I believe, have always been guided by a strong moral compass and an unwavering dedication to the well-being of those around him. I have had the privilege of serving on the YPO FL board alongside Aaron for several years. In this capacity, I witnessed his spirit of excellence, adherence to high moral standards, and genuine leadership qualities. These attributes have made substantial positive impacts on our board's initiatives and our community at large" - Juan Segarra*

### 1.   Leadership in Environmental Initiatives

Recognizing the critical importance of preserving natural resources and promoting sustainable practices, Aaron has been at the forefront of several high-impact environmental initiatives. His efforts include leading campaigns for reducing water waste, promoting recycling, and encouraging the adoption of renewable energy sources within local communities.  Aaron has coordinated roundtables, chamber events and conferences with thought leaders from around the globe to bring leading ideas to Florida and its communities.

### 2.   Educational Programs and Mentorship

Aaron's belief in the power of education as a transformative tool led him to establish various educational programs aimed at young people. He supports underprivileged students in pursuing environmental science degrees. This has enabled numerous students to attend college who might otherwise not have had the opportunity, thus fostering a new generation of environmental stewards.

Moreover, Aaron has been actively involved in mentorship programs where he guides education, strategy, and policy development for entrepreneurs, executives, and boards. His mentorship extends beyond professional advice to include guidance on ethical leadership and community service, embodying the values he promotes.

> "Aaron also took me with him to an event at the FL Governors' mansion whose purpose was for recognizing and giving opportunity to young men and women who aspired to a higher position in the business world and showed promise to the same. I didn't qualify for this event, but Aaron invited me as a gesture of goodwill and to continue to invest in my development not for his sake, but for my own. He knew the importance of community engagement and service and wanted to

*introduce us to people he knew, to round us as good citizens and community stewards through active involvement in local politics." - Pennie Rosin-Borrousch*

Aaron's contributions to education and mentorship have been recognized through various awards. In 2012, he was selected by Leadership Florida to participate in the Connect Florida Statewide Leadership Institute Class IV, which focuses on developing and nurturing future leaders in Florida.  In 2015, Aaron received the University of Florida Bob Graham Center Young Floridian Award, which was presented to an individual that has used their professional expertise and leadership to help improve the quality of life in Florida.  Aaron furthered his role supporting young leaders though the Young Presidents Organization (YPO) of Florida.

### 3.    Community Organization and Volunteerism

Beyond environmental causes, Aaron has shown a deep commitment to community service. Growing up, Aaron observed his parents' hosting children in need and providing them with a stable home and education. This early exposure to helping others laid the foundation for his lifelong dedication to community service.

*"Aaron's support extends far beyond professional matters. He has been a consistent supporter of my volunteer work for Experience Camps, a non-profit that provides free summer camps for children who have lost a parent or sibling." - Ben Burgess*

*"Aaron has exhibited an extraordinary depth of empathy and dedication, particularly in regard to the unique challenges faced by my family. As the parents of an 11-year-old boy with autism, my wife and I often encounter difficulties that can be overwhelming. Aaron has taken it upon himself to not only understand our situation but also to actively contribute to our son's well-being. His initiative to connect us with specialists and support services has significantly eased our struggles, reflecting his genuine concern and commitment to helping us. Moreover, Aaron's support transcends practical help. He has been an indispensable source of emotional strength for me. Parenting a child with autism can sometimes feel like navigating a solitary path, but Aaron has consistently been there to listen.*

*Whether through conversations that offered new insights or simply by being present in times of need, his support has been a cornerstone in my life." - Edwin Perkins*

For many years, Aaron has engaged with the underprivileged (especially children) and provided his time and resources to improve their lives. Aaron contributed to bettering others by participating in activities ranging from hands-on service projects, like providing essentials to the homeless, to serving in leadership positions on the boards of charitable organizations where he helps shape strategic directions and fundraising. Aaron's disaster relief efforts further highlighting his ability to assist in urgent community needs. Following 9-11 in New York and after hurricanes here, Aaron helped organize volunteer groups for recovery and rebuilding efforts.

### G.   Family Life and Parental Responsibilities

Aaron's family life reflects his deep commitment to being a loving husband and an involved father. His familial relationships underscore his dedication to fostering a nurturing and supportive home environment.

#### 1.   Marriage and Commitment to Family

Aaron met his wife, Mary Branan Ennis, when she was a resident at UF Shands in Emergency Medicine, through mutual friends. Initially, Branan was resistant to getting involved with who she perceived as an Ivy League educated financial type, but Aaron's persistence and genuine nature eventually won her over. Their 13-year marriage is built on mutual respect, love, and a shared commitment to contributing positively to society. Their deep mutual support was especially important as they navigated the complexities of balancing demanding careers with family life. Their

- 11 -

wedding vows emphasized their shared values and future hopes, as well as a commitment to honor God and support each other's growth. Aaron's dedication to his marriage and family is evident in the way he prioritizes time with his wife and children.

