UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 3:22-cr-23-BJD-MCR

AARON ZAHN

_____/

### UNITED STATES' MEMORANDUM OPPOSING DEFENDANT
### AARON ZAHN'S MOTION FOR RELEASE PENDING APPEAL

Defendant Aaron Zahn's Motion for Release Pending Appeal (Doc. 561) is without merit and should be denied. The motion rehashes the same legal theories that this Court denied at the motion to dismiss phase, and every phase thereafter. A close reading of the motion reveals nothing new. The motion centers around the defense theory (which the Court has rejected throughout) that somehow Aaron Zahn was not conspiring to steal money from the City of Jacksonville's (COJ) most valuable asset - JEA. Even Zahn's own argument begs the question: if Zahn was not conspiring to steal money from city property, then what was he conspiring to do? The Court, during the Rule 29 phase, described the defendant's argument as "curious" that the object of the conspiracy was not to steal money from COJ property. In addition, for purposes of the section 371 conspiracy charge, it does not matter that no money was actually stolen. The inquiry, which the defendant misstates, is whether Zahn participated in a shared and unlawful plan to do so. As

1

established conspiracy law and the Court's instructions make clear, "[t]he heart of the conspiracy is the making of the unlawful plan itself followed by the commission of *any* overt act. The Government does not have to prove that the conspirators succeeded in carrying out the plan." (Doc. 473, p. 12). Zahn's claim that the object of the conspiracy was neither money nor property does not present a "substantial question," warranting his release pending appeal. His argument just contorts existing law.

The Government addresses the defendant's additional arguments below aimed at the *Kastigar* hearing and jurisdictional elements of the offenses of conviction. None of this is new ground that the Court has not considered, and roundly rejected. These issues do not present the required close question.

## I.   The Bail Reform Act

The Bail Reform Act, 18 U.S.C. § 3143(b), presumes that a defendant (like Aaron Zahn), who has been convicted and sentenced to a term of imprisonment, should be detained without bond. *See United States v. Giancola*, 754 F.2d 898, 900 (11th Cir. 1985) ("Specifically, Congress intended to reverse the presumption in favor of bail that existed under the prior state, the Bail Reform Act of 1966."). It presumes that a defendant's conviction is valid and that he should be incarcerated. *Id.* at 900-01. The defendant bears the burden to overcome these presumptions. *Id.* ("The 1984 Act was intended to change the presumption so that the conviction is presumed

2

correct and the burden is on the convicted defendant to overcome that

presumption.").

A defendant may remain on bond pending appeal only if he can demonstrate

the following four elements:

> (1) that the defendant is not likely to flee or to pose a danger to the safety of
> any other person or to the community if released;
>
> (2) that the defendant's appeal is not for the purpose of delay;
>
> (3) that the appeal raises a substantial question of law or fact; and
>
> (4) that if the substantial question is determined favorably to the defendant on
> appeal, the decision is likely to result in reversal of conviction, an order for a
> new trial of all counts on which imprisonment has been imposed, a
> sentence that does not include a term of imprisonment, or a reduced
> sentence to a term of imprisonment less than the total of the time already
> served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1); *Giancola*, 754 F.2d at 901.

## II.   Zahn's Appeal Does Not Present A Close Question for the Eleventh Circuit

Although the United States does not dispute that the first, second, and fourth

requirements under 18 U.S.C. § 3143(b)(1) can be met in this case, the defendant is

still not entitled to relief. He has failed to meet his burden to satisfy the third

requirement (i.e., demonstrating the existence of a substantial question), rendering

him ineligible for release pending appeal.

The crux of the motion is that this Court fundamentally misunderstood what

3

this case was about the entire time. The offenses of conviction, conspiracy to commit theft and embezzlement of municipal funds and substantive wire fraud, center around Zahn's efforts to sell JEA (a COJ municipal utility and asset) and pocket cash based on the bonus plan (the PUP) that he sponsored. Again, if the object of the PUP was not to take money destined to the COJ from the sale of its own asset (JEA), what was the object?