### 2.    Fatherhood and Engagement

The birth of their three children marked a significant shift in Aaron's life, bringing new dimensions to his role as a provider and protector. As a hands-on father to Ethan (10), Scarlett (7) and Annabelle (5), Aaron is involved in all aspects of his children's lives—from education to extracurricular activities. Aaron believes strongly in the value of education and has been active in his children's learning processes, aiding with school projects, and encouraging their interests in science and the arts. His commitment to his wife and children is not only evident to family and close friends, but also to professional relationships, including members of the JEA Board.

> *"Aaron has shown tremendous humility taking on the primary caregiver role for his children and ensuring that each big milestone has been celebrated and each major holiday observed." - Henry K. Brown*

> *"Aaron's dedication to his role as a husband and father is evident in the love and care he showers on his family." - G. Alan Howard*

> *"Aaron is a very involved father whether he's taking his kids out on the water, helping them ride a bike, or playing tennis with them. I know it will be his children who will be impacted the most during Aaron's incarceration." - Taylor Bandzul*

> *"Aaron is a devoted father to three children. In a world where engaged fathers are a rarity, Aaron's dedication to his family is commendable." - Paul B. Blackstone*

> *"Aaron's dedication to his children is unparalleled. He makes them pancakes every morning, takes them to school and activities, and helps with homework ensuring they feel loved and supported every day." - Molly Zahn Harrison*

Aaron and Branan actively support their children's individual interests and hobbies. Whether it is Ethan's fascination with history and AI, Scarlett's emotional intelligence and artistic nature, or Annabelle's love of dance and climbing, they encourage their children to explore and develop their unique talents and passions.

### 3.   Community Involvement as a Family

Aaron is also a pillar of support for his extended family and community. He has provided care and support for elderly family members and has been involved in organizing community support for other families in times of need. His home is often a gathering place for family events and community meetings, reflecting his and Branan's open-door policy and their commitment to fostering a sense of community and support among their neighbors and friends.

> *"From multiple occasions of going out of his way to invite friends and even mere acquaintances to his family Thanksgiving and Christmas celebrations when they were not able to be with their own family or had no real family to visit, including myself multiple times, to offering his time and sympathy any time one of our friends was going through a rough stretch in life. Aaron always tries to be there for those close to him and any friend in need." - Christopher Bostain*

> *"Aaron's reliability is one of his most admirable traits. He has always been someone who shows up not only for his family but also for his friends and community." - Jennifer Schwegman*

> *"Aaron has been the glue that holds our family together, starting our largest extended family tradition and hosting Thanksgiving gatherings every year since 2015." - Lucas Johnston*

> *"Despite facing his own legal challenges, Aaron made a sizeable donation to help a stranger he barely knew get his life on track. His generosity and selflessness in the midst of his own troubles speak volumes about his character." - Maria Chihane Galic*

The Zahn family attends Hyde Park United Methodist Church, where they actively participate in church activities and support its mission. The church provides a platform to engage with the local community and contribute to charitable causes.

### H.     Toll of the Prosecution.

Over the past five years, Aaron and his family have endured profound trauma and suffering. Public scrutiny and humiliation have inflicted severe distress on Aaron, leading to a diagnosis of complex PTSD.  His wife and children are also being treated for trauma.  The media's relentless assaults on his character, branding him with terms like "evil" and "dishonest," persisted even after termination of the PUP and ITN.

From the beginning of his tenure as JEA's CEO more than 600 newspaper articles ran in the Jacksonville media area exacerbated with almost nightly television news coverage, the overwhelming majority portraying Aaron in a negative light. Such vilification has marred his reputation and rendered him unable to secure employment. The destruction of his character was so complete that more than three out of four Jacksonville residents surveyed who been exposed to the media coverage described him with words such as "immoral," "crooked," "thief," "greedy," "a carpetbagger," "a scammer," and "no good and very dirty." This relentless tide of negativity has exacted a significant toll on Aaron's wife, Branan, who has assumed the primary financial responsibility for their household. She has witnessed his spiral into depression and despair, compounded by the family's challenges managing relocation to ensure their children's safety and the well-being.

Aaron and his family faced repeated assaults and threats of physical violence from strangers enraged by the media and other local Jacksonville sources. Aaron and Branan had to endure watching their children being subjected to bullying prompted by the harsh glare of public scorn, absorbing the hostility directed at their father. Their new home address was publicized online, and online hackers targeted their home, which further eroded their sense of security and privacy. Aaron's parents have also been forced to suffer as Wells Fargo froze their assets due to their familial relationship with Aaron. This undue and unique level of extrajudicial punishment and suffering has been endured not only by Aaron but extends unjustly to Aaron's wife, children, and parents who will have all born the bane of a punishment they do not deserve.