A "'substantial question' is one of more substance than would be necessary to finding that it was not frivolous." *Giancola*, 754 F.2d at 901. It must be a "'close' question or one that very well could be decided the other way." *Id.* "[T]here are no blanket categories for what questions do or do not constitute 'substantial' ones." *Id.* Instead, that determination needs to be made "on a case-by-case basis." *Id.*

### 1. JEA is and was the property of the COJ, and Zahn conspired to steal money from the sale of it.

Zahn is asking this Court to decide that he conspired to steal or embezzle something other than money from a COJ asset, and that because the COJ did not have the money from the sale of its own asset in hand then there could not possibly be a cognizable conspiracy to steal money. JEA was (and is) the municipal utility of the COJ. While it is an independent agency, it is an asset owned by the COJ (not the CEO). If the COJ sold JEA (its own property), the COJ would get money.

This is straightforward, yet the defense contorts the issue and focuses solely on

4

that the COJ did not have the money in hand that Zahn conspired to steal. What the motion does is three things: (1) vastly expands the Supreme Court's holdings in *Kelly* and *Cleveland*; (2) attempts to convince the Court that there cannot be a conspiracy to steal money unless the COJ has the money in hand from the sale of its own property (JEA); and (3) misapplies the holding of the Supreme Court's decision in *Ciminelli* in an effort to apply it to this case.

The Zahn jury properly found that he participated in a conspiracy to steal money destined for the COJ. The real purpose of the PUP was for Zahn to cash in on the sale of JEA, a process he desperately tried to engineer via lies and omissions about JEA's dim (or doom and gloom) future. The criminal purpose of the PUP was for Zahn and others to gain substantial wealth from the sale of a COJ asset. As Jason Gredell (JP Morgan) testified, the PUP was a made-up stock tethered to a public entity (JEA) that had no concept of equity.

Like Zahn's motion to dismiss, *Kastigar* motions, and Rule 29 motions, the motion for release pending appeal regurgitates (for at least the fourth time in this case) that there is no cognizable charge in the indictment because of the Supreme Court's holding in *Kelly v. United States*, 140 S.Ct. 1565, 1574 (2020). Like before, the Court should reject this position. This is not a close question. There is no *Kelly* problem in this case.

As previously analyzed, in *Kelly*, the three defendants, all of whom worked for

the New Jersey Governor, closed traffic lanes for four days on the George
Washington Bridge toll plaza for Fort Lee, New Jersey commuters into Manhattan,
as political retribution against the Fort Lee Mayor for not supporting the Governor's
reelection. *Id.* at 1568. This caused major traffic issues, and led to criminal
convictions for wire fraud and fraud on a federally funded programs (18 U.S.C. §
666(a)(1)(A)). *Id.* The issue before the Supreme Court was whether the defendants
committed property fraud. *Id.* The Supreme Court held that to establish money-or-
property fraud under the wire fraud statute or the federal program fraud statute, the
government must prove that an *object* of the scheme was obtaining money or property
from the victim (the state or municipality). *Id.* at 1571-72. The Court further held that
a scheme to redirect or interfere with the government's exercise of regulatory
authority generally is not punishable under the fraud statutes. *Id.* at 1572-73. The
Court reasoned that the defendants did not "commandeer" or take the bridge access
lanes, or actually "walk away with the lanes," instead they regulated the use of those
lanes, as officials responsible for roadways often do - - allocate lanes among drivers.
*Id.* at 1573. The Court borrowed language from the predecessor case *Cleveland v.
United States*, 531 U.S. 12, 23 (2000)[1], stating that the defendants exercised the

---

[1] The Supreme Court's decision in *Cleveland* involved charges under the mail fraud statute for false
statements in applications to obtain video poker licenses from the Louisiana State Police. *Id.* at 15.
The court concluded that Louisiana's video poker licenses in particular "do not rank as 'property' for
purposes of § 1341, in the hands of the official licensor." *Id.* The Court noted that "whatever interest
Louisiana might be said to have in its video poker licenses, the State's core concern is regulatory."

regulatory rights of "allocation, exclusion, and control," deciding which drivers had access to lanes. *Id.*