## III.  CALCULATION OF THE SENTENCING GUIDELINES RANGE AND OBJECTIONS TO THE PRESENTENCE REPORT

### A.  Objections to the PSR's Loss Calculation

The PSR's Guidelines calculation is driven by an incorrect loss enhancement based on the Government's speculation about the amount of an "intended loss" that might have resulted had the charged offenses been completed. Aaron objects to the PSR's loss enhancement. Though recognizing "there is no loss" and the "victim has not requested restitution," the PSR recommends a 22-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(L) by finding, without foundation, that Aaron "would have been paid between $26 million and $40 million if JEA was sold." *See* PSR ¶ 46. [1]

---

[1] The PSR's finding that Aaron would have been paid at least a $26 million bonus had he been successful in selling the utility is based on a document provided to probation subject to

Section 2B1.1's use of the term "loss" is unambiguous—it means an actual, materialized loss, not an intended loss that never happened—and Aaron's advisory guidelines range should be based on the actual loss of zero. Even if intended loss could be considered, the alleged intended loss to JEA is too speculative to support a loss enhancement. Additionally, the PSR's offense level substantially overstates the seriousness of the offense, which warrants a downward departure.

The proper Guideline calculation results in an adjusted offense level of 9, with a 2 level reduction because Aaron meets the criteria in U.S.S.G. §§ 4C1.1(a)(1-10), for a total offense level of 7. *See* Objections to PSR, Dkt. 533, pp. 12-13.[2]

### 1. Loss under Guideline 2B1.1 is limited to actual, not intended, loss.

Guideline § 2B1.1 calls for incremental sentencing enhancements based on the "loss" caused by the defendant, with higher amounts of loss resulting in more severe enhancements. The meaning of "loss" under the Guideline is unambiguous—only *actual* harm that has *materialized* counts. It is undisputed here that there is no loss.

The PSR's recommendation of an enhancement based on intended loss is not supported by the Guidelines; it relies solely on the commentary. A court may only give commentary effect, however, when the Guideline text is "genuinely ambiguous" after exhausting the traditional tools of construction, and only if the commentary falls

---

attorney-client privilege. Aaron requested a copy, which was not provided. Aaron objects to any reliance on JEA's self-serving and unexplained loss calculation.

[2] Counsel submitted objections to the PSR and specifically incorporates those objections, and the addendum prepared by counsel in support, herein. *See* Dkt. 533, at pp. 301-329.

within the "zone of ambiguity" in the text. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-16 (2019). Applying *Kinsor*, the *en banc* Eleventh Circuit makes clear in *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) it is inappropriate to defer to the commentary unless the guideline is "genuinely ambiguous" and requires further clarification. *Id.* at 1274 (emphasis added). Here, it is not ambiguous.[3]

There is nothing ambiguous about the term "loss." "A statute is ambiguous 'if it is susceptible to more than one reasonable interpretation.'" *BBX Capital v. FDIC*, 956 F.3d 1304, 1315 (11th Cir. 2020) (citation omitted). The term "loss" is unambiguous and reasonably subject to only one interpretation—actual loss. In the absence of a statutory definition, courts "look to the common usage of words for their meaning." *United States v. Hall*, 64 F.4th 1200, 1205 (11th Cir. 2023) (citing *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1224 (11th Cir. 2001)). To aid in this effort, courts "may turn to dictionary definitions for guidance." *Id*. Dictionary definitions of "loss" uniformly contemplate actual loss, real harm, or concrete suffering.[4] Simply put, the ordinary meaning of the term "loss" is actual loss, not the Government's post hoc

---

[3] Although *Dupree* did not resolve what "loss" meant U.S.S.G. § 2B1.1, it imposed a new rule for interpreting the Guidelines. In *Dupree*, the Eleventh Circuit, sitting *en banc*, abrogated the prior approach, which allowed consideration of the Guideline commentary even when the text of the Guideline was unambiguous. This Court is bound to follow the Guidelines interpretation method set forth in *Dupree*. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (intervening precedent undermines prior precedent "to the point of abrogation" when it dictates a new standard that is applicable to analogous prior precedent).