As a result, an individual does not commit "money or property" fraud against the government when he targets the government's rights as a regulator; he only commits "money or property" fraud against the government when he targets the government's rights as a property owner. *Id.* The *Kelly* holding reiterated the holding in *Cleveland*, but with two important clarifications. First, a scheme does not target the government's rights as a property owner merely because the scheme targets the use of physical property controlled by the government. Unless the perpetrator schemes to "walk away" with the property or "convert [it]," then the scheme targets the government's power to regulate, rather than its ownership. *Kelly*, 140 S. Ct. at 1573. Second, the fact that a scheme to affect a regulatory decision necessarily requires the incidental use or expenditure of government resources does not convert the scheme into a "money or property" fraud. *Id.*[2]

---

*Id.* at 20. The Court warned of "a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress," and declined to equate the issuance of licenses and permits with a deprivation of property. *Id.* at 24.

[2] To provide clarity with regard to the scope of its holding, the Supreme stated, "[a] government's right to its employees' time and labor, by contrast, can undergird a property fraud prosecution." *Id.* The Supreme Court provided examples of cases where the object of the scheme was money or property, specifically a mayor using "on the clock city workers" to renovate his daughter's home, *United States v. Pabey*, 664 F.3d 1084, 1089 (7th Cir. 2011). Or a city parks commissioner inducing employees to perform gardening work for political contributors, *United States v. Delano*, 55 F.3d 720, 723 (2d Cir. 1995). The Supreme Court discussed that even the defendants in *Kelly* agreed that the cost of employee services would qualify as an economic loss, sufficient to meet the property

The facts of *Kelly* and *Cleveland* are far different from the facts underlying the criminal conspiracy that the Government proved in this case. Here, Zahn targeted the COJ's ownership of JEA, and tried to engineer a plan to sell it and pocket cash based on the fake stock plan. The essence of the conspiracy and fraud scheme was the COJ's ownership of JEA, and the money it would net in a sale of that asset. Despite Zahn's constant theme of the PUP being a "draft plan" or "preliminarily approved" on July 23, 2019, the jury saw otherwise. The crux of the crime occurred on July 23, 2019, during the livestreamed JEA Board Meeting. The JEA Board passed Resolution 2019-10 without a full understanding of what it meant if JEA was sold. Again, Zahn designed it this exact way, that is, to hide and conceal his plan to profit off the sale of a COJ asset based on the fake stock plan, which was designed to pay money (a significant amount) based on how the PUP formula worked.

The spreadsheet that Ryan Wannemacher prepared illustrated exactly how. *See* Govt. Ex. 20(l)(1). This spreadsheet (prepared in July before the critical Board Meeting) tracked the growth of a performance unit from $10 to $11,500 based on the formula, and showed the pool growing to approximately $345,000,000. There is no other label for this sum but "money." The Council Auditor employees' (namely Kim Taylor and Jeff Rodda) email exchanges with Wannemacher as to the methodology

---

requirement. 140 S.Ct. at 1573.

of the PUP calculation illustrated that the payout was about money. *See* Govt. Exs. 20(x), 20(y)(1) – 20(y)(3), 20(bb), 20(cc)(1) – (cc)(2), & 20(dd). While the Defendants are correct that multiple additional steps needed to occur for the plan to be successful, the gravamen of the crime is not success, it is the making of the unlawful plan and committing at least one overt act, as set forth in the Indictment, to steal money from the sale of existing COJ property (JEA).

The latest wrinkle in the defendant's argument is the citation to *Ciminelli v. United States*, 598 U.S. 306 (2023). In *Ciminelli*, the defendant was convicted of wire fraud for his involvement in a scheme to rig the bid process for obtaining state-funded development projects associated with a State of New York building initiative. *Id.* at 313. The issue was whether the Second Circuit's "right to control" theory was a valid basis for a wire fraud conviction. *Id.* Under the "right to control" theory, a defendant is guilty of wire fraud if he schemes to deprive the victim of "potentially valuable economic information" "necessary to make discretionary economic decisions." *Id.* at 314 (internal citation omitted). The court held that because "potentially valuable economic information" "necessary to make discretionary economic decisions" is not a traditional property interest, the right to control theory is not a valid basis for a wire fraud conviction. *Id.*