[4]*See Loss*, Miriam-Webster's Dictionary,https://www.merriam-webster.com/dictionary/loss (last visited June 10, 2024); The Oxford American College Dictionary, at 795 (ed. 2002) (loss includes the "process of losing something", being "deprived of someone", suffering a "detriment or disadvantage from losing", a thing that is "badly missed when lost", and "reduction of power"); Random House Webster's Unabridged Dictionary, at 1137 (2d ed. 2001) (loss includes a detriment, disadvantage, deprivation, and destruction or ruin).

approximation of an intended loss. *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022) ("The ordinary meaning of 'loss' in the context of §2B1.1 is 'actual loss.'"); *see also United States v. Patel*, Case No. 19-CR-80181-RAR, 2023 WL 5453747, at *2 (S.D. Fla. Aug. 23, 2023) (same).

The context of Guideline 2B1.1 confirms that "loss" means what it says—actual loss, not intended. *See Dawson*, 64 F.4th at 1237 (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015)) ("Under the canon of *noscitur a sociis*, 'a word is known by the company it keeps.'").[5]  Section 2B1.1's reference to "loss" is accompanied by the word "exceeds" and a Loss Table listing 16 incrementally higher dollar amounts that each result in an increased offense level.  As the "loss" exceeds each threshold value, the Guidelines impose a corresponding, two-level increase in a defendant's offense level, thereby increasing a defendant's guideline sentencing range.  In the *context* of this Guideline—that is, a corresponding higher sentence as the "loss" exceeds each dollar threshold—the only reasonable interpretation of the word "loss" is actual loss of money, deprivation of funds, and real harm.[6]

---

[5] The Government claims some "context" supports it: it asserts that U.S.S.G. § 1B1.3(a)(3) demonstrates that the Guidelines (as a whole) consider harm resulting from an offense and also harm that was the "the object of" an offense.  But U.S.S.G. § 1B1.3(a) explicitly states that it is a background directive: "[u]nless otherwise specified," the directives of U.S.S.G. § 1B1.3 apply.  U.S.S.G. § 2B1.1 (the loss Guideline) "otherwise specifie[s]" that the court is to consider "loss" and the loss table's graduated amounts when applying the loss enhancement.
[6] When the text and context resolve an interpretation, the Court should not look further to the legislative history or purpose. *See Patel*, 2023 WL 5453747, at *8-9 ("[W]hile the traditional tools of construction can include the 'structure, history, and purpose' of a regulation, the Court finds no need to consider the 'context and purpose of' § 2B1.1. Generally, a court's inquiry must begin, and usually end, with the text. Where the text of a provision is plain and unambiguous, there is no need for further inquiry. Here, § 2B1.1 is unambiguous. So, the Court cannot consider the commentary and is bound by § 2B1.1's plain text.").

The government relies on Judge Grant's concurrence in *Dupree* to argue that *Dupree* did not presumptively overrule all past precedent interpreting the Guidelines. But no Eleventh Circuit case has engaged in an analysis of the affirmative meaning of the plain text of "loss" as applied in U.S.S.G. § 2B1.1 to determine if "loss" has an unambiguous meaning. *United States v. Joselin*, No. 22-13739, 2024 WL 113718, at *6 (11th Cir. Jan. 10, 2024).[7]  As the *Dupree* majority recognized, it is more important for the Court to correctly interpret the Guidelines than to worry about upsetting prior cases that have applied the commentary.  *Dupree,* 57 F.4th at 1279 n.9 (overruling "prior precedent" because they were "incongruous with *Kisor*" and holding that "regardless of whether [prior precedent] was wrong at the time, *it is now*" based on a fresh analysis under *Kisor*) (emphasis added).

Under *Dupree*, a court can reach the commentary only when a guideline is "genuinely ambiguous." *Dupree*, 57 F.4th at 1276–77.  Because "loss" unambiguously means to be deprived of something or suffering real harm, reliance on the commentary is inappropriate and the Court should use the actual loss of zero for its Guideline

---

[7] The probation officer's Addendum to Presentence Report cites to a post-*Dupree* Eleventh Circuit case that declined to reverse the district court's reliance on intended loss for Guidelines calculations, however, this case was decided on plain error review and is not controlling here. *See* Dkt. 533, p. 294.  "To be plain, *an error must have been specifically resolved* by controlling precedent or by the clear language of a statute or rule." *Joselin*, 2024 WL 113718, at *6 (emphasis added) (citing *United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019)).  The Eleventh Circuit has yet to specifically resolve whether the term "loss" is ambiguous under the Guidelines.  Therefore, on plain error review, the defendants in these cases were not entitled to relief.  The Eleventh Circuit's refusal to find plain error, however, should not be confused with the merits of the issue before this Court—whether the term "loss" is genuinely ambiguous under § 2B1.1. *Dupree* requires sentencing courts to make this determination if properly raised by the defense.

calculation. *See Banks*, 55 F.4th at 258 ("Because the commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,' we accord the commentary no weight.").[8]