The Court noted that throughout the grand jury proceedings, litigation, and trial, the prosecution relied on the right to control theory, and stated that theory

9

cannot be squared with the federal fraud statutes, which are "limited in scope to the protection of property rights." *Id.* at 313 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)). The right to control theory treated "mere information as the protected interest," which the Court determined was improper based on its prior holdings regarding the federal fraud statutes. *Id.* at 315.[3]

But here, Zahn was not trying to steal information for financial gain, he was doing something much more basic aimed directly at depriving the COJ of its property interest in JEA. Zahn was conspiring to steal money from the sale of the COJ's most valuable asset via the PUP that was set to payout large sums contemporaneously with the sale of JEA. The object of the conspiracy was for Zahn to put COJ cash in his pocket. This is not a right of control case. It had nothing to do with Zahn leveraging valuable economic information. He simply conjured up a bonus plan via a fake stock to pay himself and others money when JEA was sold, and he lied and omitted material information along the way in perpetrating the scheme.

---

[3] The defendant attempts to support this argument with references to family law and wills and trusts law from the 1800s, including citations to Florida state courts involving dower, claims to an estate, and a beneficiary's claim to a revocable life insurance interest, while the parties are still living. The obvious problem with this argument, while creative, is that those expectations can change at any time. The revocable beneficiary receives nothing if the holder of the life insurance policy changes his or her beneficiary. The child of the deceased receives nothing from an estate if the deceased determines to bequeath the estate elsewhere. Here, JEA was and is the property of the COJ. A sale of a city asset nets profit to the city. Zahn conspired to steal that. This distinction is substantial, and thus does not render this a close question.

As this Court aptly noted in its order denying Zahn's Rule 29 motion, "Unlike *Kelly*, the evidence in this case is overwhelming that the focus of Zahn's scheme was to secure tens of millions of dollars in bonus payouts for himself and those that were complicit with his deception. That money would come at the expense of JEA, the City of Jacksonville, and the citizens of northeast Florida. The payout was not incidental to some other misguided but otherwise legal pursuit. The payout Zahn sought was not some abstract thing…. [T]he payout of money to Zahn at the expense of JEA and the City of Jacksonville was the object of his fraudulent scheme." (Doc. 540 at p. 9). No matter how creatively the defendant casts the issue, this is not a close question. The object of the scheme was money, not some intangible property right.

### 2.  This Court implemented a *Kastigar* process to vet every witness and item of evidence.

The defendant's motion also focuses on the *Kastigar* issues in this case, which were litigated over more than eleven days and continued throughout the trial, concerning exposure to and derivative use of evidence from the defendant's *Garrity* statement. The parties and the Court have extensively addressed the *Kastigar* law in briefing throughout the case, thus the Government does not reiterate that law here. The Court engaged in a process of vetting every single witness and item of evidence offered and made clear findings that the Government had an independent source for every piece of evidence (testimony, documents, videos, and summary charts) offered

11

during the trial. The Court even vetted witnesses during the trial (Jason Gredell, Eddie Manheimer, Mark Hickson, and Jeff Panger) as well as witnesses added to the Government's witness list (Herschel Vinyard and Camille Lee Johnson). Not a single witness took the stand without *Kastigar* vetting.

The court's decision that each witness had an independent source for his or her testimony was a credibility determination best left to the province of the trial court. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (internal citation omitted).

Further, while the burden to establish the independent source is on the government, the utter inability to make any headway on cross examination of the *Kastigar*-vetted witnesses became quickly apparent. It categorically devolved into whether witnesses watched the news or followed certain Florida Times Union columnists on Twitter (now X). The defendant offered nothing of substance, and sometimes even asked no or limited questions on cross, especially during the vetting of witnesses during the trial. This too does not present a close question on appeal, thus release pending appeal is not appropriate.

12

### 3. The evidence satisfied the jurisdictional elements of the section 666 conviction.

Like the Rule 29 motion, the motion for bond pending appeal misses the mark on the jurisdictional requirements of the section 666 conviction. Aaron Zahn was the CEO of JEA, and thus an employee of the COJ. The Government proved that he was an agent of both, as alleged in the Indictment.[4] While JEA was an independent agency, Zahn was nevertheless a COJ employee. If the COJ was not paying Zahn, what entity was? The answer to whether Zahn was an "agent" of JEA (and the COJ) lies in the expansive definition. The statute defines an "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, or representative." 18 U.S.C. § 666(d)(1).