### 2.   The Court may not speculate about intended loss.

Even if the court could consider intended loss, the loss here is too speculative to support an enhancement. Based on a multitude of intervening factors, the actual loss would have remained zero under all likely scenarios.  The PSR provides no basis that Aaron purposely sought to obtain the intended loss amount, and it relies on a calculation of someone at JEA for which there is no basis in the trial record. *See* Addendum, Dkt. 533, pp. 316-19 (discussing prohibition against speculative losses). At least sixteen intervening steps would have had to take place, including reviews by the Florida Attorney General, Florida Ethics Commission, and Jacksonville City Council, for there to have been a PUP payment in conjunction with a sale.  *Id.* at pp. 320-21.  Aaron did not have control over any of those intervening steps, and JEA can only speculate about its claim of how many PUP units would have been allocated to Aaron by JEA Board's Compensation Committee Chair, what the resulting payout would have been, and whether the Chair would have approved such a payout.

---

[8] The Court should be particularly reticent about deferring to the Guideline commentary without first exhausting all efforts to interpret the Guideline text considering the Supreme Court's recent decision in *Loper-Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2257 (2024), which abrogated *Chevron* deference to agency interpretations because "the final interpretation of the laws [is] the proper and peculiar province of the courts." (quotation omitted).

The Court cannot reasonably estimate an intended loss without impermissible speculation.  The PSR underestimates its burden by stating that there need only be a reasonable estimate of loss; any loss finding must be based on reliable and specific facts, of which there are none here.  *See United States v. Sepulveda*, 115 F.3d 882, 889-892 (11th Cir. 1997) (requiring the government to satisfy its burden with "reliable and specific evidence").  Determining an amount of loss from a never implemented PUP and a never sold JEA is too speculative.  Intended loss does not include speculative gains that a defendant may hope might come about from an offense.  *See* Dkt. 533, p. 18 (explaining why the defendants' *hope* to obtain a large sum of money in *United States v. Vasquez*, 791 F. Supp. 248, 353 (E.D. N.Y. 1992), did not warrant a sentencing enhancement without evidence of the amount of loss the defendants would have caused if the offense was successfully completed under the circumstances).

Throughout the Indictment and at trial the Government portrayed the PUP as costing "hundreds of millions" of dollars, but it put forth no evidence to support that figure without speculation.  It did not need to–because the amount of the loss was not at issue at the trial.  Compounding the problem, the PSR relies on JEA's unsupported speculation regarding what Aaron would have received and trial testimony by a lawyer from the Pillsbury law firm, Stephen Amdur, regarding the mayor's support of a sale transaction. Neither JEA's speculation nor Mr. Amdur's testimony support a finding that Aaron intended a $26 million or $40 million loss.

"[F]or Guidelines calculation purposes conspirators' 'specific intent' to steal a specific amount of money is not a free-flying and rudderless ballon. The amount must

be grounded in the realities to be deduced from the trial record, and it is the government's burden to prove those realities." *United States v. Capanelli*, 270 F. Supp. 2d 467, 474 (S.D.N.Y. 2003). While the Government does not have to show that "conspirators know exactly how much money they will acquire if the conspiracy succeeds," the "conspirators' hopes and uninformed beliefs [are] not sufficient to justify an increase in the offense level based upon a particular amount." *Id.* at 475.

Aaron's statement to Mr. Amdur that "he had the mayor's support to receive ***up to*** $40 million in connection with a successful transaction" at best expresses a "hope" to receive "up to" $40 million, not a specific intent to steal $40 million from JEA or the City of Jacksonville. Not only was the statement made before the PUP existed (and therefore entirely unconnected to it), but the statement does not express Aaron's intent of what he expected to unlawfully be paid from a PUP plan that had not been developed. Thus, as stated here and in Aaron's objections, the Court should disregard the PSR's loss enhancement. *See* Addendum, Dkt. 533, pp. 316-19.

### 3. The Guidelines calculation substantially overstates the seriousness of the offense.

Section § 5K2.0(a) provides for a departure from the Guidelines if the court finds there is a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission…that should result in a sentence different from that described." Moreover, application note 21(C) to § 2B1.1 recognizes that a downward departure may be warranted when the loss calculation overstates the seriousness of the offense. *See* U.S.S.G. § 2B1.1, app. note 21(C) ("There may be cases

in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."). The loss amount overstating the seriousness of the offense is an "encouraged basis for departure." *United States v. Roen*, 279 F. Supp. 2d 986, 990 (E.D. Wisc. 2003).