In this motion, Zahn continues to attempt to cast his employment with JEA in isolation (that he was not an agent of the COJ). As the Government stated in its response to the Rule 29 motion (and as the Court decided), this would lead to an absurd consequence, which is precisely what the Eleventh Circuit warns against when interpreting the plain meaning of a statute and applying the facts. *See United*

---

[4] Paragraph 1 of the Indictment should be read as a whole. Zahn ignores the construction. The Indictment alleges that JEA is a public utility owned by the COJ, and was so during the critical time of the charged offenses and during Zahn's tenure as CEO. The Government proved this fact during trial. The Indictment also alleges that Zahn is the "agent" of JEA (an independent agency of the COJ). Common sense dictates then (as did the proof) that Zahn is thus an "agent" of the COJ.

13

*States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012).

Here, the testimony of Paul McElroy and Jay Stowe established that JEA is an independent agency within the COJ. JEA is a municipal utility. The COJ is the municipality that controls it. Zahn, as the CEO, had an employment agreement with the COJ that referenced JEA as "a body politic and corporate under the laws of the State of Florida and an independent agency of the Consolidated City of Jacksonville (hereinafter referred to as "JEA" or "Employer")…." Zahn's salary of $520,392.00 was paid out of a COJ budget allocated to JEA. The ratepayers were citizens of Jacksonville, whose payments funded this independent agency of the COJ.

The sale of JEA would have entailed selling a COJ asset. Other than Legacy JEA potentially remaining to handle costs associated with the purchase and sale of Plant Vogtle power, JEA would have dissolved in the due course of a sale. The net proceeds from a sale would have gone to the COJ. There would have been nowhere for the sale proceeds to go otherwise. The sale of the COJ asset (JEA) would have funded the PUP. The notion that Zahn was not an "agent" of the COJ defies common sense. This is not a close question. And the Court so found in its Order denying the defendant's Rule 29 motion. (Doc. 540 at p. 5).

The Government proved that JEA (an independent agency of the COJ) received funds for disaster relief under the Federal program of Federal Emergency Management Agency (FEMA). *See* Govt. Exs. 44A & 44B. In fact, JEA received

14

millions of dollars in FEMA disaster relief in fiscal years ending September 30, 2019, and September 30, 2020.

The federal funds provision of the statute provides, "The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). As the jury instruction provides, "It is not necessary to prove that Mr. Zahn's conduct directly affected the funds received by the government or agency under the Federal program." Doc. 473, p. 17. The Government did not have to prove that the conspiracy targeted or implicated (in any way) those FEMA funds provided to JEA. Zahn's position seeks to narrow the intended broad reading of Section 666(b), *see United States v. Chafin*, 808 F.3d 1263, 1272-73 (11th Cir. 2015). A straightforward reading of the statute "indicates that § 666(b) encompasses many situations in which the government receives consideration in return for federal assistance." *United States v. Copeland*, 143 F.3d 1439, 1441 (11th Cir. 1998).

As the Court cited in its Order denying the defendant's post-trial Rule 29 motion, the evidence in the present case is similar to that in *United States v. Fischer*, 168 F.3d 1273, 1277 (11th Cir. 1999). In *Fischer*, a fraud and bribery case under § 666, the issue was whether the county agency responsible for operating two county

15

hospitals received the requisite federal assistance under § 666(b). *Id.* at 1275-76. The Court determined that the receipt of the Medicare funds "contrast[ed] sharply" with that in the *Copeland* decision, which involved purely commercial transactions. *Id.* at 1277. The Court further noted that the legislative history of § 666(b) indicates that the statute is to "be construed broadly, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Id.*; *see also* Doc. 540 at p. 6.

Here, the evidence of the FEMA benefits set forth in Government Exhibits 44A and 44B, together with the testimony of JEA employee Joe Orfano that those benefits are not automatic, but dispensed through the FEMA program for specific natural disasters, is clearly sufficient to satisfy the definition in § 666(b). JEA and the COJ received these funds. This too is not a close question that would merit release pending appeal.