As detailed in Aaron's PSR objections, a downward departure is warranted because there is no chance JEA would have suffered a loss since the PUP was not implemented and JEA was not sold. There were at least 16 intervening legal and political checks and contingencies that needed to occur for the PUP to payout after a sale of JEA. Each of these steps was known by Aaron but outside of his control. Indeed, JEA's Chief Administrative Officer, Herschel Vinyard, Esq. testified that Aaron and the other senior leadership team members were supportive of the legal review "circuit breakers" he built into the process. Because there was not a meaningful likelihood that a loss of $40 million loss would have resulted and the disparity between the actual loss of zero and the high intended loss, a downward departure is warranted. *See United States v. Crawford*, 407 F. 3d 1174, 1182-83 (11th Cir. 2005).

## IV.   18 U.S.C. SECTION 3553(a) SUPPORTS SUBSTANTIAL LENIENCY

The Court shall impose a sentence "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). The Court must conduct an individualized assessment of the case-specific factors, set forth in § 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing. *Kimborough*, 552 U.S. at 91 (quoting 18 U.S.C. § 3553(a)). If the Guidelines calculation results in an "inordinate emphasis" on "putatively measurable

quantities," like financial loss, a court should focus more on the statutory factors set forth in section 3553(a) to determine an appropriate sentence. *United States v. Adelson*, 441 F. Supp. 2d 506, 509-512 (S.D.N.Y. 2006). After applying the factors, the only "necessary" sentence is below the PSR's Guideline range.

### A. Aaron's personal history and characteristics support leniency.

18 U.S.C. § 3553(a)(1) requires the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" A sentencing court must broadly consider the background, character and conduct of the defendant and make an individualized assessment that ensures the punishment suits the individual defendant. *Gall v United States*, 552 U.S. 38, 50 (2007). "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the contest of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513-14. As detailed above and in the letters submitted on his behalf, Aaron is a 44-year-old husband, father of three, and devoted son and friend who has contributed to the welfare of others in numerous ways. His personal characteristics strongly counsel against a lengthy incarceration.

### B. Imprisonment is not required.

18 U.S.C. § 3553(a)(2) engages the court to consider the collateral consequences of conviction in determining a just sentence. Aaron is a first-time, non-violent offender, and in the nearly five years since the offense, he has lived an exemplary life. A criminal conviction by itself imposes serious punishment. As a result of the

numerous investigations and highly publicized prosecution, he has undergone severe, public backlash that alone deters future criminal conduct.  Additionally, because of his conviction, Aaron's business career is in ruins.  The conviction has established him as a "Bad Actor" under numerous SEC and FINRA regulations, which permanently removes his ability obtain future employment as an investor, executive or fiduciary.

There is no reason to believe that a lengthy incarceration would better deter future criminal conduct or that Aaron poses an ongoing danger to society.  In white-collar cases, "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders.'" *Adelson*, 441 F. Supp. 2d at 514; *see* Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by . . . modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty").  Aaron should not be made a "martyr to public passion." *Gupta*, 904 F. Supp. 2d at 355.

### C.   The Guidelines disproportionately focus on loss.

If the Guideline sentence is calculated based on intended loss, Aaron is entitled to a *Booker* variance under 18 U.S.C. § 3553(a) because of the undue emphasis on loss. *See Kimborough*, 128 S. Ct. 558, 574-75 (2007) ("Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.").  As explained above and in Aaron's Objections, Guidelines often overstate the seriousness of high loss fraud offenses. *See* Dkt. 533, pp. 321-22.

Using intended loss, as calculated in the PSR, in sentencing a defendant like Aaron who inflicted no actual loss on any victim demonstrates the injustice. *Id.* Adding 22 levels to a Guideline calculation is nearly equivalent to sentencing Aaron to *two* separate charges of involuntary manslaughter and is larger than enhancements available for violent crimes involving public safety and terrorism. *Id.* (citing U.S.S.G. 2K2.1(b)(3)(A); 2K1.5(b)(1), 3A1.4(a), and 2J1.2(b)(1)(c)) (providing enhancements between 12 and 15 levels for trafficking portable rockets, boarding airplanes with bombs, committing a felony to promote terrorism, and obstruction of justice related to terrorism). In contrast, Aaron's role was more akin to a flawed business idea.

Other courts recognize that careful consideration of Section 3553(a) factors mandates downward variances in cases with high intended loss figures. *See id.* at pp. 10-11, n.6 (citing *Adelson*, 441 F. Supp. 2d at 515)). Courts recognize the Guidelines' shortcoming in justifying why such a huge weight should be afforded to a single factor of loss or why use of the loss table is just in situations involving high loss amounts. *Id.*

If the Court properly interprets Guideline 2B1.1 as applying only to actual loss, considering intended loss under 3553(a) would be a mistake. Considering the multiple, material contingencies upon which the PUP and a sale of JEA[9]—outside of Aaron's control—were dependent, an evaluation of intended loss in sentencing is destined to punish Aaron based on a hypothetical set of facts bearing no relationship to charged offenses and is unsupported by the trial evidence. The difference here is not solely that

_____

[9] A sale of JEA was so speculative that investment banker Jason Gredell described it in his trial testimony as akin to landing a 747 on an aircraft carrier in the middle of a hurricane.

the scheme was thwarted in time to prevent actual loss, as the Government portrays. The Government also seeks to lay on Aaron the cost of JEA's bond downgrades and other financial ramifications, citing to an alleged net increase of JEA's financing costs for its bonds. The Government's attribution of these losses to Aaron does not make financial sense and threatens to turn the sentencing into a dispute about JEA's accounting.  Without the promised "more detailed victim impact statement," Aaron is unable to further address these speculative allegations.