### 4. The defendant continues his failed effort to convince the Court that the IBM Ustream live broadcast was not an interstate wire.

It is undisputed that the July 23, 2019, Board Meeting was broadcast live on the internet via IBM Ustream via servers outside of Florida, and thus constituted a wire communication under the statute. *See* Govt. Ex. 51 (Stipulation of the Parties). Zahn continues to press the argument (which the Court has never accepted) that because all Board Meetings were livestreamed, this was not a "wire communication"

under the law. The Court has already rejected this claim. (Doc. 540 at p. 11). The jury instruction reads, "To 'use' interstate wire, radio, or television communications is to act so that something would normally be sent through wire, radio, or television communications in the normal course of business." Doc. 473, p. 20. To "cause" the interstate wires to be used, the use of the wires need not actually be intended; it need only be reasonably foreseeable. *United States v. Ross*, 131 F.3d 970, 985 (11th Cir. 1997).

The IBM Ustream wire communication was entirely foreseeable. Zahn was the CEO. Zahn knew that the July 23 Board Meeting would be broadcast and viewed with great interest. Various witnesses, including Council Auditor employee Jeff Rodda and IBEW Business Manager Valerie Gutierrez, watched the live stream (or recorded version) on the internet. Zahn himself perpetrated the lie that if Scenario Three was not pursued, JEA would lay off 29% of its workforce (574 employees) within one year. Zahn also chose this meeting to convince the Board (based on material omissions and half-truths) to pass Resolution 2019-10, which is the crux of the crime.

The charged wire communication in Count Two goes beyond the requirements of the law. Normally, it is not necessary for the transmitted information to include any misrepresentation or omission. *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (construing mail fraud statute). An interstate wire transmission is "for the

17

purpose of executing" the scheme to defraud if it is "incident to an essential part of the scheme" or "a step in the plot." *Id.* at 710-11. The July 23, 2019, Board Meeting involved lies, omissions, and half-truths that led to the passage of the PUP, which occurred during the live transmission. Zahn controlled the content of this Board Meeting, and the information transmitted via the interstate wire. This transmission was "incident to an essential part of the scheme" and "a step in the plot" and therefore sufficiently established the interstate wire element of Count Two. The defendant fails to acknowledge that the livestream without words and sounds is nothing. It is the words used, the lies told, and the hidden omissions that form the heart of the fraud that was perpetrated during this regularly planned livestreamed wire communication. That the Board Meeting was carried out in the ordinary course of business means nothing. This is likewise not a close call.

### III.   Conclusion

When reduced to its essence, the only thing defendant Zahn does in this pleading is regurgitate the same failed theories that the Court has rejected since the motion to dismiss phase of this case. They add creative spins to the *Kelly* and *Cleveland* money or property issue, and engage in creative (but baseless) writing on the evidence pertaining to the jurisdictional requirements of the section 666 conspiracy conviction, but the substance is the same. It is lacking. The arguments on appeal do not present a close call. As often happens when new law develops with

respect to federal offenses (the fraud statutes in this case), the tendency is to try to fit every case in those parameters. This is what Zahn's appellate counsel does here. Their argument is undone with this question: If Aaron Zahn was not conspiring to steal money from the sale of city property (JEA), what was he convicted of conspiring to do? The defendant cannot answer that in any way other than how the jury and the court have. Thus, there is no close call. Aaron Zahn should report to federal prison consistent with this Court's order and final judgment.

Respectfully submitted

ROGER B. HANDBERG
United States Attorney

_/s/ Tysen Duva_
A. Tysen Duva
Assistant United States Attorney
Florida Bar No. 0603511
Arnold B. Corsmeier
Assistant United States Attorney
Florida Bar No. 869139
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile:    (904) 301-6310
E-mail: Tysen.Duva@usdoj.gov
            Chip.Corsmeier@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2024, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will send

a notice of electronic filing to the following:

Counsel of Record for Aaron Zahn

<u>*s/ Tysen Duva*</u>
Tysen Duva
Assistant United States Attorney