A 3553(a) variance is particularly appropriate because the thrust of the prosecution was a breach of the public trust, not loss.  *Id.* at p. 12.  The decision in *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) is instructive.  In *Gupta*, the defendant was charged with conspiracy and fraud.  *Id.*  The Guidelines recommended an 18-level loss enhancement even though the defendant did not receive any financial benefit.  *Id.* at 351. Just as here, the heart of the prosecution's theory was that the defendant abused his position of trust and for that he received 2 levels.  *Id.* at 350. Recognizing that the 18-level enhancement overstated a breach of trust offense, the court varied downward from a Guidelines range of 78 to 97 months and imposed a sentence of 24 months imprisonment.  *Id.*  Even when positions of power are abused and the conduct is more egregious than here, courts recognize that there are many instances where the Guideline range does not yield a reasonable sentence and sentence

defendants below the Guidelines based on 3553(a) factors.  *See United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006).[10]

### D. The Need to Avoid Unwarranted Sentence Disparities Mandates a Downard Variance from the Guidelines.

18 U.S.C. § 3553(a)(6) requires the Court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  While sentencing courts often safely assume that sentencing within the Guidelines range avoids unwarranted sentence disparities, that is not the case in high loss white-collar fraud cases.  In these cases, courts routinely sentence far below the Guidelines range, so much so, that a sentence within the Guidelines *creates* an unwarranted sentencing disparity.  In his PSR Objections, Aaron compiles cases recognizing that the loss Guidelines overstate the seriousness of fraud cases, which is why many sentences are *far* below the Guidelines range.  *See* Dkt. 533, p. 322.[11]

---

[10] *See also United States v. Block*, No. 16-cr-595 (S.D.N.Y.) (former CFO of publicly traded investment trust fraudulently inflated key metrics causing $300 million in shareholder loss sentenced to 18 months imprisonment); *United States v. Pierce*, No. 18-cr-388 (S.D.N.Y.) (former CEO of a telecom company sentenced to 36 months imprisonment for wire fraud based on loss amount of $270 million and Guidelines range of 210 to 262 months).

[11] *See also United States v. Johnson*, 2018 U.S. Dist. LEXIS 71257, *12-13 (E.D.N.Y. April 26, 2018) (significantly varying downward from a Guidelines range of 87-108 months, imposing a 24-month sentence, despite a loss of $3.1 million); *United States v. Musgrave*, 647 Fed. Appx. 529, 538-539 (6th Cir. 2016) (affirming downward variance from Guidelines range of 57 to 71 months for a sentence of 1 day despite $1.7 million actual loss); *United States v. Murray*, No. 1:16-cr-00176-RDM (D.D.C. Feb. 2017) (varying downward because loss overstated culpability and sentencing defendant with loss between $250,000 and $550,000 to 6 months imprisonment); *United States v. Farha*, No. 8:11-cr-00115 (M.D. Fla. 2014), ECF No. 882, 885, 888, 891, 903 at 91-2 (varying downward and issuing sentences between 12-36 months to defendants convicted at trial of an $11 million fraud); *United States v. Redemann*, 295 F. Supp. 2d 887, 898, 901 (E.D. Wis. 2003) (issuing sentence of 12 months to defendant in $2.5 million fraud, concluding that the amount of loss "under the guidelines substantially exceeded any fair measure of [defendant's] culpability").

In 2016, the Yale Law Journal published a landmark empirical study on white-collar sentences in the post-*Booker* era: *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases,* 125 Yale L. J. 1018 (2016).  The study had three key findings: (1) "the rate at which judges impose non-government-sponsored below-range sentences has increased dramatically.  As a result, a significant majority of defendants in major white-collar cases today receive sentences shorter than the Guidelines range," (2) when defendants "receive sentences below the Guidelines range, the sentences received are, for the most part, *significantly* shorter," and (3) the scholarly criticism that the loss table often vastly overstates the seriousness of an offense is a "critique neither unique to a small number of cases nor embraced by only a few judges."  125 Yale L.J. at 1024.[12] Because of the disparity between Guidelines and actual sentences in white collar fraud cases, it is particularly important not to let the Guidelines "anchor" the sentence.

Sentences imposed in individual cases reflect the widely held consensus that white-collar fraud sentences should be far below the Guidelines range.  One way courts

---

[12] Scholars studying white-collar sentences agree there is an "increasing divergence between the average Guidelines minimum and the average sentence actually imposed as loss amount grows."  Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 22 (2013) ("[T]he data suggest[s] that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases"); Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 FED. SENT'G REP. 167, 169 (2008) ("In sum, since *Booker*, virtually every judge faced with a top-level corporate defendants in a very large fraud has concluded that sentences called for by the Guidelines were too high."); Barry Boss & Kara Krapp, *How the Economic Loss Guidelines Lost Its Way, and How to Save It*, 18.2 OHIO ST. J. CRIM. L. 605 (2021) (explaining (1) there was a "broad judicial consensus" that Section 2B1.1's loss table "overstates culpability in a great many cases" and (2) "empirical data shows that Section 2B1.1 is not followed in the majority of cases.").

sentence below the Guidelines is to depart from the Guidelines.[13]  A common method of sentencing below the Guidelines in high loss white-collar fraud cases is to impose a substantial downward variance.  Recent sentences follow this trend.[14]  Even when there are real victims, courts sentence far below the Guidelines.[15]

## V.    CONCLUSION

Imposing a multi-year prison sentence on Aaron is not a just outcome of this matter. The jury essentially found that Aaron committed a breach of trust. For that, a promising young man has become a convicted felon, whose life has been ruined. He, along with his family, has been and continues to be punished.  The punishment for such a breach, however, does not and should not include speculative losses from the PUP.  There have been none, nor would there ever have been any, and it is unjust to claim otherwise.

---

[13] *See e.g. United States v. Roen*, 279 F. Supp. 2d 986 (E.D. Wisc. 2003) & *United States v. Roen*, 360 F. Supp. 2d 926, 929 (E.D. Wis. 2005) (departing downward 9 levels after PSR proposed a level 16-increase based on intended loss of $1.2 million and actual loss of $19,000 the court and imposing a low-end sentence of 24 months).

[14] *See e.g., United States v. Milton*, No. 21-cr-478 (S.D.N.Y. 2024) (48-month sentence for defendant with offense level of 41 and Guidelines range of 324 to 405 months); *United States v. Mullins*, 22-cr-120 (S.D.N.Y. 2022) (president of Sergeants Benevolent Association converted $600,000 from pockets of NYPD sergeants sentenced to 24 months imprisonment); *United States v. Shor,* No. 1:18-cr-00328 (S.D.N.Y. 2019) (hedge fund trader overinflated hedge fund assets by $100 million with PSR range of 168 to 210 months, sentenced to 40 months).

[15] *See e.g., United States v. Ferguson et al.,* No. 06-00137 (D. Conn. 2006) (court varied down from guideline of Life to sentences of 1-4 years for corporate executives who committed fraud which caused investors hundreds of millions of dollars in losses); *United States v. Kitterman*, 13-cr-60220 (S.D. Fla. 2014) (Defendant sentenced to 60 months for 3 counts of wire fraud relating to a Ponzi scheme in excess of $1 billion); *United States v. Butler*, 264 F.R.D. 37 (E.D.N.Y. 2010) (applying 27-to 48-month downward adjustment and sentencing defendant to 60 months for $1.1 billion fraud because, among other factors, defendant lost all his assets).

Respectfully submitted,

_/s/   A. Brian Albritton_

| | |
|---|---|
| A.  Brian Albritton | Eduardo A. Suarez |
|   Florida Bar No. 0777773 |   Florida Bar No. 752540 |
| Raquel R. Jefferson | Diego M. Pestana |
|   Florida Bar No. 103758 |   Florida Bar No. 1004436 |
| Mitchell L. McBride | **THE SUAREZ LAW FIRM** |
|   Florida Bar No. 1025234 | 1011 W Cleveland St. |
| **PHELPS DUNBAR LLP** | Tampa, Florida  33606-1913 |
| 100 South Ashley Drive, Suite 2000 | Phone:  (813) 229-0040 |
| Tampa, FL  33602-5311 | esuarez@suarezlawfirm.com |
| Phone:  813-472-7557; | |
| Fax:  813-472-7570 | **COUNSEL FOR DEFENDANT** |
| brian.albritton@phelps.com | **AARON ZAHN** |
| raquel.jefferson@phelps.com | |
| mitchell.mcbride@phelps.com | |

## CERTIFICATE OF SERVICE

We hereby certify that on July 23, 2024, we electronically filed the foregoing using the Court's CM/ECF system, thereby serving all registered users in this case.

_/s/   A. Brian Albritton_
A. Brian Albritton